## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| Event Rentals, Inc., *et al.*,[1] | Case No. 14-10282 (     ) |
| Debtors. | Joint Administration Requested |

## DECLARATION OF JEFFREY M. BLACK IN SUPPORT OF FIRST DAY
## MOTIONS AND APPLICATIONS

I, Jeffrey M. Black, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true and correct to the best of my knowledge:

1.      On February 13, 2014 (the "Petition Date"), Event Rentals, Inc. ("Event Rentals") and its affiliated debtors and debtors in possession (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), thereby commencing the above-captioned chapter 11 cases (the "Chapter 11 Cases").

2.      The Debtors continue to operate their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No committee has been appointed by the Office of the United States Trustee in these Chapter 11 Cases.

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are: Classic Midwest, Inc. (9934); Classic Northeast, Inc. (9871); Classic Panache, Inc. (1237); Classic Party Rentals, Inc. (3911); Classic Party Rentals LP (0583); Classic/Prime, Inc. (7149); Classic Southeast, Inc. (0700); DBO Acquisition Corp. (1923); DUBO Acquisition Corp. (8795); Event Rentals, Inc. (9443); Grand Events & Party Rentals, Inc. (7940); Special Event Holding, Inc. (5659); and Unique Tabletop Rentals, Inc. (4327).  The list of the Debtors' alternate names is located on the docket for Case No. 14-10282 [D.I. 3] and is also available at http://kccllc.net/CPR.

3.      I submit this declaration (the "Declaration") to assist the Court and other parties in interest in understanding the circumstances that preceded the commencement of these Chapter 11 Cases and in support of the first day motions and applications (collectively, the "First Day Motions") filed by the Debtors.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, information provided to me by certain of the Debtors' employees and professionals, my review of relevant documents or my opinion based upon my experience, knowledge, and information concerning the operations and financial affairs of the Debtors.  If I were called upon to testify, I would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

4.      This Declaration is divided into two sections.  Section I provides a brief description of the Debtors' current organizational structure and operations, their current financial condition and the events giving rise to these Chapter 11 Cases.  Section II sets forth those facts which are most germane to this Court's consideration of the Debtors' First Day Motions and is intended to supplement any other declarations submitted in direct support of any given motion or application.

## I.      BACKGROUND AND EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES

### A.      Overview of the Debtors' Business Operations

5.      Together, the Debtors comprise the nation's largest provider of event rental products and related services.  From their headquarters in Inglewood, California, the Debtors operate thirty-nine showroom and warehouse locations across the country, enabling them to serve twenty-two markets, from San Francisco to Long Island to South Florida.  In order

LOSANGELES 1041035 (2K)

to provide consistent, high-quality service throughout this sizeable geographic footprint, the Debtors rely on a workforce of over 2,500 employees.

6.      The Debtors offer their clients a full complement of products and services to create special event environments in a broad range of sizes and types.  The Debtors' event rental products include an array of seating, tables, linens, and service items that allow the Debtors and their clients to transform an ordinary space into a sophisticated event environment. With their industry-leading inventory of temporary structure equipment, the Debtors can even create the space itself, offering tenting, ground cover, and climate control products for use in a variety of applications, such as golf tournaments, trade shows, corporate functions, military installations, and disaster relief efforts.  Beyond equipment and shelter, the Debtors provide their customers with value added services such as design, permitting, set-up, safety checks, and power management to facilitate event management from concept to clean up.

7.      The Debtors' exceptional size, vast experience, and unique capabilities make the Debtors the vendor of choice for important events around the country, ranging from intimate family gatherings to corporate events to some of the biggest events in American sports and entertainment.  For example, the Debtors have for years provided services at the Super Bowl, the U.S. Open, the Academy Awards, and the GRAMMY Awards, to name a few.  At the other end of the spectrum, the Debtors are called upon to supply equipment and services for thousands of weddings, back yard parties, and countless other special personal events each year.  In total, the Debtors put on over 145,000 events for approximately 55,000 customers annually.

8.      The Debtors' commitment and contributions to their clients' successful and memorable events have earned the Debtors customer loyalty and industry recognition alike.

3

The Debtors enjoy a high rate of repeat business, with relationships spanning decades in many cases.  The Debtors have been ranked number one by the Zagat Survey as the "highest rated of the major party rental sources" for best equipment and services and are multiple winners of the prestigious Special Events Gala Award—the industry's highest honor—and Event Solutions magazine's Rental Company of the Year award.

9.      Thanks to their sizable and loyal customer base, the Debtors generated $242.1 million of revenues and $23.0 million of adjusted-earnings before interest, taxes, depreciation, and amortization ("EBITDA") for the twelve months ended December 26, 2013.  As of December 26, 2013, the Debtors' books and records (on a consolidated basis) showed assets totaling approximately $148 million and liabilities totaling approximately $246 million.

**B.      Capital and Debt Structure**

10.     The Debtors have four general types of debt obligations: (1) an aggregate of approximately $175 million in outstanding principal under a senior secured credit agreement; (2) approximately $36 million in outstanding principal under certain unsecured and subordinated liquidity notes; (3) approximately $5.5 million in outstanding principal under certain unsecured and subordinated seller financing relating to business acquisitions; and (4) trade debt, as of December 26, 2013, totaling approximately $16.6 million.  These obligations are discussed in greater detail below.

11.     First, the Debtors are party to that certain Financing Agreement dated as of December 20, 2006 (as amended, the "Senior Credit Agreement"), by and among the entities and institutions from time to time party thereto (the "Credit Agreement Parties").  As of the Petition Date, the Credit Agreement Parties consist of Event Rentals, Inc. ("Event Rentals"), as

4

borrower, Event Rentals' affiliated debtors, as guarantors, Ableco Finance LLC, as

administrative agent (the "Administrative Agent"), and various financial institutions, as lenders

(the "Prepetition Secured Lenders").

        12.     As of the Petition Date, the outstanding principal under the Senior Credit

Agreement is comprised of: (i) an approximately $16 million revolver (the "Revolver") that is

fully drawn; (ii) approximately $123 million in term loans (the "Term Loans"); (iii)

approximately $29 million in loans that were used to fund certain acquisitions by Event Rentals

(the "Acquisition Loans"); and (iv) $6.5 million in administrative agent advances (the

"Advances" and, collectively with the Revolver, the Term Loans, and the Acquisition Loans, the

"Senior Secured Facility").  The Revolver matures on June 30, 2014 (the "Revolver Maturity

Date").  The Term Loans and Acquisition Loans mature on December 31, 2014 (the "Term and

Acquisition Maturity Date" and, together with the Revolver Maturity Date, the "Secured

Maturity Dates").  The Advances were made by the Administrative Agent at the Debtors'

requests to allow the Debtors to continue to operate and prepare for an orderly bankruptcy filing

based on the condition that such Advances would be repaid promptly following the bankruptcy

filing.  The obligations of the Debtors to the Administrative Agent and the Prepetition Secured

Lenders under the Senior Secured Facility are secured by substantially all of the Debtors' assets

pursuant to the terms of (i) a Security Agreement, dated as of December 20, 2006, by and among

the Administrative Agent and the Debtors; and (ii) a Pledge and Security Agreement of the same

date and by and among the same parties.

        13.     Second, the Debtors are party to that certain 2011 Liquidity Note Purchase

Agreement, dated as of November 9, 2011 (the "2011 NPA") by and among Event Rentals, as

issuer, Event Rentals' affiliated debtors, as guarantors, and Quad-C Principals LLC ("Quad-C Principals") and Quad-C Partners VII, L.P. ("Quad-C Partners" and, together with Quad-C Principals and their affiliates, "Quad-C"), as purchasers.  Pursuant to the 2011 NPA, Event Rentals issued $12.5 million in aggregate principal of certain senior subordinated unsecured notes (the "2011 Liquidity Notes"), which accrue interest at a rate of 20% per annum, payable in kind quarterly in arrears.  The 2011 Liquidity Notes are subordinated in right of payment to the Senior Secured Facility pursuant to the terms of that certain 2011 Liquidity Note Subordination Agreement, dated November 9, 2011, by and among Quad-C and the Administrative Agent, and acknowledged by the Debtors.  As of the Petition Date, the aggregate outstanding principal amount of the 2011 Liquidity Notes was approximately $19.1 million.

14.    Further, pursuant to that certain First Amendment to Amended and Restated Liquidity Note Purchase Agreement, dated as of November 9, 2011 (the "First Amendment") by and among Event Rentals, as issuer, Event Rentals' affiliated debtors, as guarantors, and Quad-C, S.A.C. Domestic Capital Funding, Ltd. ("SAC Domestic"), S.A.C. Offshore Capital Funding Ltd. ("SAC Offshore" and, together with SAC Domestic, "SAC") and JPM Mezzanine Capital, LLC ("JPM" and, collectively with Quad-C and SAC, the "Sponsors"), as purchasers, Event Rentals issued, in exchange for the cancellation of the Cancelled Liquidity Notes (as defined below), approximately $13.5 million in aggregate principal of certain senior subordinated unsecured notes (the "Amended Liquidity Notes" and, together with the 2011 Liquidity Notes, the "Liquidity Notes"), which accrue interest at a rate of 10% per annum,

payable in kind quarterly in arrears.[2]   The Amended Liquidity Notes are subordinated in right of payment to (i) the Senior Secured Facility, pursuant to the terms of that certain Liquidity Note Subordination Agreement, dated as of March 17, 2010 (as from time to time amended); and (ii) the 2011 Liquidity Notes, pursuant to the terms of that certain Existing Liquidity Note Subordination Agreement, dated November 9, 2011.  As of the Petition Date, the aggregate outstanding principal amount of the Amended Liquidity Notes was approximately $16.9 million.

15.     Third, as further discussed herein, a key tenet of the Debtors' business strategy was to consolidate a fragmented industry and numerous acquisitions took place between 2004 and 2008.  Fourteen of the locations acquired by the Debtors were financed with the Acquisition Loans, $21.7 million of additional equity financing from the Sponsors and seller financing.  In total, the Debtors owe approximately $5.5 million in outstanding principal, as well as accrued but unpaid interest, to such sellers under seven separate notes issued in connection with the seller financing (collectively, the "Seller Notes").  Event Rentals is the obligor on each of the Seller Notes and the Seller Notes are unsecured and subordinated to the Debtors' obligations under the Senior Secured Facility.

16.     Finally, as of December 26, 2013, the Debtors owed approximately $16.6 million to trade creditors on account of the various goods and services used by the Debtors in operating their respective businesses.  Such trade creditors include, without limitation, tent

---

[2] Pursuant to that certain Liquidity Note Purchase Agreement, dated as of March 17, 2010 (the "2010 NPA"), by and among Event Rentals, as issuer, Event Rentals affiliated debtors, as guarantors, and the Sponsors, as purchasers, Event Rentals issued $9 million in aggregate principal of certain senior subordinated unsecured notes (the "2010 Liquidity Notes").  The 2010 NPA was amended and restated in its entirety pursuant to that certain Amended and Restated Liquidity Note Purchase Agreement, dated as of March 31, 2011 (the "Restated 2010 NPA"), by and among Event Rentals, as issuer, Event Rentals' affiliated debtors, as guarantors, and the Sponsors, as purchasers. Pursuant to the Restated 2010 NPA, Event Rentals issued an additional amount of approximately $1.4 million in aggregate principal of certain senior subordinated unsecured notes (the "Additional Liquidity Notes" and, together with the 2010 Liquidity Notes, the "Cancelled Liquidity Notes").

LOSANGELES 1041035 (2K)

manufacturers, furniture rental stores, insurance companies, and temporary employment agencies.  The Debtors are in significant arrears to certain of their trade creditors.

17.     Special Event Holding, Inc. ("Special Event"), directly or indirectly, owns 100% of the equity in Event Rentals and each of the other Debtors.  The equity interests in Special Event are held either as common shares or options to purchase common shares.  Without giving effect to certain outstanding options, Quad-C holds approximately 71% of the outstanding common shares in Special Event, SAC holds approximately 16%, and JPM holds approximately 10%.  The remaining 3% of the outstanding common shares in Special Event is held among approximately 80 entities or individuals.

**C.     Events Precipitating the Commencement of these Chapter 11 Cases**

18.     Beginning in 2004 and continuing after the Sponsors' acquisition of the Debtors in 2006 through 2008, the Debtors experienced a period of robust growth, which was driven by both increased consumer demand and strategic acquisitions of thirty locations.  During this period, the Debtors saw their revenues grow nearly sevenfold, from $44.3 million to pro forma revenues of $283.7 million.  However, the Debtors' acquisitions during this period were priced and financed based on projections that proved unattainable with the onset of the global financial crisis in fiscal year 2009 and the resultant significant and prolonged decline in customer demand for event rentals.  To illustrate the effect of this crisis, the Debtors' revenue and pro forma adjusted EBITDA declined from $278.5 million and $53.2 million, respectively, for the fiscal year ended June 30, 2008, to $208.8 million and $23.0 million, respectively, for the fiscal year ended June 30, 2010—representing a 25% drop in revenue and 57% drop in pro forma adjusted EBITDA during such time period.  The Debtors' businesses are very capital intensive

8

and the decline in revenues and EBITDA had a very significant and negative impact on free cash flow given the capital requirements of such businesses.

19.     The Debtors' financial performance was particularly vulnerable in the face of the global economic downturn for three main reasons.  First, individual and corporate clients alike scaled back on discretionary spending, which, for many, included spending on the Debtors' event rental and tenting services.  Second, given the government bailouts of banks, automotive companies, and insurance companies that occurred during the downturn and the resultant "AIG Effect," as well as the high unemployment rate, even those clients successfully weathering the economic storm were cautious about flaunting their good fortunes, resulting in further reduction in demand for the Debtors' services.  Third, the diminished demand resulting from clients' lack of resources or desire to hold events led to overcapacity in the rental market and, consequently, lower pricing, both directly and indirectly through increased discounting, and reduced profitability for the Debtors.

20.     Reduced sales and earnings forced the Debtors to take a variety of measures to maintain short-term financial stability.  Between May 2009 and November 2011, the Debtors engaged in repeated and intensive negotiations with the Prepetition Secured Lenders, leading to the execution of four amendments to the Senior Credit Agreement during that time period.  These negotiations resulted in a significant reduction in the Debtors' then outstanding debt and preferred equity interests, including approximately $143 million in November 2011 alone, and provided the Debtors with much needed liquidity during this time period.

21.     First, in May 2009, Quad-C infused $30 million of additional equity into the Debtors in order to reduce debt and provide liquidity. The Debtors used $20 million of such

9

proceeds to repay approximately $25 million of the Term Loans pursuant to a modified Dutch auction process and used $10 million to repay the amounts then outstanding under the Revolver. In addition, holders, which holders included each of the Sponsors, of certain then outstanding subordinated mezzanine debt (the "Mezzanine Debt") agreed to convert $37.1 million in principal of such Mezzanine Debt, approximately half of the then outstanding principal, into preferred equity and warrants.

22.     Then, in March 2010, the Sponsors agreed to purchase the 2010 Liquidity Notes, providing the Debtors with an additional $9 million in cash in order to pay down the Revolver and providing much needed liquidity necessitated by the prolonged impact of the recession.  In March 2011, because the Debtors' cash flow was still substantially below pre-recession levels, the Sponsors agreed to purchase the Additional Liquidity Notes, injecting an additional $1.4 million of cash into the Debtors to provide further liquidity.

23.     Despite the substantial amount of cash infused in the Debtors by their Sponsors in 2009, 2010, and early 2011, the Debtors' businesses continued to struggle.  To address these struggles, a comprehensive restructuring was completed in November 2011 (the "2011 Restructuring").  Among other things, the 2011 Restructuring (i) included important modifications to the Senior Credit Agreement, including the modification of certain covenants, the lowering of cash interest requirements, the deferment of principal amortization, and the extension of the maturity dates with respect to the Senior Secured Facility; (ii) included Quad-C's agreement to purchase the 2011 Liquidity Notes, which purchase injected $12.5 million of cash to provide the Debtors' essential liquidity; and (iii) included the agreement of the holders of the Mezzanine Debt, including each of the Sponsors, to (a) convert the remaining

$51.5 million due under the Mezzanine Debt into common equity, and (b) eliminate approximately $91.1 million of preferred equity.

24.      Though sufficient to sustain the Debtors through an extended period of depressed earnings from 2009 through 2013, these measures were unable to sufficiently deleverage the Debtors' capital structure and did not provide the Debtors' with sufficient access to capital to make needed investments and optimally manage their businesses.  In particular, the Debtors' significant debt and lack of liquidity impaired their ability to respond to certain competitive challenges from competitors.

25.      In short, hamstrung by depressed earnings and their significant debt obligations, the Debtors were unable to make the necessary investments in their capital intensive businesses.  These factors, when combined with demand and pricing that were and continue to be below pre-recession levels in certain markets, resulted in profitability levels well below the projections that supported pre-recession-era acquisitions and financing activities.  As a result, in 2013 the Debtors again lacked the liquidity to meet their obligations to their trade creditors and financial creditors alike.

26.      Compounding the Debtors' problems were the impending Secured Maturity Dates in 2014.  Recognizing that addressing the Secured Maturity Dates would be especially difficult given the Debtors' financial condition, in August 2013 the Debtors proactively engaged Jefferies LLC ("Jefferies") to explore financing solutions.  Thereafter, Jefferies prepared confidential information memoranda related to a potential refinancing of the Debtors (each, a "Refinancing CIM") and conducted two parallel marketing processes, beginning with a process to locate lenders for a new mezzanine facility, and later including a process to

11

locate lenders for a new senior secured facility.  Jefferies contacted 94 potential lenders for the new mezzanine facility, 29 of which executed confidentiality agreements and received a Refinancing CIM, and 38 potential lenders for the new senior facility, 11 of which executed confidentiality agreements and received a Refinancing CIM.  In addition to a Refinancing CIM, each of the parties that executed a confidentiality agreement was also provided other confidential materials via an online data room maintained by Jefferies.  Unfortunately, neither of such processes resulted in a refinancing transaction adequately addressing the Secured Maturity Dates and the rapidly deteriorating liquidity situation that was affecting the Debtors' businesses.

> **D.    Objectives in these Chapter 11 Cases**

27.    In November 2013, the Debtors, together with their advisors, and after consultation with the Administrative Agent and the Prepetition Secured Lenders and their respective advisors, determined that in order to preserve the Debtors as a going concern and maximize the value of the Debtors' businesses for all parties in interest it was necessary to explore alternative transactions.  Thus, the Debtors authorized Jefferies to explore such a transaction, following which Jefferies immediately expanded the scope of its extensive marketing process and identified numerous potential financial and strategic acquirers of the Debtors' assets.

28.    Specifically, Jefferies prepared a revised confidential information memorandum related to the potential sale (the "Sale CIM") and compiled a list of potential acquirers specially tailored to the Debtors' businesses and assets.  Jefferies then contacted 73 parties, including 26 strategic investors and 47 financial investors, and only 15 of which had been previously contacted with respect to the Refinancing CIM.  Of these 73 parties, a total of 36

12

agreed to execute a confidentially agreement, each of which received the Sale CIM and access to the data room.  During this same time period, Jefferies responded to numerous inquiries and provided information to several additional parties.  As a result of Jefferies's marketing process, over 35 potential acquirers received the Sale CIM and other confidential information related to a purchase of the Debtors' assets, five submitted a written letter of interest (an "LOI"), and five engaged in on-site diligence and conducted meetings with the Debtors' management.

29.    For several weeks and as Jefferies's marketing process continued, the Debtors management, together with Jefferies and the Debtors' other advisors, facilitated due diligence with potential buyers and engaged in negotiations with those parties that had submitted an LOI.  Although the Debtors made substantial progress with certain parties that submitted an LOI, including further negotiating and executing an LOI with one of the parties and conducting negotiations over an asset purchase agreement with such party, the Debtors were unable to reach a deal with any of these potential buyers prior to the Petition Date.

30.    However, the Debtors are currently in advanced discussions with their lenders for the sale of substantially all of the Debtors' assets (the "Sale") as a going concern pursuant to a transaction under section 363 of the Bankruptcy Code, subject to an overbid process.  Assuming the Court approves such Sale on the schedule to be proposed by the Debtors, the Debtors expect to consummate the Sale within no more than 105 days after the Petition Date. The Debtors believe that a meaningful continuation of their prepetition marketing efforts during these Chapter 11 Cases, followed by a public auction (if necessary), will ensure that the value paid to the Debtors' estates for the Debtors' assets will be maximized.  In addition to maximizing the value of the Debtors' assets, and equally important, the Debtors believe that pursuing the

Sale will likely result in the preservation—if not the creation—of jobs, the continued provision of services to the Debtors' customers, and the assumption of many of the Debtors' trade liabilities.

31.     The Sale offers interested parties a compelling investment opportunity to capitalize on a refreshed capital structure and leverage the Debtors' exceptional market reach, reputation, and proven model for generating attractive returns on rental equipment capital expenditures.  The Debtors believe that a robust marketing and auction process of these desirable businesses, conducted under the supervision of this Court, will serve to maximize the value of the Debtors' assets for the benefit of all stakeholders.

32.     Put simply, the Debtors currently operate a good business with a bad balance sheet, that could become a great business with the appropriate deleveraging and subsequent capital investments that will be provided through a successful outcome in these Chapter 11 Cases.  The Sale will lead to a marked-test valuation of the Debtors' assets and provide the buyer with businesses unburdened by substantial debt and positioned for considerable future growth.  Accordingly, the Sale contemplated in these Chapter 11 Cases is in the best interests of the Debtors' estates and all parties in interest.

## II.     FACTS IN SUPPORT OF THE FIRST DAY MOTIONS

33.     Concurrently with the filing of their chapter 11 petitions, the Debtors have filed the First Day Motions.  The Debtors request that the relief requested in each of the First Day Motions described below be granted, as each request for relief constitutes a critical element in achieving the successful rehabilitation and reorganization of the Debtors for the benefit of all parties in interest.

14

A. **Motion of Event Rentals, Inc. and its Affiliated Debtors for Joint Administration of Cases (the "<u>Joint Administration Motion</u>")**

34.    The Debtors seek the joint administration of the Chapter 11 Cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and Rule 1015-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>").  Joint administration will obviate the need for duplicative notices, motions, applications and orders, and thereby expedite the administration of the Chapter 11 Cases and reduce administrative costs for the Debtors, their estates, and this Court without prejudicing the substantive rights of any creditors.  The Debtors anticipate that numerous notices, applications, motions, orders, and other pleadings in these cases will affect many or all of the Debtors.  Joint administration will permit counsel for all parties in interest to include the Debtors' respective cases in a single caption on the many documents that will be filed and served in these cases.  Joint administration also will enable parties in interest in each of the Chapter 11 Cases to be apprised of the various matters before the Court in all of these cases.

35.    The Debtors believe that joint administration of the Chapter 11 Cases is in the best interests of the Debtors, their estates, and all other parties in interest, and should be granted in all respects.

36.    Finally, throughout the course of the Debtors' business, they have acquired various local event services and rental companies.  In order to maintain the goodwill associated with those local businesses, the Debtors have, from time to time, continued to operate under the trade names of those businesses.  These trade names too numerous to include on the caption of each respective Debtor but are all listed on <u>Exhibit B</u> to the Joint Administration Motion.

15

**B.      Application of Event Rentals, Inc. and its Affiliated Debtors for Entry of an Order Authorizing and Approving the Retention of Kurtzman Carson Consultants LLC as Claims and Noticing Agent *Nunc Pro Tunc* to the Petition Date**

37.      The Debtors seek to retain Kurtzman Carson Consultants LLC ("<u>KCC</u>") as their noticing and claims agent as of the commencement of these Chapter 11 Cases (the "<u>Claims and Noticing Agent</u>").  KCC was one of the three companies that provided proposals to the Debtors to act as the Claims and Noticing Agent in the Chapter 11 Cases.  The Debtors selected KCC because of its experience and expertise in the chapter 11 case administration and because the rates that KCC offered the Debtors for its services are competitive and reasonable given KCC's reputation and expertise.

38.      The Debtors understand that KCC is one of the country's leading chapter 11 case administrators with vast experience in noticing and claims processing.  By appointing KCC as the noticing and claims agent in the Chapter 11 Cases, parties in interest will benefit from KCC's significant experience and the efficient and cost-effective methods it has developed.

39.      Although the Debtors have not yet filed their schedules of assets and liabilities, they anticipate that there will be in excess of 2,000 entities to be noticed.

**C.      Motion of Event Rentals, Inc. and its Affiliated Debtors for Interim and Final Orders (i) Authorizing Debtors to Obtain Postpetition Financing pursuant to Section 364 of the Bankruptcy Code; (ii) Authorizing the Use of Cash Collateral pursuant to Section 363 of the Bankruptcy Code; (iii) Granting Adequate Protection to the Prepetition Secured Parties pursuant to Sections 361, 362, 363, and 364 of the Bankruptcy Code; (iv) Granting Liens and Superpriority Claims; (v) Modifying the Automatic Stay; (vi) Scheduling a Final Hearing; and Granting Related Relief (the "<u>DIP Motion</u>")**

40.      Prior to filing these Chapter 11 Cases, the Debtors and certain financial institutions negotiated the terms of a senior secured priming and superpriority debtor in

16

possession financing facility (the "<u>DIP Facility</u>").  These arm's-length negotiations culminated in

the DIP Facility.  The DIP Facility provides a total commitment of up to $20 million, and it

allows the Debtors to borrow up to $17 million on an interim basis.  The terms of the DIP

Facility will be documented in the debtor in possession credit agreement (as amended, restated,

supplemented, or otherwise modified from time to time in accordance with the orders approving

the DIP Motion, the "<u>DIP Credit Agreement</u>").  The DIP Credit Agreement will permit the

Debtors to obtain funding expenditures in accordance with an approved budget (the "<u>Budget</u>").

The Budget is attached to the Interim Order of the DIP Motion as <u>Exhibit A</u>.

      41.      I believe that the Debtors and their estates will suffer immediate and

irreparable harm if the interim relief requested in the DIP Motion is not granted, including

authorizing the Debtors' use of the Prepetition Secured Lenders' cash collateral securing such

lenders' prepetition secured obligations and borrowings of $17 million on an interim basis under

the DIP Credit Agreement.  I further believe that the commencement of these Chapter 11 Cases

will significantly increase demands on the Debtors' free cash as a result of, among other things,

the costs of administering these Chapter 11 Cases and addressing key constituents' concerns

regarding the Debtors' financial health and ability to continue operations.

      42.      Without Court approval of the DIP Facility, the Debtors will not have

sufficient cash to ensure uninterrupted business operations or make timely payments to vendors

and employees that are essential to the Debtors' continued operations.  Failure to pay these

expenses would result in the immediate deterioration of the Debtors' businesses and going-

concern value.  The Debtors' ability to finance their operations and the availability to the Debtors

of sufficient working capital and liquidity through the DIP Facility is vital to the confidence of

the Debtors' employees, vendors, and customers and to the preservation of the going-concern value of the Debtors' estates.

43.    The Debtors have an immediate need for access to liquidity to, among other things, fund working capital, general corporate requirements, and day-to-day operations; maintain business relationships with vendors, caterers, and event planners in their industry; and pay employees, vendors and other essential third parties – all of which are necessary to preserve and maintain the Debtors' going-concern value.  Based on these circumstances, the Debtors require the interim funding provided by the DIP Facility to avoid immediate and irreparable harm to their operations, businesses, and estates.

**D.    Motion of Event Rentals, Inc. and its Affiliated Debtors for Order Authorizing (i) the Continued Use of Existing Bank Accounts, (ii) the Continued Use of Existing Checks and Business Forms, and (iii) Waiving Investment and Deposit Requirements (the "Cash Management Motion")**

44.    Pursuant to the Cash Management Motion, the Debtors seek authority to (i) continue to use their existing bank accounts; (ii) pay the Bank Fees, without regard to when such fees arose; (iii) continue use of existing checks and business forms; and (iv) waiver of investment and deposit requirements.

45.    In the ordinary course of business, the Debtors utilize an integrated, centralized cash management system that provides well-established and efficient mechanisms for the collection, concentration, management, and disbursement of funds used in their operations (the "Cash Management System").  On a weekly basis, the Cash Management System collects approximately $5 million and effectuates thousands of cash transactions.  The continued use of the Cash Management System is essential to the Debtors' operations.  Absent the relief sought in

18

the Cash Management Motion, the Debtors would be unable to continue to operate their Cash Management System after the Petition Date.

46.    The Debtors submit that the cost and expense of changing the Bank Accounts would be disruptive to the Debtors' businesses and provide no attendant benefit for the Debtors' estates or the parties in interest.  Indeed, all parties in interest would be best served if the Debtors are permitted to maintain their existing Cash Management System, which will preserve business continuity and avoid the operational and administrative disruption that closing the Bank Accounts and opening new ones would necessarily entail.

### i.    The Debtors' Bank Accounts

47.    The Cash Management System is comprised of a variety of financial accounts (the "Bank Accounts") that the Debtors wish to maintain during the pendency of the Chapter 11 Cases.  All of the Bank Accounts are maintained at either U.S. Bancorp ("U.S. Bank") or Bank of America, N.A. ("Bank of America," together with U.S. Bank, the "Banks"), both of which are Federal Deposit Insurance Corporation ("FDIC") insured financial institutions.  The Bank Accounts maintained at U.S. Bank are operating accounts and include a depository account, a concentration account, and several specialized accounts, such as a special payroll account, a tax payment account, a health insurance payment account, and an accounts payable disbursement account.  In addition, the Debtors maintain two non-operating accounts at U.S. Bank: (i) a restricted account holding collateral for the Debtors' U.S. Bank company credit cards and collateral for a letter of credit benefiting RLI Insurance Company pursuant to that certain irrevocable letter of credit, dated December 13, 2013; and (ii) a restricted money market account for a letter of credit pursuant to that certain lease between 550 Meadowland Parkway,

19

LCC and Classic Northeast, Inc. (one of the Debtors).  The Bank Accounts maintained at Bank

of America consist of a concentration account, a disbursement account, a manual payroll

account, and petty cash accounts.[3]  The aforementioned non-petty cash accounts are listed on

Exhibit C, attached to the Cash Management Motion.  The petty cash accounts are listed on

Exhibit D, attached the Cash Management Motion.

### ii.    The Cash Management System

48.    The Cash Management System has two main functions: (i) cash collection

and (ii) cash disbursement to fund the Debtors' operations.  A graphic chart demonstrating the

Cash Management System is attached to the Cash Management Motion as Exhibit E.

49.    Cash Collection.  The Debtors receive funds from their customers for a

variety of event rental and event-related services.  With the exception of cash received from field

locations, which do not have access to a U.S. Bank service center and therefore deposit cash

received into the Bank of America concentration account, all checks, cash, and electronic funds

transfers received by the Debtors are deposited into the Debtors' depository account at U.S.

Bank.

50.    Cash Disbursements.  Disbursements are made from almost all of the

Debtors' Bank Accounts.  From the U.S. Bank depository account, credit card processing fee

payments are made to American Express and Total Merchant Services, Inc. (which uses a

processing platform called Global Payments Direct, Inc.) on behalf of MasterCard, Visa and

Discover.  The remainder of the U.S. Bank depository account is manually swept at least twice a

---

[3] In addition, the Debtors have six accounts with Bank of America that have a zero balance and are no longer in use but have not yet been closed, a checking account for sales tax payments (-9443), a checking account for health insurance payments (-9448), and four additional accounts (-7914, -9499, -0964, and -0822).  Because such accounts are no longer in use, they are not reflected on Exhibit E, attached to the Cash Management Motion.

day into the U.S. Bank concentration account.  From the U.S. Bank concentration account,[4] (i)

ADP, Inc. ("ADP") and Ultimate Software ("UltiPro") withdraw cash to fund employee payroll;

(ii) transfers are made to the Bank of America concentration account to fund the petty cash

accounts; and (iii) transfers are made to the specialized U.S. Bank accounts (fringe benefits

relating to payroll (-5075),[5] tax payments (-1565), health insurance payments (-1573), account

payable disbursements (-5067)) and the Bank of America payroll account for manual payroll and

(iv) certain accounts payable payments.

        51.      The Debtors also maintain certain petty cash accounts at Bank of America

(collectively, the "Petty Cash Accounts," each a "Petty Cash Account"), which are funded

through the Bank of America disbursement account in various amounts.  At most times, the

account balance in the majority of Petty Cash Accounts does not exceed $10,000 except for large

locations, such as El Segundo, San Francisco, and the corporate headquarters in Inglewood,

California; and at certain other locations only in their busy season or if they are undertaking a

major event.[6]  Individual locations are unable to make disbursements from any of the non-Petty

Cash Accounts, which are maintained at the corporate level.  Nevertheless, these individual

locations are often required to satisfy necessary and minimal expenses that arise from the day-to-

day operations of their businesses.  By funding the Petty Cash Accounts, the individual locations

---

[4] The concentration account is a holdover from the Debtors' legacy cash management system.  The Debtors cannot close the concentration account, however, because certain automatic withdrawals, such as payroll, are debited from that account.  For this reason, the concentration account remains a vital part of the Debtors' Cash Management System.

[5] The Debtors' payroll administrators, ADP and UltiPro, which provide payroll services to the Debtors, are authorized to make direct withdrawals, through a reverse wire, from the Debtors' U.S. Bank concentration account.  Certain benefits, such as 401(k) withholdings, are paid through the special payroll account, which is funded by the concentration account.  The Debtors also maintain a payroll account at Bank of America for manual payroll.

[6] The average amount of cash in any petty cash account over the past twelve months was approximately $7,500.

can access limited funds to pay for certain day-to-day expenses, while keeping the funding and accounting of the non-Petty Cash Accounts centralized at the corporate level.  To manage the Petty Cash Accounts, each location maintains a petty cash log, which includes the balance and activity of a location's Petty Cash Account.  The use of the Petty Cash Accounts is governed by the Debtors' Petty Cash Policy.

52.    The Debtors submit that the cost, expense, and delay of closing their Bank Accounts and opening new bank accounts would be disruptive to the Debtors' businesses and provide no benefit for the Debtors' estates or parties in interest.  Indeed, the Debtors believe that the closure of the Bank Accounts would interfere with their ability to continue their businesses and collect much-needed revenues.

### iii.    The Debtors' Ordinary Course Bank Fees

53.    In the ordinary course of business, the Banks (as well as certain credit card processors) charge, and the Debtors pay, honor, or allow the deduction from the appropriate account, certain service charges and other fees, costs, and expenses (collectively, the "Bank Fees").  The Debtors respectfully request that the Court authorize the Bank to continue to charge the Debtors the Bank Fees, whether such fees accrue before, on, or subsequent to the Petition Date.  Failure to pay the Bank Fees could result in the Banks imposing an administrative freeze on the Bank Accounts and possibly an offset.  Either action would severely adversely affect the Debtors' ability to operate at a crucial time in these Chapter 11 Cases.

54.    It is imperative that the Debtors' individual locations have access to cash during the early stages of these Chapter 11 Cases.  Without access to cash, these individual locations may not be able to provide all the goods and services required under an agreement for

22

an event.  The failure to complete a job would have ruinous consequences, especially at the commencement of these Chapter 11 Cases, when the Debtors need to instill confidence in their customers rather than deplete it.

### iv.   The Debtors' Company Credit Cards

55.   In the ordinary course of business, the Debtors provide company credit cards to certain employees for travel and to purchase goods and services that are used to operate the Debtors' businesses (the "Company Credit Cards").  The Company Credit Cards are issued by either U.S. Bank or American Express and are pre-funded by the Debtors before an employee uses such card.  The employee cardholders are not individually liable for the expenses on these cards.  As security for the U.S. Bank Company Credit Cards, the Debtors have pledged one of the restricted accounts at U.S. Bank (-0972), which maintains a cash balance of $400,000, to U.S. Bank pursuant to that certain Borrower's Pledge Agreement, dated October 18, 2011.  As security for the American Express Company Credit Cards, the Debtors made a deposit to American Express in the amount of $150,000 on or about January 9, 2014, which determines the limits on the American Express Company Credit Cards.  While the Debtors are in the process of phasing out the U.S. Bank Company Credit Cards and phasing in the American Express Company Credit Cards, the Debtors propose to continue using the U.S. Bank Company Credit Cards in the ordinary course of business on a postpetition basis until such transition is complete and thereafter use the American Express Company Credit Cards in the ordinary course of business.

56.   The Debtors believe that the continued use of Company Credit Cards will help ease the transition into the Chapter 11 Cases for the Debtors' employees.  As the Debtors'

businesses requires significant travel by their employees, the employees need assurance that they

will not have to front travel expenses out of their own pockets on the Debtors' behalf.

### v.    The Debtors' Existing Business Forms and Checks

57.    While the Debtors, in the ordinary course of business, print their own

checks and business forms (the "Business Forms"), the Debtors had to hire a third party to create

the templates from which the checks and Business Forms are printed.  In order to add "debtor in

possession" to the checks and Business Forms, the Debtors would have to contact the third party

to make an appointment for a technician to come to the Debtors' corporate headquarters and

manually modify the checks and Business Forms (currently, the third party vendor's first

available appointment for a technician is 21 days from the date a customer makes such request);

the technician would have to come out to headquarters and make these changes supervised by the

Debtors' controller, the only person in the Debtors' management team who can approve such

changes; the controller would have to test these changes with the Banks; and the Banks would

have to approve the changes.  If the Banks reject the changes, the technician would have to come

back out to correct the issues identified by the Banks.  This process is not only time consuming

for the Debtors and, in particular, the Debtors' controller, but also requires the Debtors to pay the

technician on an hourly basis, each time he or she has to come to the Debtors' corporate

headquarters, to modify the checks and Business Forms.

58.    To minimize expenses to their estates and conserve management

resources, the Debtors believe it is appropriate to continue to use all checks and Business Forms,

as such items were in existence before the Petition Date, without reference to the Debtors' status

as debtors in possession, for the first sixty (60) days of the Chapter 11 Cases.  During the first

sixty (60) days of these Chapter 11 Cases, the Debtors' controller will be focused on managing accounting changes arising from the chapter 11 filing, overseeing the payment of Court-ordered prepetition invoices, and insuring postpetition invoices are paid in the ordinary course of business without undue interruption.  Moreover, the controller will be likely inundated with calls from vendors and creditors throughout the chapter 11 process, but in particular, in the first few months of these cases.  To heap the extra task of supervising the addition of "debtor-in-possession" to the Debtors' checks and Business Forms onto the controller's already full plate, at the early stages of these cases, will be an unnecessary burden and distraction.

59.    For this reason, the Debtors seek to postpone the revision of the check and Business Forms templates to include "debtor in possession" for sixty (60) days after the Petition Date.  Upon the expiration of sixty (60) days after the Petition Date, the Debtors will print new checks and Business Forms from their revised templates reflecting their status as debtors in possession.

60.    In addition, the Debtors use, in the ordinary course of business, checks for the Petty Cash Accounts, which they do not print themselves.  The Debtors have significant stock of these pre-printed checks in their possession.

61.    The relief requested in the Cash Management Motion is necessary to avoid immediate and irreparable harm to the Debtors' estates.  Further, the relief requested in the Cash Management Motion is critically important to prevent irreparable damage to the Debtors' operations.

E.   **Motion of Event Rentals, Inc. and its Affiliated Debtors for Order Granting Authority to Pay Prepetition Wages, Compensation, Employee Benefits, and Related Obligations (the "Employee Motion")**

62.    Pursuant to the Employee Motion, the Debtors seek authority to pay certain prepetition obligations owing to the Debtors' employees (as specifically set forth and defined in the Employee Motion).  The Debtors seeks authority to honor such obligations, which are critical and essential to employee morale and future business needs.

i.   **Employees**

63.    The Debtors currently employ approximately 2,500 employees, of which approximately 2,000 employees are paid on an hourly basis (the "Hourly Employees") and approximately 500 employees are paid a salary (the "Salary Employees").  Among the Hourly Employees, approximately 150 are union employees, employed pursuant to the terms of a collective bargaining agreement.  The Debtors also use the services of ten (10) independent contractors (the "Contract Employees," collectively with the Hourly Employees and Salary Employees, the "Employees").  The Employees are employed centrally by Classic Party Rentals, Inc.

64.    The Employees consist of: (a) senior management, which includes the chief executive officer, chief financial officer, chief information officer, and vice presidents (collectively, the "Senior Executives," each a "Senior Executive");[7] (b) middle management, which includes the Debtors' general managers and directors (collectively, the "Middle

---

[7] For the purposes of the Employee Motion, a "Senior Executive" is a member of the senior executive team that is responsible for management and strategic direction of the Debtors on an operational and corporate level.  In addition to employees with the title of Chief Executive Officer, Chief Financial Officer, Chief Information Officer, or Vice President, the Debtors consider Chip Brown, Director of Strategic Planning, to be a Senior Executive.  As of the Petition Date, there are eighteen (18) Senior Executives.

Managers"); and (c) rank and file Employees, made up of outside sales, project/event managers, sales managers, sales consultants, and sales, project, and event support (collectively, the "Rank and File Employees").  The Rank and File Employees report to the Middle Managers, who then report to a Senior Executive.  Approximately 4.9% of the Debtors' payroll costs represent compensation paid to the Senior Executives, approximately 5.8% represents compensation to the Middle Managers, and the remaining approximately 89.3% represents compensation to the Rank and File Employees.

65.    Among other things, the Employees (a) manage and monitor the delivery, set-up, and pick-up of the Debtors' inventory of tables, chairs, fine china, high-end flatware, specialty linens, centerpieces, tents, and canopies; (b) consult on events and recommend locations; and (c) play a significant role in working with event planners, caterers, venues, and other third parties to provide the client with all necessary rentals for events, ranging from high-profile Hollywood awards shows, premiers, celebrity weddings, graduations, charity events, golf tournaments, and other similar events.

66.    The Debtors believe that any disruption in Employee pay or benefits would have adverse consequences to the Debtors, including, without limitation, staff attrition and loss of Employee morale.  Many of these Employees have strong relationships with the Debtors' customer base and their separation from the Debtors could result in the loss of the customer relationship, which would be harmful to the Debtors' ability to consummate a sale of their assets and successfully complete the chapter 11 process.

ii.      **Salary, Wages and Other Compensation**

a.      **Payroll Obligations**

67.      The Debtors request authority to honor all outstanding payroll obligations

to their Employees.  Such obligations include Employees' salaries and wages; vacation, paid

time off, and sick leave; car allowances; and commissions and bonuses.

### (1)      Salaries and Wages

68.      The Debtors pay the Employees bi-weekly in arrears, with a Sunday

payroll close date and a Thursday pay date.  On a bi-weekly basis, the Debtors' payroll averages

approximately $5.0 million in the aggregate.  Employees are divided into three pay groups, two

of which are paid on the same day: (i) Employees working in California (the "First Pay Period

Group"), (ii) Employees working outside of California (the "Outside CA Group"), and (iii)

certain corporate Employees (together with the Outside CA Group, the "Second Pay Period

Group").  Payroll is staggered; the First Pay Period Group is paid on Thursday one week and the

Second Pay Period Group is paid on Thursday the following week.  The Debtors have two

payroll services that assist them with payroll, Ultimate Software Group, Inc. ("UltiPro") and

Kronos Incorporated ("Kronos").  In addition, ADP Payroll Services, Inc. ("ADP") prints all of

the Debtors' payroll checks and administers direct deposit.[8]

69.      The Debtors respectfully request the authority to pay the accrued but

unpaid obligations in respect of Employee wages and salaries (collectively, the "Employee

Payroll Obligations") in the ordinary course of business without regard to the date that such

obligations arose.  The request to pay Employee Payroll Obligations relates solely to Employees

---

[8] Under certain circumstances, the Debtors have the ability to manually pay Employees by check through the Bank of America, N.A. payroll account.

LOSANGELES 1041035 (2K)

who are employed as of the Petition Date.  With the exception of one Employee, the Debtors

estimate that no other single Employee is owed in excess of $12,475 on account of the Employee

Payroll Obligations.[9]  The Debtors estimate that the Employee Payroll Obligations will not

exceed $2.1 million.

70.     To the extent they may be construed as obligations arising prior to the

Petition Date requiring Court authority to pay, the Debtors further request authority to pay

applicable employer payroll taxes in connection with the payment of the Employee Payroll

Obligations.  These taxes (collectively, the "Employer Payroll Obligations") include (i) Social

Security taxes (OASDI) in the amount of 6.20% of the gross wage of each Employee that has not

yet paid the statutory aggregate annual maximum Social Security contribution; (ii) the Medicare

portion (HI) in the amount of 1.45% of the Employees' aggregate gross wages; (iii) the Medicare

taxes in the amount of 0.90% for individuals with earned income of more than $200,000

($250,000 for married couples filing jointly); and (iv) applicable state and federal unemployment

taxes.

71.     Although the Debtors believe that most payroll checks issued prepetition

have been presented to and honored by the applicable drawee banks, the Debtors recognize that

certain Employees may fail to cash or deposit their paychecks in a timely manner.  Accordingly,

it is possible that some checks remain in float as of the Petition Date, which checks the banks

may not honor.  To the extent any payroll checks are dishonored, the Debtors will issue new

---

[9] As of the Petition Date, only one Employee is owed more than $12,475 in Employee Payroll Obligations: Jeffrey
Black ($12,980.77).

checks upon entry of the order granting the relief requested in the Employee Motion, if this Court enters such order.

### (2)    Administrative Fees

72.    As is customary for companies of their size, the Debtors use third parties to assist with processing payroll and administering employee benefit plans.  Specifically, the Debtors' payroll is processed in-house using UltiPro and Kronos.  In addition, UltiPro prepares, deposits, and files the Debtors and Employees' federal, state, and local payroll taxes, as well as prepares and deposits any garnishments.  After UltiPro calculates all the necessary deductions from an Employee's gross pay, it generates a check file.  The check file is then transmitted to ADP, which provides the Debtors with direct deposit services and issues the Debtors' payroll checks.[10]  UltiPro charges the Debtors an annual fee of $143,000 for its services (the "UltiPro Processing Fee"), paid in 36 installments.  In addition, UltiPro charges a subscription fee of $7/Employee, which is billed quarterly based on a fixed number of Employees.  At the end of each quarter, UltiPro reconciles the fixed number of Employees with the actual number of Employees and bills the Debtors in arrears for the previous quarter for these adjustments (the "UltiPro Subscription Fee," together with the UltiPro Processing Fee, the "UltiPro Fees").  Kronos charges the Debtors a subscription fee per service per Employee, which is billed on a monthly basis totaling approximately $13,000 a month (the "Kronos Fee").  ADP charges the Debtors a per Employee fee for printing checks and administering their direct deposit as well as a

---

[10] In the ordinary course of business, ADP also provides the Debtors with ALINE debit cards, which allow the Debtors to pre-fund a debit card with an Employee's *per diem* travel allowance.

30

monthly fee of $450 to maintain the Debtors' legacy time management system (the "ADP Fees," collectively with the UltiPro Fees and the Kronos Fee, the "Payroll Fees").

73.     Likewise, the Debtors' 401(k) plan is processed and administered by ING Life Insurance and Annuity Company ("ING"). Each pay date, ING withdraws from the Debtors' payroll bank account amounts requested by participating Employees to be withheld from their respective paychecks in order to fund their 401(k) retirement savings accounts. ING does not charge the Debtors an annual fee for administering the Debtors' 401(k) plan. Rather, the ING administrative fees are paid by the Employees.

74.     To the extent the Payroll Fees may be construed as obligations arising prior to the Petition Date requiring Court authority to pay, the Debtors request authorization for the Debtors to pay such fees. The Debtors submit that UltiPro, Kronos, and ADP may be entitled to decline to perform any payroll services for the Debtors for which they are not paid their respective agreed fees, which would result in a costly disruption to the Debtors' fulfillment of their payroll obligations. The Debtors estimate that the Payroll Fees in respect of the Employee Payroll Obligations and the Employer Payroll Obligations will not exceed $30,000.

### b.     Vacation, Paid Time Off, and Sick Leave

### (1)     Paid Time Off

75.     In addition to wages and salary, the Employees are given paid time off ("PTO") in the form of (i) sick leave, (ii) holidays,[11] and (iii) vacation time. Allocations for sick leave and holidays are uniform across all Employees and do not accrue. Under no circumstances

---

[11] For full-time, hourly Employees, holidays are paid unless the Employee, unapproved, takes the day preceding or following the holiday off, in which case the holiday is not paid.

31

may unused allocations be converted to a cash payment.  Vacation time accrues to each full-time

Hourly Employee,[12] after such Employee has completed six months of service.  Thereafter,

vacation time accrues at the rate of 3.2 hours per bi-week.  The Debtors believe that

accommodating the sick and personal time needs of their Employees is essential to Employee

well-being and morale.

76.    In addition, unused vacation time is payable for full-time Hourly

Employees, pursuant to state law, upon the termination of an Employee's employment

relationship with the Debtors (the "Vacation Payouts").  As of the Petition Date, the Debtors

estimate that the aggregate value of all potential Vacation Payouts does not exceed $650,000.

### c.    Car Allowances

77.    Approximately 200 of the Debtors' Employees that are required to travel

frequently in the course of their employment are provided with a regular car allowance, ranging

from approximately $70 to $450 per pay period (the "Car Allowances").  The Car Allowances

are designed to cover the costs of gas, wear and tear, maintenance, and insurance for the

Employees' personal vehicles, and are included in the Debtors' regular payrolls.  On a monthly

basis, the Debtors pay approximately $150,000 in Car Allowance expenses.  Such car allowances

are standard in the industry and are included as part of each Employee's compensation package

upon being hired or promoted into a qualifying position.  The Debtors believe that it is critical to

continue to pay the Car Allowances in the ordinary course in accordance with their prepetition

policy.

---

[12] Salary Employees do not accrue vacation time.

### d.    Commissions and Bonuses

78.    Prior to the Petition Date, the Debtors designed and implemented incentive policies pursuant to which sales consultants and sales support Employees are eligible to receive a certain percentage of the business they refer to the Debtors (each, a "Commission" and, collectively, the "Commissions").  The Debtors employ approximately 270 sales vice presidents, sales managers, and sales rank and file employees, most of whom are eligible to earn Commissions.  These Commissions are in addition to their annual salary or hourly compensation and are intended to reward employees who hit certain performance targets.  Further, the amount of the Commissions increases as the Employee meets additional thresholds.  For example, if an Employee has a goal of $500,000 worth of business on an annual basis, such Employee is entitled to a Commission only upon meeting such performance goal.  The amount of any particular Commission paid to the Employee is based upon collected revenue and contingent upon such Employee meeting their performance goals.  Because performance goals are based on collected revenue, the commission payments are in arrears.  For this reason, the Debtors are unable to determine as of the Petition Date exactly which, if any, Employees will meet or exceed their performance goals.  Historically, the aggregate average monthly Commissions paid to employees is approximately $300,000 - $350,000.  As of the Petition Date, the aggregate amount of accrued but unpaid Commissions is estimated to be $350,000.  The Debtors believe that no Commission will cause an Employee to be owed more than $12,475 when combined with the other Priority Amounts (as defined below).

79.    In addition, the Debtors pay certain Employees discretionary, incentive bonuses for exceptional work (the "Bonuses," and, each a "Bonus").  For example, if an

33

Employee attends a bridal show and books a $10,000 wedding, this may merit a Bonus.  Bonuses

may range from approximately $100 - $1,000 and are paid through payroll.

80.     To award a Bonus, a general manager submits a proposal to a Regional

Vice President describing the work meriting the Bonus and the amount of the Bonus for

approval.  Once approved, the Regional Vice President sends a request to the Debtors' controller

to pay the Bonus.  All requests for Bonuses must be received by the controller no later than the

Monday before payroll in order for such bonuses to be paid with payroll.  While the Debtors

cannot determine, as of the Petition Date, which, if any, Employees have been awarded

discretionary bonuses, the Debtors estimate the aggregate amount of accrued but unpaid Bonuses

is $30,000.  In addition, the Debtors believe that no Bonus will cause an Employee to be owed

more than $12,475 when combined with the other Priority Amounts (as defined below).

81.     The Debtors believe that it is critical to continue to pay Commissions and

Bonuses in the ordinary course in accordance with prepetition policies.  The Commissions and

Bonuses are part and parcel of an Employee's compensation and the failure to pay such

Commissions and Bonuses would destroy employee morale and remove critical sales incentives.

### e.     401(k) Contribution

82.     The Debtors offer all eligible employees an opportunity to participate in a

401(k) plan (the "401(k) Plan").  Under the 401(k) Plan, Employees, subject to certain

limitations, may contribute up to 100% of their pre-tax earnings annually, up to $17,500.  An

Employee is eligible to enroll in the 401(k) Plan, annually on January 1 or July 1, depending on

the date of hire, whichever is sooner, so long as they have completed three (3) months of service.

The Debtors' 401(k) Plan is administered by ING.  The Debtors do not match Employees' 401(k)

34

contributions.  The Debtors submit that it is essential for the morale and maintenance of trust of the Employees that necessary steps are taken to protect the Employees' 401(k) Plan.

### iii.    Reimbursable Business Expenses

83.    In the ordinary course of business, for the convenience of the Employees and the Debtors alike, Employees make purchases on behalf of the Debtors with their own funds.[13]  Upon submission of proof of such purchases in accordance with the Debtors' protocols, the Debtors, in turn, reimburse the Employees, by direct deposit or check, for such purchases (each such reimbursement, an "Employee Reimbursement").  At any given time, one or more Employees may (a) be holding a reimbursable receipt for a business expense that it has not yet submitted for reimbursement; or (b) have submitted a reimbursement request to the Debtors but not yet received payment on account of such request.  The Debtors assume that each of these circumstances existed as of the Petition Date.  Employees that make purchases on behalf of the Debtors in furtherance of the Debtors' businesses do so with the reasonable expectation of receiving prompt reimbursement on account of such purchases.  Based upon historical averages, approximately 60 employees incur expenses bi-weekly, aggregating, on average, $400,000, relating to, among other things, business related travel expenses, business meals, car rentals, goods and services essential to completing a rental invoice, and a variety of miscellaneous expenses (collectively, the "Reimbursable Expenses").  The Debtors estimate that, as of the Petition Date, the total amount of Reimbursable Expenses owed is no more than $400,000.

84.    The Debtors believe that the failure to promptly process and pay in full each valid Employee Reimbursement would be detrimental to Employee morale.

---

[13] In some cases, such as travel *per diems*, Employees may use ALINE cards or corporate credit cards.

### iv.      Employee Benefits

85.      In the ordinary course of their businesses, and as is customary for most large companies, the Debtors have established various employee benefit plans and policies that provide Employees with medical, dental, prescription, disability and life insurance, employee savings, and other similar benefits (collectively, the "Employee Benefits").  The Employee Benefits are generally described below.

### (1)      Employee Insurance Benefits

86.      The Debtors pay certain amounts to certain third-party insurance providers that, in turn, provide insurance benefits to Employees (the "Insurance Benefits").  The Insurance Benefits are provided by (i), for health insurance, Anthem Blue Cross Life and Health Insurance Company ("Anthem") (approximately $200-$300 per Employee[14] per month depending on the plan elected and the number of family members covered);[15] (ii) for dental insurance, Cigna (approximately, $10.00 per Employee per month); (iii) for life insurance and accidental death and dismemberment insurance, Anthem (covered 100% for qualifying Employees at approximately $20 per Employee per year); (iv) for long-term disability insurance, Lincoln National Life Insurance Company (approximately $50 per Employee per month);[16] and (v) to

---

[14] For certain Employees, the Debtors supplement the Employee's earnings in an amount equal to 100% of the cost of their elected medical and dental insurance benefits (approximately $140-$2,600 per Employee per month depending on the plan elected and the number of family members covered).

[15] While almost 90% of the Debtors' Employees are insured by Anthem, the remaining 10% of Employees are either insured by Kaiser Permanente (Northern California Region) ("Kaiser") (approximately 20 Employees working in Northern California locations), which costs the Debtors between $148.50-$214.87 per Employee per month depending on the plan elected and the family members covered; or SRC, an Aetna Company ("Aetna") (approximately 25 Employees who have worked for the Debtors for less than one (1) year), which costs the Debtors between $0-$50.00 per Employee per month depending on the plan elected and the family members covered, but coverage is capped at $10,000.

[16] Long-term disability insurance amounts are only paid on behalf of former Employees of Regal Rents, Inc.

36

administer Flex Spending Accounts as may be elected by an Employee, ADP (approximately $9 per month per electing Employee).  The providers of Insurance Benefits (collectively, the "Insurance Benefits Providers") bill the Debtors monthly.

87.     Each Employee is responsible to pay a certain percentage (depending on which plan each employee elects and how many family members are covered by such plan) of the actual cost to the Debtors of the Insurance Benefits provided to such Employee during each pay period, which is deducted from the Employee's paycheck each pay period.  If an employee has separated from the Debtors but elected to continue their health insurance coverage through COBRA, the employee pays 102% of the costs relating to or arising from COBRA.

88.     The Debtors submit that the Insurance Benefits Providers may be entitled to discontinue provision of Insurance Benefits to the Employees if the Debtors fail to pay their obligations to such providers on account of the Insurance Benefits in the ordinary course of business.  The Debtors believe that the Insurance Benefits constitute a valuable and important component of the compensation payable to the Employees, and that any disruption in the provision of such benefits would adversely affect Employee morale.  Accordingly, the Debtors request authorization for the Debtors to pay ordinary course obligations in respect of the Insurance Benefits in the ordinary course of business, without regard to when such obligations were incurred.  The Debtors believe that they are current on all payments to the Insurance Benefits Providers.  They further estimate that accrued, but not invoiced, obligations in respect of the Insurance Benefits as of the Petition Date stood at not more than $100,000, in the aggregate.  The Debtors believe that no Insurance Benefits will cause an Employee to be owed more than $12,475 when combined with the other Priority Amounts (as defined below).

37

89.    The Anthem,[17] Kaiser, and Aetna health insurance policies are self-insured.  As such, the Debtors are liable for claims made under such policies.  To protect themselves from large health insurance claims, the Debtors have an Excess Risk and Aggregate Excess Risk policy, which covers medical and prescription drug benefits exceeding $200,000 per Employee per policy period, through Reliastar Life Insurance Company, coverage period from May 1, 2013 – April 30, 2014 (the "Stop Loss Coverage").[18]  The Stop Loss Coverage does not apply to the Aetna policy, which is capped at $10,000, nor does it cover Employees who elected the Anthem EPO2 policy, which is capped at $100,000.[19]

### (2)    Workers' Compensation

90.    The Debtors maintain workers' compensation coverage through Old Republic Insurance Company (the "Workers' Compensation Policy").[20]  The annual premium of the Workers' Compensation Policy is $4,524,011, with a $0 deductible.  The Debtors made a down payment on the premium in the amount of $1,037,387 in June, 2013.  Thereafter, the Debtors are required to make eight monthly installments of $435,828 to Old Republic Insurance Company due on the 7th of each month.

---

[17] On the Petition Date, all the COBRA participants are insured with Anthem through COBRA.

[18] Filed concurrently herewith is the *Motion of Event Rentals, Inc. and its Affiliated Debtors for Order (i) Authorizing Debtors to (a) Maintain Insurance Program, (b) Maintain Insurance Premium Financing Program, (c) Pay Insurance Premiums in the Ordinary Course, and (d) Pay All Obligations Associated Therewith; and (ii) Preventing Insurance Companies from Giving any Notice of Termination or Otherwise Modifying any Insurance Policy Without Obtaining Relief from the Automatic Stay* (the "Insurance Motion"), which seeks approval to (i) maintain the Stop Loss Coverage policy, and (ii) pay any premium in the ordinary course related thereto, among other relief.

[19] Approximately 650 Employees elected the Anthem EPO2 policy.

[20] Filed concurrently with the Employee Motion is the Insurance Motion, which seeks approval to (i) maintain the Workers' Compensation Policy, and (ii) pay any premium in the ordinary course related thereto, among other relief.

LOSANGELES 1041035 (2K)

### (3)    Employee Rental Discounts

91.    The Debtors offer discounted costs on equipment rentals to active employees in good standing.  Discounted employee rentals are subject to availability and at the sole discretion of the Debtors.

### v.    Withholdings from Employee Paychecks

92.    The Debtors deduct certain amounts from their Employees' paychecks for the payment of the Employee portion of health, dental and welfare insurance premiums; voluntary life insurance; flexible benefit plans that provide for withholdings on a pre-tax basis of certain medical and dental premiums; flexible benefit plans that provide for pre-tax deductions of certain dependent care and certain reimbursable medical expenses; 401(k) deductions; and other miscellaneous amounts (collectively, the "Employee Deductions").  The Employee Deductions comprise property of the Debtors' Employees and are forwarded by the Debtors to appropriate third-party recipients at varying times.

93.    The Debtors may also be in possession of various withholdings, such as payroll taxes, social security, garnishments, child support payments, etc. (together with the Employee Deductions, the "Deductions").  It is likely that funds have been deducted from employee wages but have not yet been forwarded to the appropriate third-party recipients.  Without authority to forward the Deductions to the appropriate parties, the Debtors expose their officers and directors to personal liability.[21]

---

[21] Filed concurrently with the Employee Motion is the *Motion of Event Rentals, Inc. and its Affiliated Debtors for Order Authorizing Payment of Prepetition Trust Fund Taxes and Sales and Use Taxes*, which seeks, among other things, authority to pay prepetition obligations owing on account of trust fund taxes.

###### vi.    Collective Bargaining Agreements

94.    As noted above, the Debtors are party to two collective bargaining agreements (collectively, the "CBAs"): (i) the first with the United Food and Commercial Workers Local 135 in San Diego, California, and (ii) the second with the Teamsters, Local Union No. 710 in Chicago, Illinois.  The CBAs set forth the terms and conditions of the Debtors' employment relationship with each union member.  The CBAs generally provide the same benefits available to the Debtors' non-union Employees, as well as certain additional benefits.

95.    For the avoidance of doubt, the aggregate amount paid to any individual employee of the Debtors on account of Employee Payroll Obligations, Vacation Payouts, PTO, Car Allowances, Commissions, Bonuses, and Insurance Benefits (collectively, the "Priority Amounts") shall not exceed $12,475.[22]

96.    The Debtors submit that, absent the relief requested in the Employee Motion, the Debtors could suffer considerable disruption in their efforts to bring about an orderly sale of the Debtors' assets for the benefit of their creditors.  Employees who go unpaid or are denied benefits to which they are accustomed could seek alternate employment opportunities with a more certain future or, even if they remain with the Debtors, may be disinclined to provide the level of effort and commitment to assist the Debtors in carrying out their Chapter 11 Cases.  Given the Employees' relationships with current repeat customers and their knowledge of the Debtors' businesses, the loss of Employees will not only result in a decrease in efficacy but also a possible decrease in customer rental agreements.  Thus, in order to assist the Debtors in

---

[22] Only one Employee is owed in excess of $12,745 for the Priority Amounts, Jeffrey Black, who is owed $14,980.77.

operating while the subject of the Chapter 11 Cases and meeting the objectives thereof, the

Debtors submit that the relief requested in the Employee Motion is necessary and appropriate.

97.     The Debtors' Employees are an essential component of a successful

reorganization.  Any deterioration in employee morale and welfare at this critical time

undoubtedly would have a devastating impact on the Debtors, the value of their assets and

businesses, and ultimately, the Debtors' ability to reorganize.  Accordingly, the relief sought in

the Employee Motion is in the best interests of the Debtors' estates and creditors and will allow

the Debtors to continue to operate their businesses with minimal disruption and proceed with the

important task of stabilizing their operations.  Further, the relief requested in the Employee

Motion is necessary to avoid immediate and irreparable harm to the Debtors' estates

**F.      Prepetition Trust Fund Taxes and Sales and Use Taxes Motion (the "<u>Tax</u>**
**<u>Motion</u>")**

98.     Pursuant to the Tax Motion, the Debtors seek authority to pay prepetition

trust fund taxes and sales and use taxes.

99.     In the ordinary course of business, the Debtors collect sales, use, and other

trust fund type taxes (however denominated) (the "<u>Trust Fund Taxes</u>") from their customers and

other parties, and subsequently remit such taxes to the appropriate federal, state and local taxing

authorities (each, a "<u>Taxing Authority</u>").  For example, the Debtors collect and remit sales taxes

in connection with the sale of various event related goods and services, and use taxes primarily

arise from the purchase of goods outside of the states where the Debtors operate.  A list of the

Taxing Authorities is annexed to the Tax Motion as <u>Exhibit B</u>.  Although the Debtors believe the

list of Taxing Authorities set forth on <u>Exhibit B</u> to the Tax Motion is substantially complete, the

relief requested in the Tax Motion is to be applicable with respect to all Taxing Authorities and

41

is not limited to those Taxing Authorities listed on <u>Exhibit B</u> to the Tax Motion.

100.    There is often a lag time between when the Debtors incur an obligation to pay the Trust Fund Taxes and the date on which payment of such taxes is due.  Various governmental units may therefore have claims against the Debtors for Trust Fund Taxes that have accrued, but are unpaid and not yet due, as of the Petition Date.  The relevant Taxing Authority may also make retrospective adjustments to determine any payment deficiency or surplus for a particular period resulting in a demand for further payment from or refund to the taxpayer.  The Debtors estimate that the total amount of prepetition Trust Fund Taxes owing to the various Taxing Authorities is approximately $1.5 million.

101.    Some, if not all, of the agencies collecting taxes may audit the Debtors if such taxes are not paid forthwith.  Such audits needlessly would divert the Debtors' attention away from the reorganization process and diminish their estates.  Moreover, the Trust Fund Taxes represent a relatively small portion of the Debtors' unsecured liabilities.

102.    The relief requested in the Tax Motion is necessary to avoid immediate and irreparable harm to the Debtors' estates for the reasons as set forth above.  Further, the proposed payment on account of the above-described Trust Fund Taxes is critically important to prevent irreparable damage to the Debtors' operations.

**G.    Motion of Event Rentals, Inc. and its Affiliated Debtors for Order (i) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service to the Debtors; (ii) Deeming Utility Companies Adequately Assured of Future Payment; and (iii) Establishing Procedures for Determining Requests for Additional Adequate Assurance (the "<u>Utility Motion</u>")**

103.    Pursuant to the Utility Motion, the Debtors seek an order (i) prohibiting utility companies from altering, refusing, or discontinuing service to the Debtors; (ii) deeming

utility companies adequately assured of future payment; and (iii) establishing procedures for determining requests for additional adequate assurance.

104.    In connection with the operation of their businesses and management of their leased storefront and warehouse locations, the Debtors obtain electricity, gas, water, and sewage/trash services (collectively, the "Utility Services") from various utility companies (each, a "Utility Company," and collectively, the "Utility Companies").[23]  The Debtors use over seventy (70) Utility Companies and in some instances maintain multiple accounts with a Utility Company.  A list of substantially all of the Utility Companies providing services to the Debtors is attached to the Utility Motion to as Exhibit C (the "Utility Service List").[24]  Prior to the Petition Date, the average aggregate monthly cost of Utility Services for all of the Debtors was approximately $275,000.

105.    The Debtors maintain storefronts and warehouses in thirty-nine (39) locations throughout the United States and require uninterrupted Utility Services at each location to run successfully.  If any Utility Company were to refuse or discontinue service, even for a brief period, the Debtors could be forced to cease the operation of any affected locations, resulting in a substantial disruption to the Debtors' businesses, ultimately causing irreparable

---

[23] The Utility Companies referred to in the Utility Motion are paid directly by the Debtors and not through any third parties.

[24] The Utility Companies listed on Exhibit C to the Utility Motion include Utility Companies for the Debtors' various locations.  The listings of any entity on Exhibit C, as well as any omission of any entity from Exhibit C, is not an admission by the Debtors that such entity is or is not a utility within the meaning of section 366 of the Bankruptcy Code.  The Debtors reserve the right to assert, at any time, that any entity listed on Exhibit C is not entitled to adequate assurance pursuant to section 366 of the Bankruptcy Code.  The Debtors further reserve the right to terminate the services of any Utility Company at any time and to seek an immediate refund of any Utility Deposit (as defined in the Utility Motion) without effect to any right of setoff or claim asserted by a Utility Company against the Debtors.  In addition, the Debtors are requesting that the Utility Motion apply to all of the Debtors' Utility Companies, whether or not any given Utility Company is included on the Utility Service List.  The Debtors have proposed a procedure for supplementing the Utility Service List.

harm to the Debtors' estates and jeopardizing their ability to reorganize. Accordingly, to avert an economically harmful situation that could negatively impact the Debtors' ability to sell their businesses in these Chapter 11 Cases, the Debtors have sought the relief requested in the Utility Motion.

106.    To provide adequate assurance of payment for future services to the Utility Companies, the Debtors propose to deposit (the "Utility Deposit") with certain Utility Companies an amount equal to 50% of the Debtors' estimated cost of monthly utility consumption for each such Utility Company. Additionally, the Debtors have previously provided certain Utility Companies with and such Utility Companies currently hold deposits in the amounts listed on Exhibit C to the Utility Motion (the "Existing Deposits"). The total amount of Utility Deposits the Debtors propose to provide to the Utility Companies is provided in Exhibit C to the Utility Motion.

107.    The Debtors intend to pay their postpetition obligations to the Utility Companies in a timely fashion and in the ordinary course of business. The Debtors submit that the Utility Deposits and/or the Existing Deposits (or some combination thereof), in conjunction with their ability to pay for the Utility Services in the ordinary course of business, constitutes adequate assurance of payment for each of the Utility Companies. Nonetheless, the Debtors anticipate that certain Utility Companies may request additional adequate assurance. Therefore, the Debtors seek to establish reasonable procedures by which a Utility Company may proceed if it believes that its Utility Deposit is insufficient.

108.    The Debtors submit that granting the relief requested in the Utility Motion is both necessary and appropriate. The relief requested in the Utility Motion will afford the

44

Debtors an opportunity to successfully reorganize and will not prejudice the rights of any of the

Utility Companies.

H.    **Emergency Motion of Event Rentals, Inc. and its Affiliated Debtors for Order Authorizing (i) Deposit Payments to Essential Providers as Assurance of Payment on Future Orders; and (ii) Payment of Certain Ordinary Course Obligations under Prepetition Vendor Contracts Relating to Postpetition Client Events (the "Essential Provider Motion")**

109.    Pursuant to the Essential Provider Motion, the Debtors seek an order to

(i) make deposit payments to essential providers of goods and services as assurance of payment

on future orders; and (ii) pay, in the ordinary course of business, certain ordinary course

obligations under prepetition vendor contracts relating to postpetition client events.

110.    In the ordinary course of their businesses, the Debtors rely on a network of

hundreds of third party vendors, supplying such diverse goods and services as event staffing,

dishware, heavy equipment rental, linen cleaning, HVAC, temporary flooring solutions, and

portable restrooms.  Despite the differences in the types of goods and services they provide,

many of these vendors have one thing in common: they are essential to the Debtors' ability to

provide event rental and related services to the Debtors' clients.

i.    **Essential Providers Deposits**

111.    Unfortunately, prior to the Petition Date, the Debtors fell behind on their

payments to many of their essential providers.  In many cases, this led to *ad hoc* payment plans

under which the Debtors sought to make up their arrearages.  As a result of the Debtors' chapter

11 filings, these payment plans will necessarily be suspended, leaving any outstanding balance

on the Debtors' accounts until the Chapter 11 Cases are resolved.

45

112.    The Debtors are deeply concerned that their failure to stay current prior to the Petition Date and the stigma associated with operating under bankruptcy protection may deter their essential providers from continuing business relations with the Debtors during the Chapter 11 Cases.  If the Debtors' essential providers were to suspend dealings with the Debtors *en masse*, the consequences to the Debtors' business would be catastrophic.  Indeed, whether due to their longstanding relationships with the Debtors or their unique positions within their respective markets, it would be impractical, if not impossible, for the Debtors to find alternative providers for many of their essential providers.  Accordingly, the Debtors hereby seek authority to make deposits to their essential providers, pursuant to the Essential Providers Deposit Procedures described below, as assurance of payment on future orders made by the Debtors during the Chapter 11 Cases.  In exchange, any essential provider accepting a deposit payment will agree to continue doing business with the Debtors on ordinary, non-default terms provided that the Debtors remain current on all postpetition obligations.

113.    The Debtors estimate, and seek authority to pay up to $2 million in deposits pursuant to the Essential Providers Deposit Procedures, which is equivalent to 12% of the Debtors' average accounts payable balance.

114.    The Debtors submit that the Essential Providers Deposit Procedures will serve to protect the Debtors' valuable relationships with their most important goods and services providers while avoiding potentially controversial preferential treatment of these providers' prepetition claims.  The Debtors further submit that the relief requested with respect to the Straddle Services is justified on a variety of legal and practical grounds.

46

115.    The Debtors seek authority to make Essential Providers Deposits in order to preserve valuable business relationships that would be costly, if not impossible, for the Debtors to replace.  In formulating the Essential Providers Deposit Procedures, the Debtors have carefully considered the interests of the Debtors' estates and all parties in interest and believe that the procedures appropriately serve the need to preserve the Debtors' going concern value while respecting the important bankruptcy policy against pre-plan payment on account of prepetition claims.  As discussed above, the Essential Providers are critical to the Debtors' ability to serve their clients.  For example, some Essential Providers supply the Debtors with equipment, through sale or rental arrangements, that enable the Debtors to meet client demands for their special events.  Other Essential Providers, though contracted through the Debtors, provide client facing services alongside the Debtors such that the Debtors' clients associate these Essential Providers directly with the Debtors.  In short, without the goods and services provided by the Essential Providers, the Debtors would be unable to provide the high level of service their clients have come to expect of them or, in some cases, unable to execute the event as required under their agreement with the client.

116.    The relationships the Debtors have developed in working closely with their Essential Providers are extremely valuable for a number of reasons and therefore warrant maintenance by way of the relief requested in the Motion.  Among others things, these relationships facilitate efficient cooperation between the Debtors and their Essential Providers, something which is particularly important in the event management industry that is frequently high stress and runs on short deadlines.  Where delays are not an option, a trusted and reliable partner is an invaluable asset.  Moreover, the relationships have resulted in considerable

47

goodwill between the Debtors and their Essential Providers.  Although the Debtors recognize

their Essential Providers would surely prefer immediate payment on account of their prepetition

claims, the Debtors believe that the assurance of current payment on future orders, in the form of

a significant deposit, will satisfy their Essential Providers' concerns over non-payment and

provide a compelling economic incentive to continue doing business with the Debtors as they

seek a transaction that is in the best interests of all parties in interest, including the Essential

Providers.

> 117.    Absent some concrete assurance of payment by the Debtors to their

Essential Providers, the Essential Providers are more likely to suspend business relations with the

Debtors during the pendency of the Chapter 11 Cases.  If the Essential Providers abandon their

relationships with the Debtors, the Debtors' ability to serve their clients will be severely

impaired and the Debtors' businesses will be disrupted at a critical juncture.  This, in turn, at

best, will greatly diminish the value of the Debtors' businesses and, at worst, cause the Debtors

to breach their agreements, and in either case, reduce the value in these Chapter 11 Cases

available for distribution to parties in interest.

### ii.    Ordinary Course Payment for Straddle Services

> 118.    The Debtors are also particularly committed to maintaining uninterrupted

business relations with vendors that agreed prepetition to provide services relating to client

events that will occur, in whole or in part, postpetition[25] (services under such agreements referred

to herein as "Straddle Services").  As already outlined above, the Debtors frequently subcontract

---

[25] For the avoidance of doubt, an event ends when all the goods provided by third party vendors or the Debtors have
been picked up from the event location and/or dropped off at the third party vendor.

aspects of their event services to third party vendors.  In many cases, the subcontracting is

accomplished informally, such as by telephone, with a handshake, or by a bare invoice.  Almost

invariably, the bulk of the Debtors' and their third-party vendors' work relating to an event

occurs the day of or in the few days leading up to the event.  Still, some work may begin well in

advance of the event and, naturally, the agreement is made prior to the event.

119.    In order to avoid any confusion or uncertainty concerning the proper

classification of claims arising from Straddle Services, the Debtors seek authorization to make

ordinary course payments on account of Straddle Services in the ordinary course of their

businesses, without regard to either (i) the fact that the Debtors contracted for the Straddle

Services prior to the Petition Date; or (ii) the fact that some portion of the Straddle Services were

or may have been provided prior to the Petition Date; *provided*, *however*, the aggregate

estimated value of <u>prepetition</u> services rendered for, or in connection with, the Straddle Services

shall not exceed $500,000 based on the business judgment of the Debtors (the "<u>Estimated</u>

<u>Prepetition Value Maximum</u>").

120.    If the Debtors are unable to assure providers of Straddle Services that the

Debtors will be authorized to make payments on account of such services in the ordinary course,

Straddle Services providers may elect not to provide the most important (and typically most cost-

intensive) part of the Straddle Services—the services at the actual client event.  This would be

extremely harmful to the Debtors.  Among other things, the Debtors would be forced to find a

replacement on short notice in order to avoid disruption to a client event and the consequent loss

of goodwill.  The cost of a replacement on short notice could exceed the cost of simply paying

the component of the Straddle Services provider's claim that may have arisen prior to the

Petition Date.  In many cases, however, it would be impossible for the Debtors to find a replacement vendor, as certain goods are unique to those vendors and the Debtors' client may have specifically requested such goods.  Further, as previously stated, unlike some companies, the Debtors cannot delay performance of its agreements.  The events serviced by the Debtors are usually tied to a once-occurring date, such as Christmas, New Year's, Fourth of July, a specific wedding date, or birthday.  In these cases, the failure to provide such goods at the event could result in an un-curable breach and potential administrative claims against the Debtors' estates.

121.    The Debtors believe that almost all ordinary course claims for contractual payments on account of Straddle Services are postpetition claims payable in the ordinary course of the Debtors' businesses.  Vendors with whom the Debtors subcontract event work generally receive some combination of prepayment for the work at the time of contracting, partial payment mid-stream, or final payment upon conclusion of the work.  In most cases, however, a final payment will be due by the Debtors upon the Straddle Services providers completion of its work for the Debtors at or near the time of the event.  This is so because Straddle Services are limited to those services requested by the Debtors and commenced prior to the Petition Date but not concluded until after the Petition Date.

122.    Generally, the Debtors and Straddle Services providers work in concert to put on events for the Debtors' clients, such that performance remains due on each side until the conclusion of the event.  The Debtors believe that little benefit would inure to the Debtors estates by parsing the prepetition versus postpetition components of a vendor's Straddle Services.

123.    The administrative cost of attempting to distinguish between postpetition obligations in respect of Straddle Services and prepetition obligations, if any, would be

50

considerable and likely exceed the value of the exercise to the Debtors' estates.  Whereas a

Straddle Services provider may have to plan and prepare to provide services at an event, the most

cost-intensive portion of the provider's obligations is typically the day of the event itself, or, less

typically, the few days preceding the event.

124.    Payment on account of the Straddle Services is necessary to preserve the

going concern value of the Debtors' businesses because the Straddle Services are key in some

instances and mandatory in others to the Debtors' ability to fulfill their obligations to their clients

and thus generate revenue and preserve valuable client goodwill.  Without the relief requested in

the Essential Provider Motion, one or more providers of Straddle Services may conclude that

payment on account of its services is at risk and, on that basis, refuse to perform the remaining

Straddle Services.  This would have serious consequences for the Debtors.  Even if the Debtor

had some remedy against a Straddle Services provider that refused to perform, it would be

extremely difficult to adequately compensate the Debtors for their losses resulting from such

refusal.

125.    As an initial matter, to the extent that a Straddle Services provider's

cancellation were to cause some disruption to a client event, the harm to the Debtors' reputation

could be irreparable.  Thus, the Debtors would necessarily take every possible step to secure a

replacement provider.  Even if the Debtor were able to secure a suitable replacement provider on

short notice, which in many cases would prove impossible, the cost of obtaining such a provider

would likely exceed the cost of paying the full amount owed the Straddle Services provider

negotiated on regular notice.  Moreover, even if the Debtors' losses in this regard are

compensable, or if the Debtors were able to find a stand-in at the same rates as the initial

51

provider, the drain on the Debtors' operational resources in arranging for a replacement provider on short notice would be disruptive to the Debtors' other operations at a time when flawless operational execution will be of greater importance than ever.

126.    Finally, it could prove impossible to locate an adequate substitute for certain specialized Straddle Services, or a client could be dissatisfied with the substitute service provider when the client expected the original Straddle Service provider.  If these events are disrupted due to the Debtors' inability to find a replacement vendor such disruption may result in a postpetition breach of contract allegation and a potential administrative claim against the Debtors' estates.

127.    The Debtors' ability to maintain the high level of service their clients expect from the Debtors' family of event brands is essential to maintaining the Debtors' going concern value.  The value of the Debtors' brands lies significantly in their excellent reputation with clients who repeatedly choose the Debtors over their competitors based on successful events they have heard about, attended, or previously hosted with the Debtors' assistance.  The Debtors are committed to maintaining this reputation throughout the pendency of their Chapter 11 Cases and submit that the relief requested in the Essential Provider Motion is necessary to do so.

128.    The relief requested in the Essential Provider Motion is necessary to avoid immediate and irreparable harm to the Debtors' estates.  Further, the relief requested in the Essential Provider Motion is critically important to prevent irreparable damage to the Debtors' operations.

I.     **Motion of Event Rentals, Inc. and its Affiliated Debtors for Order (i) Authorizing Debtors to (a) Maintain Insurance Program, (b) Maintain Insurance Premium Financing Program, (c) Pay Insurance Premiums in the Ordinary Course, and (d) Pay All Obligations Associated Therewith; and (ii) Preventing Insurance Companies from Giving any Notice of Termination or Otherwise Modifying any Insurance Policy without Obtaining Relief from the Automatic Stay (the "<u>Insurance Motion</u>")**

129.    Pursuant to the Insurance Motion, the Debtors seek of an order

(i) authorizing the Debtors to (a) maintain their insurance programs; (b) maintain their insurance

premium financing program, including authority to renew, supplement, or enter into new

financing arrangements as needed; (c) pay insurance premiums in the ordinary course, without

regard to when those obligations arose; and (d) pay any prepetition and postpetition obligations

associated therewith; and (ii) preventing insurance companies from giving any notice of

termination or otherwise modifying or canceling any insurance policies without first obtaining

relief from the automatic stay imposed by section 362 of the Bankruptcy Code.

130.    In connection with the operation of their businesses, the Debtors maintain

a corporate risk program, pursuant to which the Debtors are insured under numerous insurance

policies (collectively, the "<u>Insurance Policies</u>," each, an "<u>Insurance Policy</u>") through several

different carriers (collectively, the "<u>Insurance Carriers</u>") including, but not limited to, the

Insurance Policies and Insurance Carriers identified on <u>Exhibit B</u>, attached to the Insurance

Motion.

131.    The Debtors pay, either directly or through their insurance brokers,

premiums or premium equivalents in connection with the Insurance Policies (the "<u>Insurance</u>

<u>Premiums</u>").  The Insurance Policies have various deductible obligations that are paid based on

LOSANGELES 1041035 (2K)

the amount of claims made against the Insurance Policies and are calculated in accordance with the applicable Insurance Policy.

132.    The Debtors have commercial general liability coverage through First Mercury Insurance Company with an annual premium of $323,587.00, commercial automobile coverage through Old Republic General Insurance Corporation with an annual premium of $749,919.00, excess automobile coverage through Rockhill Insurance Company with an annual premium of $257,788.00, umbrella coverage through Great American Insurance Company with an annual premium of $255,326.00, equipment floater/inland marine coverage through Underwriters at Lloyd's of London with an annual premium of $182,500.00, equipment floater/inland marine/windstorm or hail coverage through Colony Insurance Company with an annual premium of $121,518.00, workers' compensation coverage through Old Republic General Insurance Corporation with an annual premium of $4,524,011.00, executive risk coverage through ACE (Westchester Insurance Company) with an annual premium of $72,775.00, commercial property coverage through Zurich American Insurance Company with an annual premium of $128,876.00, and crime coverage through Federal Insurance Company with an annual premium of $4,880.00.  The Debtors also maintain employee healthcare liability stop loss coverage with Reliastar Life Insurance Company with an annual premium equivalent of approximately $240,000.00, depending on the number of individuals covered.

133.    Prior to the Petition Date, the Debtors obtained a six year runoff executive risk policy and a Newco executive risk package through ACE (Westchester Insurance Company) with an effective date of February 19, 2014.  The total premium for the runoff policy and the Newco executive risk package is $239,837.00, which the Debtors paid in full through their

insurance brokers, Lockton Insurance Brokers, LLC ("<u>Lockton</u>").  In conjunction with the executive risk runoff policy, the Debtors renewed their commercial crime policy, effective February 19, 2014.  The premium for the commercial crime policy renewal is $2,604.00, which the Debtors also paid in full.

### i.     Policies with Financed Premiums

134.     The Debtors finance certain of their Insurance Policies.  The commercial general liability policy, the commercial automobile policy, the excess automobile policy, and the umbrella policy are financed pursuant to an insurance financing agreement (the "<u>Premium Assignment Corporation Financing Agreement</u>"), dated December 19, 2013, between Special Event Holding, Inc., as insured, and Premium Assignment Corporation, as lender.  The total annual premium under the Insurance Policies financed through the Premium Assignment Corporation Financing Agreement is $1,586,620.00.  The down payment under the Premium Assignment Corporation Financing Agreement is $475,985.94 and, after assessment of a $17,899.74 finance charge, the Debtors payments under the Premium Assignment Corporation Agreement total $1,128,533.60.  This total is payable in eight monthly installments of $141,066.70.

135.     In addition, the equipment floater/inland marine policy, the equipment floater/inland marine/windstorm or hail policy, and the commercial property policy are financed pursuant to an insurance financing agreement (the "<u>IPFS Financing Agreement</u>," together with the Premium Assignment Corporation Financing Agreement, the "<u>Premium Financing Agreements</u>," and each, a "<u>Premium Financing Agreement</u>") beginning on September 7, 2013, between Special Event Holding, Inc., as insured, and IPFS Corporation, as lender.  The total

55

annual premium under the Insurance Policies financed through the IPFS Financing Agreement is $432,894.36. The total down payment under the IPFS Financing Agreement is $85,498.20 and, after an assessment of a $9,009.34 financing charge, the Debtors' payments under the IPFS Financing Agreement total $356,405.50. This total is payable in eleven monthly installments of $32,400.50. As of the Petition Date, the Debtors believe that they are current on their obligations under the Premium Financing Agreements.

136.    The Debtors' obligations under the Premium Financing Agreements are secured by all unearned premiums or dividends payable to the Debtors under the Insurance Policies covered by the Premium Financing Agreements, as well as any loss payments. Under the Premium Financing Agreements, Premium Assignment Corporation and IPFS Corporation are appointed the Debtors' attorney-in-fact under the Premium Assignment Corporation Financing Agreement and the IPFS Financing Agreement, respectively, with authority to, among other things, cancel the Insurance Policies as described under the respective Premium Financing Agreement in the event of non-payment.

### ii.    Policies Without Financed Premiums

137.    Premiums payable under the Insurance Policies that are not financed are paid in accordance with the applicable agreement governing each such Insurance Policy. As of the Petition Date, the Debtors believe that they have prepetition obligations owing on account of certain Insurance Policies without financed premiums in an amount of not more than $500,000.[26]

---

[26] On or about January 17, 2014, the Debtors received a demand letter from Zurich American Insurance Company demanding $899,215 (the "Zurich Demand") in connection with a defunct insurance policy that is not the subject of the Insurance Motion. The Debtors dispute the Zurich Demand and reserve all rights with respect thereto. Accordingly, nothing in the Insurance Motion should be construed to authorize payment of the Zurich Demand.

Accordingly, the Debtors request to pay any obligations arising from the Insurance Policies in the ordinary course, without regard to when those obligations arose, in an amount not to exceed $500,000.

138.    The Debtors can easily articulate a sound business justification for maintaining insurance coverage.  First, it is critical that the Debtors maintain their Insurance Policies in order to provide a comprehensive range of coverage that protects their property, assets, and the equipment, which are all necessary to conduct their businesses, including but not limited to, the rental properties out of which the Debtors operate their showrooms and warehouses, property in transit, the rental equipment and machinery that the Debtors require to set up and put on events (*e.g*., tools, machinery, and party equipment), and the fleet of vehicles that the Debtors own and lease in order to transport rental goods and sales and support staff to event sites.  Without the coverage provided by the Insurance Policies, the Debtors could incur significant liabilities relating to their day-to-day operations.

139.    Second, if the Debtors are unable to pay the premiums necessary to maintain the Insurance Policies, they may be unable to find alternative insurance carriers willing to offer them similar insurance at a competitive price.  While the Debtors dispute the right of any insurer to terminate the Insurance Policies for non-payment of premiums, any litigation associated with such alleged termination would be contested and thus very costly to the Debtors' estates.  Prepetition premiums or other amounts due and owing on the Insurance Policies and Premium Financing Agreements are minimal compared with the potential risk to the value of the Debtors' estates absent insurance coverage.  Without such coverage, the Debtors would be exposed to substantial liability because many, if not all, of the property and goods that are

required to operate their businesses would not be covered by insurance.  The Debtors would almost certainly incur substantial costs associated with repairing and replacing any damaged property not covered by insurance.  Also, as noted above, many of the coverage requirements are mandated by law or by the contracts governing the Debtors' commercial activities.  Accordingly, the potential exposure and consequences that would stem from such lapses or cancellations would have a serious adverse effect on the Debtors' business operations and the value of their estates.

140.    The Insurance Policies are essential for the preservation of the Debtors' businesses, and are, in some cases, required by various laws, regulations, or contracts that govern the Debtors' businesses.  The relief requested in the Insurance Motion is necessary to avoid immediate and irreparable harm to the Debtors' estates.  The relief requested in the Insurance Motion is critically important to prevent irreparable damage to the Debtors' operations.

**J.    Motion of Event Rentals, Inc. and its Affiliated Debtors for Authority to (i) Maintain Certain Referral Commission Programs and (ii) Honor or Pay Related Prepetition Obligations in Receipt Thereof (the "<u>Referral Commission Motion</u>")**

141.    Pursuant to the Referral Commission Motion, the Debtors seek an order authorizing the Debtors to (i) maintain certain referral commission programs and (ii) honor or pay certain related prepetition obligations to the Referral Parties (as defined below) and granting certain related relief.

142.    Continued success in the Debtors' industry is highly dependent on building and maintaining strong business relationships with key venues, caterers, party planners, and other business contacts (the "<u>Referral Parties</u>").  Prior to the Petition Date, and in the ordinary course of their businesses, the Debtors incurred certain commission and/or rebate

58

obligations in developing and sustaining positive business relationships and referrals within the

marketplace for their products and services (the "<u>Referral Commissions</u>").  The Referral

Commissions are generally a percentage (between 5-15%) of the rental invoice (not including

fees, sub-rentals, etc.) or a percentage (between 5-20%) of a specific category of items on the

rental invoice (*e.g.* linens, kitchen equipment, china, etc.).  The Referral Commissions vary

depending on many factors including the nature of the engagement, the market, and the

application of discounts (collectively, the "<u>Referral Commission Programs</u>").

143.    The Referral Commissions accrue when the Referral Parties refer

customers to the Debtors.  Reconciliation of the accrued Referral Commissions occurs monthly

and the Debtors pay such commissions after the Debtors receive final payment on the customers'

invoices, either directly from the customer to the Debtors or through the Referral Parties'

account with the Debtors.

144.    Many of the Referral Commission obligations are incurred and satisfied

within a short time frame, typically within a month of the event taking place, and amount to a

relatively small percentage of the invoice for the event.  Prior to the Petition Date, the cost

associated with the Referral Commission Programs typically amounted to approximately 15% of

the revenue generated by the Referral Commission Programs and approximately 1-1.5% of the

Debtors' total revenue.  However, due to the uncertain impact of these Chapter 11 Cases,

increased discounts and incentives may be required to motivate referrals and customers.

145.    The Referral Commission Programs represent an important aspect of the

Debtors' sales and marketing efforts, particularly in maintaining strong relationships with key

venues and contacts.  Without the use of commission incentives, the Debtors' ability to remain

competitive in their industry would be adversely impacted.  Further, the cost of the Referral

Commission Programs has historically been more than justified by the amount of sales generated

thereby.  As of the Petition Date, the Debtors estimate that outstanding obligations due under

their Referral Commission Programs associated with pending events do not exceed $500,000.

146.    The success and viability of the Debtors' businesses are dependent, in

large measure, upon the Debtors' reputation and the strength of their business relationships.

Through the Referral Commission Programs, the Debtors have generated valuable goodwill,

repeat business, and net revenue increases.  Failure to honor obligations under the Referral

Commission Programs may irreparably harm the Debtors' business and customer relationships at

a time when their loyalty is critical.  Indeed, if the Debtors are prohibited from honoring and

maintaining the Referral Commission Programs consistent with their past business practices, the

damage to their key business relationships will irreparably harm the Debtors' businesses to an

extent that far exceeds the cost associated with honoring and continuing such practices.  The

Debtors believe that continuing these benefits throughout their Chapter 11 Cases is essential to

preserving the value of the Debtors' estates.

147.    The vast majority of the Debtors' value is in their relationships with key

business contacts, Referral Parties, and customers and their strong reputation in the event

planning industry.  Failure to continue the Referral Commission Programs could significantly

impair the Debtors' ability to fully realize the value of their assets and generate revenue.

Further, continuing to honor the Referral Commission Programs will, for a relatively *de minimis*

cost, protect the Debtors' reputation and the loyalty of their contacts and customers during this

critical time.

60

148.    The relief requested in the Referral Commission Motion is necessary to avoid immediate and irreparable harm to the Debtors' estates.  Further, the relief requested in the Referral Commission Motion is critically important to prevent irreparable damage to the Debtors' operations.

**K.      Motion of Event Rentals, Inc. and its Affiliated Debtors for an Order (i) Authorizing the Debtors to Satisfy Certain Prepetition Obligations in Connection with Current Customer Contracts and Agreements, (ii) Authorizing the Debtors to Return Customer Deposits, (iii) Approving the Form and Manner of a Supplemental Customer Notice of the Commencement of the Chapter 11 Cases, and (iv) Granting Related Relief (the "Deposit Motion")**

149.    Pursuant to the Deposit Motion, the Debtors seek an order (i) authorizing, but not directing, the Debtors to perform under the prepetition customer contracts as described below, including by applying certain customer deposits to outstanding balances consistent with their past business practices and in accordance with and subject to the terms and conditions of the relevant contracts; (ii) authorizing, but not directing, the Debtors to return customer deposits subject to and in accordance with the Debtors' past ordinary course business practices and/or the terms of such contracts; (iii) approving the form and manner of providing a supplemental customer notice of the commencement of the above-captioned chapter 11 cases; and (iv) authorizing, but not directing, the Debtors to proceed immediately with honoring their obligations under the contracts.

150.    Prior to the Petition Date, the Debtors entered into oral and written contracts with customers in connection with events that have not yet occurred (the "Contracts"). The terms of the Contracts vary depending on the customer, the event, and the Debtors' operating region, but generally provide for, among other things, a description of the equipment

61

and services to be provided, the total price, and payment of a deposit (a "<u>Deposit</u>" and,

collectively, the "<u>Deposits</u>").  A sample of one of the Debtors' standard invoice sales contracts is

attached to the Deposit Motion as <u>Exhibit A</u>.

   151. Upon receipt, Deposits are recorded as a liability and comingled with the

Debtors' funds.  Upon final invoicing, the Debtors credit the amount of the Deposit against the

remaining payment required from the customer.  As of the Petition Date, the Debtors estimate

that they have collected and currently hold in excess of $2 million in Deposits in connection with

the Contracts.

   152. If a customer cancels an event, however, under the terms of the Contracts,

the Debtors are not obligated to refund the Deposit. Further, in the Debtors' business judgment,

the customer may be charged a re-stocking fee, which varies depending upon the terms of the

individual Contract, the Debtor's operating region, and the proximity of the cancellation to the

scheduled event.  The re-stocking fee is first applied against the customer's Deposit, and in the

event the Deposit exceeds the amount of the re-stocking fee, any remaining Deposit may be

refunded to the customer in accordance with the Debtors' ordinary course business practices and

in their business judgment.  In the normal course of business, depending on the customer, the

event, and the operating region, the Debtors typically refund approximately $100,000 in Deposits

each week.[27]

   153. The Debtors believe that the ability (i) to honor the Contracts, by, among

other things, applying certain customer deposits to outstanding balances and (ii) to return

---

[27] The amount of refunded Deposits varies significantly from week to week depending on the type and location of the events scheduled for the week.  As such, this refund amount is only an estimate.

Deposits subject to and in accordance with the Debtors' past ordinary course business practices and/or the terms of such Contracts is essential to retaining the Debtors' customer base.  The Debtors successful operation is heavily dependent upon their reputation and repeat business from certain key clients and referral sources.  The Debtors' inability to refund customer Deposits when appropriate, and in the Debtors' business judgment, will damage the Debtors' reputation in the event community; thereby causing immediate and irreparable harm to the Debtors' businesses, and severely decreasing the value of the Debtors' estates.  The Debtors strongly believe that this decreased value would exponentially exceed the value obtained from retaining such Deposits.

154.    Absent the authority to apply and/or return Deposits, the Debtors will lose existing customers, resulting in a loss of revenue and, perhaps, the Debtors' ability to continue as a going concern.  In addition, the Debtors' reputation in the marketplace will be damaged such that the Debtors will be unable to attract new customers, further impacting the Debtors' ability to reorganize.  Any interruption in the Debtors' ability to honor the current prepetition Contracts and/or return Deposits, in the Debtors' business judgment will result in immediate and irreparable harm to the value of the Debtors' assets and businesses to the detriment of the Debtors' estates and creditors.

155.    Further, because of the nature of the Debtors' businesses and the sensitive relationship between the Debtors and their customers, especially those who have provided the Debtors with Deposits, the Debtors believe that any notice served on their customers regarding these Chapter 11 Cases must be carefully drafted and tailored to those customers' unique concerns.  Accordingly, the Debtors propose to provide their customers, in addition to the

63

general notice of the filing of these Chapter 11 Cases, a letter from me (the "Customer Filing Notice"), substantially in the form attached to the Deposit Motion as Exhibit B.

156.    The Customer Filing Notice will provide (i) notice of the commencement of these Chapter 11 Cases, (ii) a description of certain relief granted the Debtors in connection with the first day motions, and (iii) assurances that the Debtors' businesses will continue to operate as normal and that the Contracts will be honored.  The Debtors believe that the Customer Filing Notice will provide comfort to the Debtors' customers in a manner familiar to them and at de minimis cost to the Debtors.  The Customer Filing Notice will aid in preventing the attrition to the Debtors' customer base that might otherwise result if the customers receive a typical filing notice, preserving the value of the Debtors' estates.

157.    The Debtors believe that the Customer Filing Notice is critical to preserve the value of the Debtors' estates, and thus, is necessary to carry out the provision of the Bankruptcy Code.  The Debtors are only seeking authority to provide the Customer Filing Notice in addition to the general notice of the filing of these Chapter 11 Cases.  For this reason, the Debtors' customers will be provided with ample and sufficient notice of the filing of the Chapter 11 Cases.

158.    The relief requested in the Deposit Motion is necessary to avoid immediate and irreparable harm to the Debtors' estates.  Further, the relief requested in the Deposit Motion is critically important to prevent irreparable damage to the Debtors' operations.

### III.    CONCLUSION

159.    The Debtors' ultimate goal in these Chapter 11 Cases is to achieve a sale of their business that maximizes the value of the Debtors' estates for the benefit of all the

Debtors' creditors, and subsequently confirm a chapter 11 plan.  In the immediate term, however, in order to minimize any loss of value of their businesses during these Chapter 11 Cases, the Debtors' most pressing objective is to minimize the disruption to the Debtors' operations to the greatest extent possible as it enters chapter 11 protection.  The Debtors believe that if the Court grants the relief requested in each of the First Day Motions, the prospect for achieving this objective and, in turn, their overriding goal in these Chapter 11 Cases, will be substantially increased.

[signature on following page]

I declare under penalty of perjury under the laws of the United States of America that the forgoing is true and correct.

Executed on February 13, 2014.

Jeffrey M. Black