**Exhibit A**

Successful Bid Agreement

DRAFT 4/20/14

# ASSET PURCHASE AGREEMENT

## BY AND AMONG

## SPECIAL EVENT HOLDING, INC.,

## EACH SUBSIDIARY OF SPECIAL EVENT HOLDING, INC. SET FORTH ON THE SIGNATURE PAGES HERETO[1]

## AND

## [BUYER TO BE DESIGNATED]

## Dated as of April [20], 2014

---

[1]    Event Rentals, Inc., a Delaware corporation, Dubo Acquisition Corporation, a Delaware corporation, DBO Acquisition Corporation, a Delaware corporation, Classic Party Rentals LP, a Texas limited partnership, Classic Party Rentals, Inc., a California corporation, Classic Midwest, Inc., a Delaware corporation, Classic Northeast, Inc., a Delaware corporation, Classic Panache, Inc., a Delaware corporation, Classic/Prime, Inc., a Delaware corporation, Classic Southeast, Inc., a Delaware corporation, Unique Tabletop Rentals, Inc., a California corporation, and Grand Events and Party Rentals, Inc., a Tennessee corporation.

# TABLE OF CONTENTS

**Page**

ARTICLE IDEFINITIONS ........................................................................................1

    Section 1.1    **Certain Definitions** ........................................................1

    Section 1.2    **Other Definitional and Interpretive Matters** ................11

ARTICLE IIPURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES ..........12

    Section 2.1    **Purchase and Sale of Assets** ......................................12

    Section 2.2    **Excluded Assets** ........................................................14

    Section 2.3    **Excluded Liabilities** ..................................................15

    Section 2.4    **Assumed Liabilities** ..................................................17

    Section 2.5    **[Intentionally Omitted]** ............................................18

    Section 2.6    **Further Conveyances and Assumptions** ....................18

    Section 2.7    **Transitional Matters** ................................................19

    Section 2.8    **Cure Amounts** ..........................................................21

ARTICLE IIICONSIDERATION ..............................................................................22

    Section 3.1    **Purchase Price** ..........................................................22

ARTICLE IVCLOSING AND TERMINATION ..........................................................22

    Section 4.1    **Closing Date** ............................................................22

    Section 4.2    **Deliveries by Sellers** ................................................22

    Section 4.3    **Deliveries by Buyer** ..................................................23

    Section 4.4    **Termination of Agreement** ........................................23

    Section 4.5    **Buyer Deposit** ..........................................................25

    Section 4.6    **Effect of Termination** ..............................................25

ARTICLE VREPRESENTATIONS AND WARRANTIES OF SELLERS ................................25

    Section 5.1    **Organization of Sellers; Authorization of Agreement** ..................26

i

Section 5.2        **No Conflicts** ................................................................................26

Section 5.3        **Title to Purchased Assets** ..............................................................27

Section 5.4        **Real Property Leases** ....................................................................27

Section 5.5        **Tangible Personal Property** ..........................................................27

Section 5.6        **Intellectual Property** .....................................................................28

Section 5.7        **Financial Statements** .....................................................................28

Section 5.8        **Financial Advisors** ........................................................................28

Section 5.9        **Litigation** ........................................................................................28

Section 5.10       **Compliance with Laws** .................................................................29

Section 5.11       **Permits** ...........................................................................................29

Section 5.12       **Contracts** ........................................................................................29

Section 5.13       **Taxes** ...............................................................................................29

Section 5.14       **Employee Benefits** ........................................................................30

Section 5.15       **Labor Matters** ...............................................................................30

Section 5.16       **Suppliers** ........................................................................................31

Section 5.17       **Insurance** .......................................................................................31

Section 5.18       **[Intentionally Omitted.]** ..............................................................32

Section 5.19       **No Other Agreements to Purchase** ...............................................32

Section 5.20       **Environmental Matters** ................................................................32

ARTICLE VIREPRESENTATIONS AND WARRANTIES OF BUYER ..................................32

Section 6.1        **Organization and Good Standing** ..................................................32

Section 6.2        **Authorization of Agreement** .........................................................32

Section 6.3        **No Conflicts** ...................................................................................33

Section 6.4        **Financial Advisors** ........................................................................33

Section 6.5        **Litigation** ........................................................................................33

Section 6.6        **Adequate Assurances Regarding Purchased Contracts and Certain Real Property** ........................................................33

Section 6.7        **Independent Investigation** ..................................................34

Section 6.8        **Commitments** .......................................................................34

ARTICLE VIIBANKRUPTCY COURT APPROVAL .........................................34

Section 7.1        **Competing Transaction** .....................................................34

Section 7.2        **Bankruptcy Court Filings** ................................................35

Section 7.3        **Buyer Deposit** ....................................................................35

ARTICLE VIIICOVENANTS ................................................................................35

Section 8.1        **Access to Information** ........................................................35

Section 8.2        **Further Assurances.** ...........................................................36

Section 8.3        **Confidentiality** ...................................................................37

Section 8.4        **Preservation of Records** ....................................................38

Section 8.5        **Publicity** .............................................................................38

Section 8.6        **Operation of Business** ........................................................38

Section 8.7        **WARN Act Notices** ...........................................................41

Section 8.8        **Notification of Certain Matters** ........................................41

Section 8.9        **Prospective Employees** ......................................................41

Section 8.10       **Name Change** .....................................................................43

Section 8.11       **Certain Financing Matters** ...............................................43

Section 8.12       **Rejected Contracts** ............................................................44

Section 8.13       **Disclaimer of Warranties** .................................................44

ARTICLE IXCONDITIONS TO CLOSING .........................................................44

Section 9.1        **Conditions Precedent to Obligations of Buyer** ................44

Section 9.2        **Conditions Precedent to Obligations of Sellers** ..............45

Section 9.3        **Conditions Precedent to Obligations of Buyer and Sellers** ............46

Section 9.4        Frustration of Closing Conditions ...................................................46

ARTICLE XNO SURVIVAL.................................................................................................46

Section 10.1        No Survival of Representations and Warranties ...........................46

ARTICLE XITAX MATTERS..............................................................................................46

Section 11.1        Transfer Taxes ...........................................................................46

Section 11.2        Purchase Price Allocation ........................................................46

Section 11.3        Withholding ..............................................................................47

ARTICLE XIIMISCELLANEOUS.......................................................................................47

Section 12.1        Expenses ....................................................................................47

Section 12.2        Submission to Jurisdiction; Consent to Service of Process...........47

Section 12.3        Waiver of Right to Trial by Jury ..............................................48

Section 12.4        Power of Attorney .....................................................................48

Section 12.5        Entire Agreement; Amendments and Waivers ..............................48

Section 12.6        Governing Law ..........................................................................49

Section 12.7        Notices ......................................................................................49

Section 12.8        Severability ...............................................................................50

Section 12.9        Binding Effect; Assignment ......................................................50

Section 12.10        Injunction..................................................................................51

Section 12.11        No Recourse ..............................................................................51

Section 12.12        Releases ....................................................................................51

Section 12.13        [Intentionally Omitted]...............................................................52

Section 12.14        Counterparts .............................................................................52

## EXHIBITS

Exhibit A                   Sale Order
Exhibit B                   Assignment and Assumption Agreement

## SCHEDULES

Schedule 1.1(a)          Contracts
Schedule 1.1(b)          Purchased Contracts

| | |
|---|---|
| Schedule 1.1(c) | Purchased Intellectual Property |
| Schedule 2.1(t) | Additional Purchased Assets |
| Schedule 2.2(f) | Additional Excluded Assets |
| Schedule 2.4(a) | Specified Assumed Liabilities |
| Schedule 2.4(d) | Specified Trade Payables |
| Schedule 2.4(f) | Cure Amounts |
| Schedule 2.4(g) | Specified Ad Valorem and Personal Property Taxes |
| Schedule 2.7(e) | Designation Rights Contracts |
| Schedule 5.2 | No Conflicts |
| Schedule 5.4 | Real Property Lease Defaults |
| Schedule 5.5 | Personal Property Leases |
| Schedule 5.7 | Pro Forma Balance Sheet |
| Schedule 5.8 | Financial Advisors |
| Schedule 5.9 | Litigation |
| Schedule 5.10 | Compliance with Laws |
| Schedule 5.11 | Permits |
| Schedule 5.13 | Tax Audits |
| Schedule 5.14 | Benefit Plans |
| Schedule 5.15(a) | Collective Bargaining Agreements |
| Schedule 5.15(f) | Employment Agreements |
| Schedule 5.17 | Insurance Policies |
| Schedule 5.20 | Environmental Matters |
| Schedule 6.4 | Buyer's Financial Advisors |
| Schedule 8.6(e) | Specified Leases |
| Schedule 8.6(g) | Affiliate Transactions |
| Schedule 8.6(i) | Specified Contracts |
| Schedule 8.6(m) | Capital Expenditure Budget |
| Schedule 11.1 | Transfer Taxes |

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "**Agreement**"), dated as of April [20], 2014 (the "**Execution Date**"), is entered into by and among Special Event Holding, Inc., a Delaware corporation, Event Rentals, Inc., a Delaware corporation, Dubo Acquisition Corporation, a Delaware corporation, DBO Acquisition Corporation, a Delaware corporation, Classic Party Rentals LP, a Texas limited partnership, Classic Party Rentals, Inc., a California corporation, Classic Midwest, Inc., a Delaware corporation, Classic Northeast, Inc., a Delaware corporation, Classic Panache, Inc., a Delaware corporation, Classic/Prime, Inc., a Delaware corporation, Classic Southeast, Inc., a Delaware corporation, Unique Tabletop Rentals, Inc., a California corporation, and Grand Events and Party Rentals, Inc., a Tennessee corporation (collectively, "**Sellers**"), and [_____][2] (and together with its designee(s), as provided under Section 12.9, "**Buyer**").

### W I T N E S S E T H:

**WHEREAS**, on February 13, 2014 (the "**Petition Date**"), each of the Sellers commenced cases (the "**Bankruptcy Cases**") under Chapter 11 of Title 11 of the United States Code (as it may be amended from time to time as applicable to the Bankruptcy Cases, the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**");

**WHEREAS**, on February 14, 2014, the Sellers filed a motion seeking approval of the sale of the Purchased Assets (as defined below) and assumption and assignment of the Assumed Liabilities (as defined below) to an entity formed on behalf of the Sellers' prepetition secured lenders pursuant to the Stalking Horse APA, or to the Winning Bidder (as defined herein), pursuant to Sections 363 and 365 of the Bankruptcy Code;

**WHEREAS**, on March 14, 2014, the Bankruptcy Court entered the Bid Procedures Order (as defined below) setting forth the terms and conditions for the auction and sale process with respect to the Purchased Assets and the Assumed Liabilities;

**WHEREAS**, certain terms used in this Agreement are defined in Section 1.1.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements hereinafter contained, the Parties hereby agree as follows:

### ARTICLE I
### DEFINITIONS

Section 1.1    **Certain Definitions.**  For purposes of this Agreement, the following terms shall have the meanings specified in this Section 1.1:

---

[2]    Prior to the Sale Hearing, Apollo Capital Management, L.P., on behalf of investment funds managed by it and its affiliates, will designate an entity (or entities) as the Buyer and, promptly thereafter, the Buyer(s) will execute this Agreement.

"**Accounts Receivable**" means all accounts, accounts receivable, credit card receivables, contract rights to payment, notes, notes receivable, and vendor rebates of Sellers, trade accounts and other amounts receivable (including overdue accounts receivable) and the full benefit of security for all such accounts or rights to payment, and any and all claims, remedies or other rights relating to any of the foregoing, together with any interest or unpaid financing charges accrued thereon, in each case existing on the Execution Date or arising after the Execution Date.

"**Affiliate**" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"**Agent**" means Ableco Finance LLC, as successor administrative agent on behalf of the Lenders under the Financing Agreement, and any successor agent duly appointed under the Financing Agreement.

"**Agreement**" has the meaning set forth in the Preamble.

"**Alternative Proposal**" has the meaning set forth in Section 7.1(a).

"**Antitrust Laws**" has the meaning set forth in Section 8.2(c).

"**Approved Budget**" means the budget established pursuant to and in accordance with the DIP Order and any subsequent budget, in form and substance acceptable to Buyer, that collectively extend through and including the Closing Date, as supplemented, modified or amended with the express written consent of Buyer.

"**Arbitrator**" has the meaning set forth in Section 11.2.

"**Assumed Liabilities**" has the meaning set forth in Section 2.4.

"**Assumption Notice**" has the meaning set forth in Section 2.7(e).

"**Auction**" has the meaning set forth in the Bid Procedures Order.

"**Back-Up Bidder**" has the meaning set forth in the Bid Procedures Order.

"**Bankruptcy Cases**" has the meaning set forth in the Recitals.

"**Bankruptcy Code**" has the meaning set forth in the Recitals.

"**Bankruptcy Court**" has the meaning set forth in the Recitals.

"**Bid Procedures Order**" means the Order of the Bankruptcy Court, entered on March 14, 2014 [Docket No. 175], approving the bid procedures with respect to the Auction and the qualifications for a Qualified Bid (as defined in the Bid Procedures Order).

2

"**Business**" means the business and operations of Sellers of any kind that are conducted by Sellers, including arising out of and relating to the provision of party and event rental products and services.

"**Business Day**" means any day of the year on which national banking institutions in New York are open to the public for conducting business and are not required or authorized to close.

"**Buyer**" has the meaning set forth in the Preamble.

"**Buyer 401(k) Plan**" has the meaning set forth in Section 8.9(e).

"**Buyer Deposit**" has the meaning set forth in Section 7.3.

"**Buyer Documents**" has the meaning set forth in Section 6.2.

"**Buyer Employees**" has the meaning set forth in Section 8.9(b).

"**Buyer Released Parties**" has the meaning set forth in Section 12.12(b).

"**Cash**" means the aggregate amount of cash, cash equivalents, marketable securities and instruments of the Sellers immediately prior to the Closing, including cash pledged to secure outstanding letters of credit and the amounts of any received but uncleared checks, drafts and wires issued prior to such time.

"**Cash Payment**" has the meaning set forth in Section 3.1(b).

"**Closing**" has the meaning set forth in Section 4.1.

"**Closing Date**" has the meaning set forth in Section 4.1.

"**COBRA**" has the meaning set forth in Section 8.9(f).

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Competing Bid**" has the meaning set forth in Section 7.1(a).

"**Contract**" means any legally binding written or oral contract, indenture, commitment, purchase or sale order, note, bond, lease, Real Property Lease, Personal Property Lease, franchise agreement, deed, understanding, arrangement, letter of intent, indemnification agreement, registration, authorization, easement, servitude, mortgage, credit agreement, instrument, or other agreement (including, without limitation, employment and consulting agreements), and all amendments thereof, to which any Seller is a party, including any contract, arrangement or circumstances granting to any Person a right of refusal, right of offer, option or similar preferential right to purchase or acquire any right, asset or property, but excluding any governmental permits, licenses or approvals, as set forth on Schedule 1.1(a).

"**Cure Amounts**" means any and all amounts required to be paid to a counterparty to a Purchased Contract in connection with the cure of a default or event of default, or any actual pecuniary losses that have resulted therefrom under the Purchased Contracts assumed by the

applicable Seller and assigned to Buyer, as determined by the Bankruptcy Court or in accordance with the Bid Procedures Order, as applicable, pursuant to Section 365(b) of the Bankruptcy Code.

"**DIP Order**" means that certain final Order entered by the Bankruptcy Court on April 1, 2014 authorizing and approving post petition financing and the use of cash collateral [Docket No. 277].

"**Designation Notice Parties**" has the meaning set forth in <u>Section 2.7(e)</u>.

"**Designation Rights Contract**" has the meaning set forth in <u>Section 2.7(e)</u>.

"**Designation Rights Period**" has the meaning set forth in <u>Section 2.7(e)</u>.

 "**Documents**" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer lists, stationary, forms, labels, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, catalogs, flyers, artwork, photographs, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

"**Employee Obligations**" means (i) all wages, bonuses, commissions, incentive, equity, equity-based or similar compensation obligations, deferred compensation arrangements, vacation pay, sick time, pension payments, overtime pay, change of control payments, severance pay and any other termination or severance obligations and any other compensation or obligation which may be due by statute, contract or Law relating to the employment of the Employees in respect of the Business and (ii) any claim, demand, action, cause of action, damage, loss, cost, Liability or expense, including legal costs, made or brought by any Employee, including, but not limited to, any claim made pursuant to any applicable Laws relating to employment standards, occupational health and safety, labor relations, workers compensation, pay equity, employment equity, minimum wage, overtime, tip credit, WARN, the Americans with Disabilities Act, the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act of 1967, the Older Workers Benefit Protection Act, the Family and Medical Leave Act or the Fair Labor Standards Act or any other Law regarding employment discrimination.

"**Employees**" means all individuals, as of the Execution Date, whether or not actively at work as of the Execution Date, who are employed by Sellers in connection with the Business, together with individuals who are hired in respect of the Business after the Execution Date and prior to the Closing Date.

"**Environmental Condition**" means, as relating to the Business or the Purchased Assets, the release into the environment of any Hazardous Substance as a result of which Sellers (i) have or may become liable to any Person for an Environmental Liability, (ii) are or were in violation of any Environmental Law, (iii) have or may be required to incur response costs for investigation or remediation, or (iv) may be subject to any Lien under Environmental Laws.

"**Environmental Laws**" means any applicable federal, state, local or foreign law (including common law), statute, code, ordinance, rule, regulation or other requirement relating to the environment, natural resources, or public or employee health and safety.

"**Environmental Liabilities**" means any Liabilities, claims or investigations arising under any Environmental Law concerning violations of Environmental Law or releases of Hazardous Substances, including those arising under common law and including Liabilities, claims or investigations arising from (i) non-compliance or alleged noncompliance with any Environmental Law; (ii) the use, presence, release or threatened release of Hazardous Substances (or allegations thereof); (iii) bodily injury (including illness, disability and death), property damage caused or allegedly caused by exposure to, or the presence of, any Hazardous Substance, and relating to the Business or the Purchased Assets.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**Estate Professional**" means any attorneys, accountants, financial advisors and other professional advisors retained by the Sellers or by any creditors' committee in the Bankruptcy Cases.

"**Excluded Assets**" has the meaning set forth in <u>Section 2.2</u>, subject to <u>Section 2.7(c)</u> and <u>Section 2.7(e)</u>.

"**Excluded Categories**" has the meaning set forth in <u>Section 3.1(b)</u>.

"**Excluded Contracts**" means all Contracts other than Purchased Contracts, subject to <u>Section 2.7(c)</u> and <u>Section 2.7(e)</u>.

"**Excluded Liabilities**" has the meaning set forth in <u>Section 2.3</u>.

"**Execution Date**" has the meaning set forth in the Preamble.

"**Final Order**" means an Order of the Bankruptcy Court or any other court of competent jurisdiction that has not been vacated, reversed, modified, amended, or stayed, and for which the time to further appeal or seek review or rehearing has expired with no appeal, review or rehearing having been filed or sought.

"**Financial Statements**" has the meaning set forth in <u>Section 5.7</u>.

"**Financing Agreement**" means that certain Financing Agreement, dated as of December 20, 2006, by and among Sellers, the Agent and the Lenders, as amended, restated, supplemented or otherwise modified from time to time.

"**Furniture and Equipment**" means all furniture, fixtures, furnishings, equipment, vehicles, leasehold improvements, and other tangible personal property owned or leased by Sellers, including all artwork, desks, chairs, tables, computer and computer-related hardware (including, computers, file servers, facsimile servers, scanners, printers, and networks), copiers, telephone lines and numbers, telecopy machines and other telecommunication equipment, cubicles, cash registers, point-of-sale equipment, warehouse equipment, and miscellaneous office furnishings and supplies.

"**GAAP**" means generally accepted accounting principles of the United States consistently applied, as in effect from time to time.

"**Governmental Body**" means any foreign, domestic, federal, state or local government or governmental or regulatory body thereof, or political subdivision thereof, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private) of competent jurisdiction.

"**Hazardous Substance**" means any pollutant, chemical, substance and any toxic, infections, carcinogenic, reactive, corrosive, ignitable or flammable chemical, or chemical compound, or hazardous substance, material or waste, whether solid, liquid or gas, that is subject to regulation, control or remediation under applicable Environmental Laws, or that otherwise results in any Environmental Liability, including without limitation, any quantity of friable asbestos, urea formaldehyde foam insulation, PCBs, crude oil or any fraction thereof, all forms of natural gas, petroleum products or by-products or derivatives.

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"**Indebtedness**" of any Person means, without duplication, (i) the principal and interest of, and premium (if any) in respect of, (A) indebtedness of such Person for money borrowed, whether or not reflected in such Person's financial statements, together with prepayment premiums or penalties and other amounts with respect to such indebtedness prepaid or becoming due as a result of this transaction, and (B) indebtedness evidenced by notes, debentures, bonds, mortgages or other similar instruments or securities for the payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property or services, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable and other accrued liabilities arising in the Ordinary Course of Business); (iii) all obligations of such Person under leases required to be capitalized in accordance with GAAP; (iv) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (v) all obligations of the type referred to in clauses (i) through (iv) of other Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations; and (vi) all obligations of the type referred to in clauses (i) through (v) of other Persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"**Insurance Policies**" has the meaning set forth in <u>Section 5.17</u>.

"**Intellectual Property**" means all worldwide intellectual property rights of Sellers, including all (i) patents, patent applications and inventions, (ii) trademarks, service marks, trade names and trade dress, which expressly includes the goodwill and any common law rights associated with the foregoing, (iii) domain names, websites and mobile device applications, (iv) copyrights, including copyrights in computer software, (v) confidential and proprietary information, including trade secrets, confidential business information, ideas, research and development, customer and supplier lists, pricing and cost information, business and marketing plans and proposals, and know-how ("**Trade Secrets**"), (vi) licenses relating to any of the foregoing, (vi) registrations and applications for registration and renewal of the foregoing, and (vii) any past, present or future claims

6

or causes of action arising out of or related to any infringement or misappropriation of any of the foregoing.

"**Inventory**" means all of Sellers' now owned or hereafter acquired inventory and goods, wherever located, including all inventory and goods that (a) are leased by any Seller as lessor, (b) are held by such Seller for sale or lease or to be furnished under a contract of service, (c) are furnished by any Seller under a Contract of service, or (d) consist of raw materials, work in process, finished goods or material used or consumed in connection with the Business.

"**Knowledge**" means, with respect to Sellers, the actual knowledge of Jeffrey M. Black, Andre Oberholzer, Andrew Hinkelman and Chip Brown after reasonable inquiry, and (ii) with respect to Buyer, the actual knowledge of Jason Scheir.

"**Law**" means any federal, state, local or foreign law, statute, code, ordinance, rule or regulation of any Governmental Body or any Order.

"**Legal Proceeding**" means any judicial, administrative or arbitral actions, suits, proceedings (public or private) or claims by or before a Governmental Body, and any appeal from any of the foregoing.

"**Lenders**" means the "Lenders" as such term is defined in the Financing Agreement.

"**Liability**" means any Indebtedness, liability, obligation, commitment, expense, claim (as defined in Section 101(5) of the Bankruptcy Code), deficiency, guaranty or endorsement of any type whatsoever (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), and including all costs and expenses relating thereto.

"**Lien**" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest or similar interest, claim, lease, title defects, hypothecation, restrictive covenant, preemptive right, judgment, charge, option, right of first refusal, easement, servitude, proxy, voting trust or agreement, or transfer restriction under any shareholder or similar agreement or encumbrance.

"**Material Adverse Effect**" means any event, change, circumstance, fact, development, effect or occurrence that, individually or in the aggregate, has had or would reasonably be expected to have or result in (i) a material adverse effect on the business, assets, liabilities, results of operations or financial condition of the Business, the Purchased Assets or the Assumed Liabilities, taken as a whole, or (ii) a material adverse effect on the ability of Sellers to consummate the transactions contemplated by this Agreement or perform their obligations under this Agreement, provided that none of the following shall be taken into account in determining the existence of a Material Adverse Effect as set forth in clause (i) above: (a) the effect of any change resulting from any action taken by Buyer or its Affiliates with respect to the transactions contemplated hereby, the fact that Sellers are debtors in possession under the Bankruptcy Code, or any effect resulting directly from the filing of the Bankruptcy Cases or from the compliance by Sellers with the terms of the Bid Procedures Order; (b) a change in applicable Law, accounting requirements or principles or GAAP or any interpretation by any Governmental Body of the foregoing; (c) the announcement, execution, pendency or performance of this Agreement or the transactions contemplated hereby or any communication by Buyer or any of its Affiliates of its plans or intentions (including in respect of

employees) with respect to any of the businesses of the Sellers, including losses or threatened losses of, or any adverse change in the relationship with, employees, customers, suppliers, distributors, financing sources, joint venture partners, licensors, licensees or others having relationships with Sellers, the Business, the Purchased Assets or the Assumed Liabilities; (d) general economic, industry, political or financial market conditions or the financing, banking, currency or capital markets in general or general changes in the industry in which Sellers conduct business; (e) any natural disaster or any acts of terrorism, sabotage, military action, armed hostilities or war (whether or not declared) or any escalation or worsening thereof, whether or not occurring or commenced before or after the date of this Agreement; (f) any failure by the Sellers to meet any internal projections or forecasts (excluding the events, circumstances, changes, facts, developments, effects or occurrences underlying such failure); (g) seasonal changes in the results of operations of the Sellers; or (h) any inaction by Sellers following the refusal by Buyer to consent to any request by Sellers under Section 8.6 with respect to such action, provided, further, that the foregoing clauses (b), (d), and (e) shall not include, and therefore determination of "**Material Adverse Effect**" shall not exclude, any event, change, circumstance or occurrence that affect the Business, the Purchased Assets or the Assumed Liabilities in a materially disproportionate manner when compared to the effect of the same on other Persons engaged in the industries in which Sellers conduct the Business or plan to conduct the Business.

"**Non-Recourse Parties**" has the meaning set forth in Section 12.11.

"**Noticed Employee**" has the meaning set forth in Section 8.7.

"**Noticed Employee Liabilities**" has the meaning set forth in Section 8.7.

"**Order**" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body (whether temporary, preliminary or permanent).

"**Ordinary Course of Business**" means the ordinary and usual course of normal day-to-day operations of the Business consistent with the past practice of the Business through the date hereof, subject to any duties and restrictions imposed on Sellers under the Bankruptcy Code.

"**Parties**" means Sellers and Buyer.

"**Permits**" means any approvals, authorizations, consents, licenses, permits or certifications issued by a Governmental Body, excluding any permits of a temporary or short term nature that are necessary or advisable with respect to an event or series of related events that are the subject of a Contract to which any Seller is a party.

"**Permitted Exceptions**" means (i) all defects, exceptions, restrictions, easements or rights of way and similar non-monetary encumbrances or non-monetary impediments reflected in policies of title insurance which have been made available to or are obtained by Buyer prior to the Execution Date and that would not interfere in any material respect with the use of the Purchased Assets or conduct of the Business in accordance with historical practice; (ii) statutory Liens for current Taxes, assessments or other governmental charges not yet delinquent; (iii) mechanics', carriers', workers', repairers' and similar Liens arising or incurred in the Ordinary Course of Business; (iv) zoning, entitlement and other land use and environmental regulations imposed by any Governmental Body in the Ordinary Course of Business provided that such regulations have not been violated; (v) title of a

lessor under a capital or operating lease, and (vi) such other imperfections in title or similar Liens which would not interfere in any material respect with the use of the Purchased Assets, or as Buyer may approve in writing in its sole discretion.

"**Person**" means any individual, corporation, proprietorship, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"**Personal Property Leases**" shall have the meaning set forth in Section 5.5.

"**Petition Date**" has the meaning set forth in the Recitals.

"**Previously Omitted Contract**" has the meaning set forth in Section 2.7(d)(i).

"**Previously Omitted Contract Designation**" has the meaning set forth in Section 2.7(d)(i).

"**Previously Omitted Contract Notice**" has the meaning set forth in Section 2.7(d)(ii).

"**Prospective Employees**" has the meaning set forth in Section 8.9(a).

"**Purchase Price**" has the meaning set forth in Section 3.1(a).

"**Purchased Assets**" has the meaning set forth in Section 2.1.

"**Purchased Contracts**" means the Contracts set forth on Schedule 1.1(b), as such Schedule may be amended from time to time in accordance with this Agreement.

"**Purchased Intellectual Property**" means all Intellectual Property and related Software and Technology of the Sellers, including as set forth on Schedule 1.1(c).

"**Purchased Inventory**" means, as of the Closing, all Inventory of Sellers except as specifically excluded by Buyer at least two (2) Business Days prior to the Closing.

"**Real Property Leases**" shall have the meaning set forth in Section 5.4.

"**Sale and Bid Procedures Motion**" means the motion filed by the Sellers with the Bankruptcy Court on February 14, 2014 seeking, among other things, approval and entry of the Bid Procedures Order and the Sale Order [Docket No. 29].

"**Sale Order**" means an Order of the Bankruptcy Court, in the form attached hereto as Exhibit A or as otherwise approved by Buyer in its sole and absolute discretion, approving this Agreement and all of the terms and conditions hereof, approving the sale and assignment to Buyer of all of the Purchased Assets (assuming that either Buyer is the winning bidder at the Auction), and approving and authorizing Sellers to consummate the transactions contemplated hereby.  Without limiting the generality of the foregoing, such order shall find and provide, among other things, that (i) the Purchased Assets sold to Buyer pursuant to this Agreement shall be transferred to Buyer free and clear of all Liens (other than Liens specifically assumed or created by Buyer and Permitted Exceptions), claims (other than Assumed Liabilities), encumbrances and interests (including Liens,

9

claims, encumbrances and interests of any Governmental Body), including any claims or assertions based on successor or transferee liability, such Liens, claims, encumbrances and interests to attach to the proceeds of sale of the Purchased Assets, and enjoining all persons holding Liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee Liability, from asserting them against Buyer, (ii) the Purchased Contracts may be assumed by Sellers and assigned to Buyer under Section 365 of the Bankruptcy Code, (iii) Buyer has acted in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code and is entitled to the full benefits of such provision, (iv) this Agreement was negotiated, proposed and entered into by the Parties without collusion, in good faith and from arm's length bargaining positions, (v) Sellers and Buyer have not engaged in any conduct that would cause or permit this Agreement to be avoidable under Section 363(n) of the Bankruptcy Code, (vi) the Bankruptcy Court shall retain jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement, or the breach hereof as provided in <u>Section 12.2</u> hereof, (vii) this Agreement and the transactions contemplated hereby are binding upon, and not subject to rejection or avoidance by, any chapter 7 or chapter 11 trustee of Sellers, (viii) neither Buyer nor any of its Affiliates shall be deemed a successor in interest to Sellers, and (ix) upon Buyer's payment of the consideration provided hereunder, Sellers shall have received fair and reasonably equivalent value for the Purchased Assets.

"**Seller 401(k) Plan**" has the meaning set forth in <u>Section 8.9(e)</u>.

"**Seller Disclosure Letter**" has the meaning set forth in <u>Article V</u>.

"**Seller Documents**" has the meaning set forth in <u>Section 5.1</u>.

"**Seller Marks**" has the meaning set forth in <u>Section 8.10</u>.

"**Seller Names**" has the meaning set forth in <u>Section 8.10</u>.

"**Seller Released Parties**" has the meaning set forth in <u>Section 12.12(a)</u>.

"**Sellers**" has the meaning set forth in the Preamble.

"**Software**" means, except to the extent generally available for purchase from third Persons, any and all (i) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (iii) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons and (iv) all documentation including user manuals and other training documentation related to any of the foregoing.

"**Stalking Horse APA**" means that certain asset purchase agreement dated as of February 14, 2014 between the Sellers, on the one hand, and CPR Acquisition Holdings, LLC, involving a credit bid by the buyer thereunder.

"**Tax Return**" means all returns, declarations, reports, estimates, claims for refund, information returns and statements required to be filed in respect of any Taxes, including any schedule or attachment thereto and any amendment thereof.

10

"**Taxes**" means (i) all federal, state, local or foreign taxes, charges or other assessments, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, Inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property, escheatment or unclaimed property, and estimated taxes, and together with all interest, penalties, fines, additions to tax or additional amounts imposed by any taxing authority in connection with any item described in this clause (i), (ii) any liability for the payment of any amounts of any of the foregoing types as a result of being a member of an affiliated, consolidated, combined or unitary group, or being a party to any agreement or arrangement whereby liability for payment of such amounts was determined or taken into account with reference to the liability of any other Person, (iii) any liability for the payment of any amounts as a result of being a party to any tax sharing or allocation agreements or arrangements (whether or not written) or with respect to the payment of any amounts of any of the foregoing types as a result of any express or implied obligation to indemnify any other Person, and (iv) any liability for the payment of any of the foregoing types as a successor, transferee or otherwise.

"**Technology**" means, collectively, all designs, formulae, algorithms, procedures, methods, techniques, ideas, know-how, research and development, technical data, programs, subroutines, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice), apparatus, creations, improvements, works of authorship and other similar materials, and all recordings, graphs, drawings, reports, analyses, and other writings, and other tangible embodiments of the foregoing, in any form whether or not specifically listed herein, and all related technology, that are used in, incorporated in, embodied in, displayed by or relate to, or are used or useful in the Business.

"**Termination Date**" has the meaning set forth in Section 4.4(b)(iii).

"**Trade Secrets**" has the meaning set forth in Section 1.1 (in the definition of Intellectual Property).

"**Transfer Taxes**" means sales, use, stamp, documentary stamp, recording, transfer or similar fees or Taxes or governmental charges (including any interest and penalty thereon) payable in connection with Sellers' transfer of the Purchased Assets to Buyer pursuant to this Agreement.

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, and any similar Law.

"**Winning Bidder**" has the meaning set forth in the Bid Procedures Order.

Section 1.2    **Other Definitional and Interpretive Matters.**

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

Calculation of Time Period.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

Dollars.  Any reference in this Agreement to "dollars" or "$" shall mean U.S. dollars.

Exhibits/Schedules.  The Exhibits and Schedules are deemed incorporated and made a part hereof (and an integral part of this Agreement) as if set forth in full herein.  Any matter or item disclosed on one Schedule shall not be deemed to have been disclosed on any other Schedule unless explicitly cross-referenced.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

Gender and Number.  Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

Headings.  The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.  All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

Herein.  Words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

Including.  The word "including" or any variation thereof means "including, without limitation," and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(b)    The Parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

## ARTICLE II
## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

Section 2.1    **Purchase and Sale of Assets.** On the terms and subject to the conditions set forth in this Agreement and pursuant to Section 363 and Section 365 of the Bankruptcy Code and the Sale Order, including the provisions of Section 2.2, Section 2.7(c) and Section 2.7(e), at the Closing Buyer shall purchase, acquire and accept from Sellers, and Sellers shall sell, transfer, assign, convey and deliver to Buyer the Purchased Assets.  "**Purchased Assets**" shall mean all of Sellers' right, title and interest in, to and under the following assets of Sellers (but excluding Excluded Assets), free and clear of all Liens (other than Liens included in the Assumed Liabilities and Permitted Exceptions) as more particularly set forth  in the Sale Order, as of or after the Closing:

(a)    all Accounts Receivable of Sellers;

(b)    all Cash, other than the Cash Payment and any Cash necessary and actually used to cover checks or similar draws outstanding as of the Closing that were made in accordance with the Approved Budget in effect on the Closing Date;

12

(c)      all Purchased Inventory;

(d)      all deposits (including customer deposits and security deposits for rent, electricity, telephone or otherwise, and (to the extent reflecting amounts in excess of (i) the lesser of (A) the amounts permitted therefor under the Approved Budget and (B) the actual amounts ultimately allowed and payable pursuant to a Final Order of the Bankruptcy Court) retainers held by Estate Professionals) and other prepaid charges and expenses of Sellers, provided that any customer deposit provided under an Excluded Contract shall not constitute a Purchased Asset;

(e)      all rights of Sellers under each Real Property Lease set forth on Schedule 1.1(b), together with Sellers' interests in and to all improvements and fixtures under each such Real Property Lease, and other appurtenances thereto, and Sellers' rights in respect thereof;

(f)      all Furniture and Equipment except as expressly identified by Buyer in writing on or prior to two (2) Business Days prior to the Closing Date;

(g)      all Purchased Intellectual Property;

(h)      all Purchased Contracts;

(i)      all Documents of Sellers, including Documents relating to Accounts Receivable, Employees, services, marketing, advertising, promotional materials, Purchased Intellectual Property and all files, customer lists, files and documents (including credit information), supplier lists, records, literature and correspondence, whether or not physically located on any of the premises referred to in clause (e) above, but excluding Documents related exclusively to the Excluded Assets or set forth in Section 2.2(d); provided that Sellers shall be permitted to retain a copy of such Documents to the extent related to the Excluded Assets;

(j)      to the extent assignable, all Permits held by Sellers;

(k)      all supplies owned by Sellers;

(l)      all insurance policies or rights to proceeds thereof;

(m)      all rights of Sellers under non-disclosure or confidentiality, non-compete, or non-solicitation, or similar agreements with Employees and agents of Sellers or with third parties to the extent relating to the Business, the Purchased Assets, or the Assumed Liabilities;

(n)      all rights of Sellers under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent affecting the Business, any Purchased Assets or the Assumed Liabilities;

(o)      all goodwill and other intangible assets associated with the Business and/or the Purchased Assets, and the goodwill associated with the Purchased Intellectual Property owned by Sellers;

(p)      any claim, right or interest of Sellers in or to any refund, rebate, abatement or other recovery for Taxes, together with any interest due thereon or penalty rebate arising therefrom;

(q)     all rights, claims or causes of action of Sellers and their estates (whether arising before or after the Bankruptcy Cases), including, without limitation, all rights, claims or causes of action arising under Chapter 5 of the Bankruptcy Code or any similar Law, relating to the assets, properties, Business or operations of Sellers or the Purchased Assets (collectively, the "**Litigation Claims**"); provided that the Buyer agrees (i) not to prosecute, or assert, any Litigation Claims that arise under Chapter 5 of the Bankruptcy Code other than as a defense or offset to an affirmative claim or cause of action brought against the Buyer based on any conduct, claim, action, or inaction arising prior to the Closing Date (it being understood that nothing contained herein shall expand or create any third party rights or claims against the Buyer), and (ii) not to sell, transfer, or convey any such Litigation Claims to any other person or entity unless such person or entity agrees to be bound by this covenant not to sue.

(r)     to the extent transferable, all prepaid Taxes and Tax credits of Sellers;

(s)     all rights to the telephone and facsimile numbers and e-mail addresses used by Sellers, as well as rights to receive mail and other communications addressed to Sellers (including mail and communications from customers, suppliers, distributors and agents) to the extent related to the Business, the Purchased Assets or the Assumed Liabilities;

(t)     all other property and assets pertaining to or used or useful in the conduct of the Business or the ownership of the Purchased Assets, including but not limited to the assets set forth on Schedule 2.1(t); and

(u)     all other assets, properties, rights, claims and causes of action of any Seller of any kind or nature whatsoever not otherwise described above but that are not expressly designated as Excluded Assets.

Notwithstanding anything herein to the contrary, Buyer may, from time to time, amend the Purchased Assets so as to include additional assets in its sole and absolute discretion until the date that is two (2) Business Days prior to the Closing (except that Buyer may not add as a Purchased Asset anything specifically listed in this Section or Section 2.2 below as an Excluded Asset, other than Excluded Contracts); and provided, however, that no such addition shall result in any adjustment of the Purchase Price. Furthermore, Buyer may, from time to time, remove any Purchased Contract from Schedule 1.1(b) and/or any other Purchased Asset from this Section 2.1 in its sole and absolute discretion until the date that is two (2) Business Days prior to the Closing and elect to treat such Contract, Permit and/or other asset in accordance with Section 2.7(c) or Section 2.7(e) or as an Excluded Asset. Sellers shall be permitted to update the Schedules as necessary to correct or complete any such Schedule in accordance with the foregoing.

Section 2.2     **Excluded Assets.**  Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Buyer, and Sellers shall retain all right, title and interest to, in and under the Excluded Assets. "**Excluded Assets**" shall mean the following assets:

(a)     the Cash Payment and any Cash necessary and actually used to cover checks or similar draws outstanding as of the Closing that were made in accordance with the Approved Budget in effect on the Closing Date;

(b)     all Excluded Contracts;

14

(c)     all Liabilities, Indebtedness and other obligations, including any note Indebtedness, owed to any Seller by any Affiliate of any Seller, other than those expressly included as an Assumed Liability;

(d)     any (i) general books of account and books of original entry that comprise Sellers' permanent Tax records and books and records that Sellers are required by Law to retain; provided, however, that Buyer shall have, to the extent allowed by applicable Law, the right to make copies of any and all portions of such retained books and records; (ii) minute books, charter documents, equity, stock or membership interest records and corporate seals; (iii) Documents relating to proposals to acquire the Business by Persons other than Buyer or any Documents which constitute privileged material of Sellers; and (iv) such other books and records as pertain to the organization, existence and capitalization of any Seller;

(e)     all of Sellers' rights under this Agreement and/or other documents and agreements executed in connection with the transactions provided for herein, any and all cash and non-cash consideration payable or deliverable to or for the account of Sellers pursuant to and subject to the terms of this Agreement (including Sellers' right to the Cash Payment);

(f)     all of the right, title, and interest in and to the assets set forth on Schedule 2.2(f);

(g)     all deposits that are not a Purchased Asset in accordance with Section 2.1(d); or

(h)     any equity interests in any Seller.

Notwithstanding anything herein to the contrary, Buyer may, from time to time, exclude any assets from the Purchased Assets in its sole and absolute discretion until the date that is two (2) Business Days prior to the Closing; provided, however, that after the Closing Buyer may declare any Contract to be an Excluded Contract if the Cure Amount for any such Contract is subject to dispute as of the Closing and is determined by the Bankruptcy Court after the Closing to be greater than the amount set forth in Schedule 2.4(f); provided, further, that no such exclusion or declaration shall result in any adjustment of the Purchase Price.  Sellers shall be permitted to update the Schedules as necessary to correct or complete any such Schedule in accordance with the foregoing.

Section 2.3     **Excluded Liabilities.**  Buyer will not assume or have any responsibility with respect to any Liability of Sellers (or any predecessor or Affiliate of Sellers) of any nature whatsoever not expressly included within the definition of Assumed Liabilities, including:

(a)     Taxes (i) imposed on any Seller for any period, or (ii) arising out of or related to the Business or the Purchased Assets for all Tax periods (or portions thereof) ending on or prior to the Closing, including, without limitation, any Liability related to or arising from the Tax Return audits identified on Schedule 5.13, other than those Taxes specifically assumed pursuant to Section 2.4(g);

(b)     any costs or expenses incurred in connection with, or related to, the administration of the Bankruptcy Cases, including any fees and expenses of any Estate Professional except as expressly set forth in Section 3.1(b);

15

(c)     Liabilities to the extent arising out of or related to the Excluded Assets, including Liabilities relating to Excluded Contracts;

(d)     Liabilities of Sellers under this Agreement or the Seller Documents;

(e)     all Liabilities which may become due or owing under the Purchased Contracts (i) with respect to the period prior to the Closing (other than the Cure Amounts) or (ii) after the Closing but which arise out of or relate to any breach that occurred prior to the Closing (other than the Cure Amounts);

(f)     all Indebtedness owed by any Seller or any predecessor of any Seller except as expressly contemplated herein (if any);

(g)     other than as expressly set forth in Sections 2.4(j) and 8.9, any Employee Obligations to any Employee arising out of such Employee's employment by Sellers;

(h)     any WARN Act Liabilities arising with respect to actions or omissions (other than acts or omissions by or at the direction of Buyer) or "employment losses" (as defined in the WARN Act), in each case, prior to the Closing and with respect to  Employees and former employees of any Seller (other than, in each case, as expressly assumed by Buyer pursuant to Section 2.4(j) below);

(i)     any claim (as defined in the Bankruptcy Code) arising prior to Closing and not expressly assumed pursuant to this Agreement;

(j)     any Liability to any stockholder or other equity holder of any Seller or any predecessor of any Seller;

(k)     any Liability arising out of or related to any Legal Proceeding commenced or threatened against any Seller or any predecessor of any Seller, including, without limitation, any such Liability related to or arising from the Legal Proceedings and Claims identified on Schedule 5.9;

(l)     any Liability for infringement or misappropriation of any Intellectual Property arising out of or related to any conduct of any Seller or operation of the Business on or before the Closing;

(m)     any Liability of any Seller based upon any Seller's acts or omissions occurring before or after the Closing unless expressly assumed by Buyer;

(n)     any Liabilities relating to any environmental, health or safety matter (including any Liability or obligation under any Environmental Law), arising out of or relating to any Seller's operation of the Business; and

(o)     all other Liabilities and obligations for which Buyer does not expressly assume any liability (collectively, the "**Excluded Liabilities**").

Section 2.4    **Assumed Liabilities.**  Effective as of the Closing, Buyer shall be obligated to pay, perform and discharge, as and when due or as may otherwise be agreed between Buyer and the obligee, all of the Assumed Liabilities.  The "**Assumed Liabilities**" are specifically as follows:

(a)    all Liabilities of Sellers set forth on Schedule 2.4(a), which shall be comprised of Liabilities that arise and are due and payable after the Petition Date and unpaid as of the Closing and that arise in the Ordinary Course of Business and in accordance with the Approved Budget, other than (i) Liabilities expressly assumed in Sections 2.4(b) through (k) and (ii) any Excluded Liabilities;

(b)    all Liabilities under the Purchased Contracts accruing after the Closing;

(c)    all (i) Liabilities with respect to the Business or the Purchased Assets arising after the Closing, (ii) Employee Obligations with respect to Buyer Employees and Noticed Employees as specified in Section 8.9 and, if Buyer assumes the sponsorship of any Benefit Plan pursuant to Section 8.9, such Benefit Plan, in each case to the extent set forth and subject to the limitations contained in Section 8.9, and (iii) Employee Obligations to all Buyer Employees arising from and after the Closing out of each Buyer Employee's employment by Buyer;

(d)    all Liabilities, in the amounts listed on Schedule 2.4(d), (i) to the vendors listed on Schedule 2.4(d) on account of prepetition general unsecured non-priority claims (regardless of the amount set forth in the vendors' proofs of claim, if any); provided that to the extent such amounts are greater than the amount actually owed to any such vendor, Buyer will only pay the actual amount owed to the vendor, and (ii) without duplicating any Liabilities in clause (i), allowed and unpaid administrative expenses under Bankruptcy Code Section 503(b)(9) arising in the Bankruptcy Cases, provided that the Liabilities listed in Schedule 2.4(d) shall be paid on the later of allowance of any such claim and one hundred and twenty (120) days following the Closing, unless Buyer determines in its sole and absolute discretion to pay any such Liability earlier;

(e)    unused vacation, sick leave or other paid time off earned and accrued as of the Closing Date by Buyer Employees;

(f)    the Cure Amounts, as determined by the Bankruptcy Court, if any, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Purchased Contracts assumed at Closing.  Sellers have provided to Buyer a schedule set forth on Schedule 2.4(f) setting forth a good faith estimate as of the Execution Date of all Cure Amounts for all Purchased Contracts, which schedule the Sellers shall update on or prior to the date that is fourteen (14) days prior to the Closing Date;

(g)    all Liabilities (i) for sales and use taxes and FICA, FUTA, Social Security and other payroll "trust fund" taxes that are due and payable after the Petition Date and are unpaid as of the Closing Date and that are attributable to transactions or payments occurring in the Ordinary Course of Business and in accordance with the Approved Budget, (ii) all Transfer Taxes to the extent set forth in Section 11.1; (iii) for Taxes relating to the Purchased Assets or the Business arising and incurred for any Tax period (or portion thereof) beginning after the Closing; and (iv) ad valorem and personal property taxes incurred by Sellers in the Ordinary Course of Business that are due and

17

payable after the Closing Date, that give rise to allowed claims entitled to priority under Sections 503(b)(1)(B) or 507(a)(8) of the Bankruptcy Code, and that are set forth in Schedule 2.4(g);

(h)    at the option of Buyer, all Liabilities under any or all outstanding letters of credit issued by Sellers in the Ordinary Course of Business that are secured by cash segregated and specially pledged to or under the control of the letter of credit issuer, to the extent such letters of credit are not drawn as of the Closing, but solely to the extent such Liabilities are covered by such letters of credit;

(i)    any WARN Act Liabilities arising (i) from actions, omissions or "employment losses" on or following the Closing with respect to Employees or Buyer Employees (including any WARN Act Liabilities arising from (A) "employment losses" prior to the Closing which are subject to the WARN Act only when required to be aggregated by the WARN Act with "employment losses" on or following the Closing or with respect to the Noticed Employees, (B) failure of Buyer to extend offers of employment to Employees in accordance with Section 8.9(b) and (C) the terms of such offers of employment and/or initial terms of employment with Buyer being different from the terms of employment of the applicable Buyer Employees immediately prior to the Closing), or (ii) from any WARN Act notice delivered pursuant to Section 8.7 below at the instruction of the Buyer, but only to the extent that the applicable notice period with respect to the applicable Noticed Employee (as defined in Section 8.7 below) has not expired prior to the Closing; and

(j)    any administrative expenses and Noticed Employee Liabilities (as defined in Section 8.7 below) explicitly assumed by Buyer in accordance with Section 8.9 below.

Buyer's assumption of the Assumed Liabilities shall in no way expand the rights or remedies of third parties against Buyer as compared to the rights and remedies which such parties would have had against Sellers had this Agreement not been consummated.

Section 2.5    **[Intentionally Omitted].**

Section 2.6    **Further Conveyances and Assumptions.**  From time to time following the Closing, Sellers and Buyer shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, licensure and permit filings, assumptions, releases and acquaintances and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Buyer and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Buyer under this Agreement and the Seller Documents and to assure fully to Sellers and their respective Affiliates and their respective successors and assigns, the payment of the Purchase Price, the assumption of the liabilities and obligations intended to be assumed by Buyer under this Agreement and the Seller Documents, and to otherwise make effective the transactions contemplated hereby and thereby.  If following the Closing, the Sellers receive or become aware that they hold any property (including any payment), right, claim, demand or asset which constitutes a Purchased Asset then the Sellers shall transfer or otherwise return such property, right, claim, demand or asset to the Buyer as promptly as practicable for no additional consideration.

Section 2.7      **Transitional Matters.**

(a)      From and after Closing, Sellers shall retain full right and authority to use, enforce, pursue remedies and take actions with respect to any of the Excluded Assets.

(b)      From and after the Closing Date, Buyer will retain and make available to Sellers, or any trustee or other bankruptcy estate representative and their respective representatives acting on behalf of Sellers' estates, during normal business hours and upon reasonable advance notice to Buyer and for a period of six (6) months following the Closing Date, the Documents delivered by Sellers to Buyer, Buyer Employees, and other files of Buyer pertaining to (i) the conduct of the Business or ownership of the Purchased Assets prior to the Closing Date and (ii) the Excluded Assets and Excluded Liabilities if reasonably needed by Sellers for liquidation, winding up, Tax reporting or other proper purposes; provided, that Sellers will use reasonable efforts to retain copies of Documents and the Parties otherwise will reasonably cooperate so as to not disrupt or interfere with the Business in any material respect as a result of such access.

(c)      To the extent that the assignment to Buyer of any Purchased Contract pursuant to this Agreement is not permitted without the consent of a third party and such restriction cannot be effectively overridden or canceled by the Sale Order or other related order of the Bankruptcy Court, the Parties will use commercially reasonable efforts to obtain consent prior to the Closing.  If such consent is not obtained by the Closing, each Seller will, with respect to each such Contract, from and after the Closing and until the earlier to occur of (x) the date on which such applicable consent is obtained and (y) the date on which such Seller liquidates and ceases to exist, use commercially reasonable efforts (subject to restrictions under Law) during the term of such Contract to (i) provide to Buyer the benefits under such Contract, (ii) cooperate in any reasonable and lawful arrangement (including holding such Contract in trust for Buyer, pending receipt of the required consent) designed to provide such benefits to Buyer, and (iii) enforce for the account of Buyer any rights of such Seller under such Contract (including the right to elect to terminate such Contract in accordance with the terms thereof upon the direction of Buyer).  Buyer will cooperate with the applicable Sellers in order to enable Sellers to provide to Buyer the benefits contemplated by this Section 2.7(c). Buyer will pay any amount it would have been required to pay under any such Contract had the Contract been assigned (after obtaining the requisite consent) to Sellers at the Closing in accordance with this Agreement.  For the avoidance of doubt, the efforts contemplated by this Section 2.7(c) shall not include any obligation by Sellers to pay money (advance or otherwise) to any third party or to incur out of pocket expenses unless Buyer funds such amounts.

(d)      Previously Omitted Contracts.

(i)      If prior to or following Closing it is discovered that a Contract should have been listed on Schedule 1.1(a) but was not listed on Schedule 1.1(a) (any such Contract, a "**Previously Omitted Contract**"), Sellers shall, promptly following the discovery thereof (but in no event later than two (2) Business Days following the discovery thereof), notify Buyer in writing of such Previously Omitted Contract and all Cure Amounts (if any) for such Previously Omitted Contract.  Buyer shall thereafter deliver written notice to Sellers, no later than five (5) Business Days following notification of such Previously Omitted Contract from Sellers, designating such Previously Omitted Contract as "Assumed" or "Rejected" (a "**Previously Omitted Contract Designation**").  A Previously Omitted Contract designated in accordance with this Section 2.7(d)(i)

19

as "Rejected," or with respect to which Buyer fails to timely deliver a Previously Omitted Contract Designation, shall be an Excluded Contract.

(ii)     If Buyer designates a Previously Omitted Contract as "Assumed" in accordance with Section 2.7(d)(i), (A) Schedule 1.1(b) shall be amended to include such Previously Omitted Contract and (B) Sellers shall serve a notice (the "**Previously Omitted Contract Notice**") on the counterparties to such Previously Omitted Contract notifying such counterparties of the Cure Amounts with respect to such Previously Omitted Contract and Sellers' intention to assume and assign such Previously Omitted Contract in accordance with this Section 2.7(d) with no adjustment to the Purchase Price. The Previously Omitted Contract Notice shall provide the counterparties to such Previously Omitted Contract with seven (7) days to object, in writing to the Sellers and Buyer, to the Cure Amount and the assumption, assignment and sale of the Previously Omitted Contract. If the counterparties, Sellers and Buyer are unable to reach a consensual resolution with respect to the objection, Sellers will seek an expedited hearing before the Bankruptcy Court to determine the Cure Amounts and approve the assumption, assignment and sale. If no objection is timely served on Sellers and Buyer, Sellers shall obtain an Order of the Bankruptcy Court fixing the Cure Amounts and approving the assumption of the applicable Previously Omitted Contract.

(e)     Designation Rights Contracts.

(i)     From the Closing through the date that is one hundred and fifty (150) days after the date on which the Sale Order is entered by the Bankruptcy Court, or such other date mutually agreed to by Buyer and Sellers (the "**Designation Rights Period**") (provided, that in no event shall the Designation Rights Period exceed two hundred and ten (210) days after the Petition Date with respect to any Real Property Lease absent the consent of the counterparty affected thereby, and subject to any required order of the Bankruptcy Court governing such extension of time), Sellers will provide Buyer, at Buyer's expense, with the rights and benefits under the Contracts set forth on Schedule 2.7(e) (which schedule may be amended by Buyer in Buyer's sole and absolute discretion until the Closing) (the "**Designation Rights Contracts**"). Buyer's access to and use of the real property, personal property and other rights, benefits and services subject to the Designation Rights Contracts from and after the Closing will be subject to and consistent with the Sellers' obligations, if any, to third parties with respect to such Designation Rights Contracts; and Buyer (and, if necessary and at Buyer's expense, Sellers) will pay and perform Sellers' obligations to the extent and as required under such Designation Rights Contracts and applicable law arising from and after the Closing Date (provided that Sellers shall not be required to, and shall not, pay any Cure Amounts in respect of any such Designation Rights Contracts except as required by Section 2.7(e)(ii)).

(ii)     Sellers shall (A) provide Buyer with access to, and reasonably cooperate with Buyer (to the extent practicable) in connection with any negotiations or discussions with, the counterparties to each Designation Rights Contract during the Designation Rights Period, and (B) within three (3) business days after receipt of written request of Buyer, at Buyer's expense, file with the Bankruptcy Court and serve on (a) each non-debtor party to such Contract, (b) counsel to the Buyer and the Agent, and (c) counsel to the Committee (collectively, the "**Designation Notice Parties**"), a notice (an "**Assumption Notice**") as set forth in paragraph 39 of the Sale Order. Upon compliance with the terms and procedures set forth in paragraph 39 of the Sale Order, any such Designation Rights Contract shall be deemed to be a Purchased Contract. The Cure Amounts, as determined by the Bankruptcy Court, if any, necessary to cure all defaults, if any, and to pay all

20

actual or pecuniary losses that have resulted from any defaults under those Designation Rights Contracts to be assumed and assigned to Buyer shall be paid by Buyer, and Sellers shall have no liability therefor or thereafter, and no further consideration (except for the applicable Cure Amount with respect to a Designation Rights Contract) shall be required to be paid for any Designation Rights Contract that is assumed, assigned, transferred and/or sold to Buyer.  Buyer shall indemnify and hold harmless Sellers for amounts required to be paid by Sellers (including, without limitation, any administrative claims but not including any general unsecured claims asserted against Sellers' estates) as a result of any breach of any Designation Rights Contract by Buyer or any of its employees in connection with its performance of such Designation Rights Contract; provided that Sellers shall provide Buyer with prior written notice of any claim by any third party related to any such breach, and Buyer shall control the defense of any such claim and have the sole authority to settle or compromise such claim (provided Buyer shall have the right to cause Sellers to enter into any compromise or settlement consistent with clauses (x), (y) and (z) below) but, without the consent of Sellers, any such compromise or settlement (x) may not obligate Sellers to pay any damages or have any non-monetary obligations, (y) must include an unconditional release of Sellers from all liability arising out of such claim and (z) shall not include a statement as to or an admission of liability or fault by or on behalf of any Seller.  Buyer shall provide Sellers with not less than fifteen (15) days' prior written notice specifying the date that it will no longer require such rights and benefits with respect to any Designation Rights Contract, and Buyer shall have no further obligation with respect to such incremental costs or administrative claims after the later of such termination date or the last day of the payment period in which such termination date occurs, and any such Contract shall be deemed an Excluded Contract.  Any Designation Rights Contract not designated by Buyer as a Contract to be assumed on or prior to the end of the Designation Rights Period shall be deemed an Excluded Contract without further action by Buyer or Sellers.

(iii)   Sellers and Buyer agree and acknowledge that the covenants set forth in this Section 2.7(e) shall survive the Closing.

Section 2.8   **Cure Amounts.**

(a)   No later than twenty-one (21) days prior to the Sale Hearing, Sellers shall commence appropriate proceedings before the Bankruptcy Court and otherwise take all necessary actions in order to determine Cure Amounts with respect to any Purchased Contract and Real Property Leases to be assumed and assigned to Buyer and to otherwise obtain an order of the Bankruptcy Court that no consent, condition, approval or other obligation must be satisfied, other than entry of the Sale Order, in order to transfer such Purchased Contracts and Real Property Leases to Buyer at the Closing.  Sellers shall take all necessary actions and, if necessary, promptly commence appropriate proceedings before the Bankruptcy Court in order to effect the assumption of any Purchased Contract and/or Real Property Lease by Sellers, if applicable, and the assignment of such Contract to Buyer at the Closing pursuant to the Sale and Bid Procedures Motion.

(b)   Any motion, application or other court document filed with, and the proposed orders submitted to, the Bankruptcy Court seeking authorization to assume and assign or reject or terminate any Purchased Contracts or Real Property Lease shall be provided to Buyer in advance of filing (with a reasonable opportunity to review and comment on same) and shall be in form and substance satisfactory to Buyer in all material respects.

# ARTICLE III
# CONSIDERATION

Section 3.1    **Purchase Price.**

(a)    In consideration of the transfer of the Purchased Assets to Buyer and the other undertakings set forth herein, the purchase price (the "**Purchase Price**") for the Purchased Assets shall be (i) One Hundred and Twenty-Five Million, Two-Hundred and Fifty Thousand Dollars ($125,250,000), which amount shall include the Buyer Deposit, (the "**Cash Payment**"), plus (ii) the assumption of the Assumed Liabilities by Buyer at the Closing. The Cash Payment shall be adjusted downward by up to One Million Dollars ($1,000,000) to the extent the Cash at Closing to be acquired by Buyer under Section 2.1(b) is less than One Million Dollars ($1,000,000).

(b)    In the event that Buyer (i) declares a Designation Rights Contract to be subject to Section 2.7(e), (ii) declares a Contract or other asset to be an Excluded Asset pursuant to the definition of Purchased Inventory, Section 2.1(f), the last sentence of Section 2.1, the last sentence of Section 2.2, or (iii) extends the time to assume or reject Designation Rights Contracts pursuant to Section 2.7(e) of this Agreement, which causes any costs, fees and/or expenses to be incurred by Sellers from and after the Closing, Buyer shall directly pay for such costs, fees and/or expenses or promptly reimburse Sellers upon written request and furnishing of reasonably detailed documentation.

# ARTICLE IV
# CLOSING AND TERMINATION

Section 4.1    **Closing Date.**    Subject to the satisfaction of the conditions set forth in Section 9.1, Section 9.2 and Section 9.3 hereof (or the waiver thereof by the Party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in Article II hereof (the "**Closing**") shall take place remotely via electronic communication (or at such other place as the Parties may designate in writing) as soon as practicable (and in any event no later than the date that is three (3) Business Days) following the satisfaction or waiver of the conditions set forth in Article IX (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions). The date on which the Closing shall be held is referred to in this Agreement as the "**Closing Date**," and the Closing shall be deemed effective at the close of business on the Closing Date. Unless otherwise agreed by the Parties in writing, the Closing shall be deemed effective and all right, title and interest of each Seller in the Purchased Assets to be acquired by Buyer hereunder shall be considered to have passed to Buyer and the assumption of all of the Assumed Liabilities shall be considered to have occurred as of 12:01 a.m. Eastern Time on the Closing Date.

Section 4.2    **Deliveries by Sellers.**    At the Closing, Sellers shall deliver to Buyer:

(a)    a duly executed bill of sale and assignment;

(b)    duly executed assignments of the U.S. trademark registrations and applications included in the Purchased Intellectual Property, in a form suitable for recording in the U.S. trademark office, and general assignments of all other Purchased Intellectual Property;

(c)    a duly executed assignment and assumption agreement with respect to the Purchased Contracts and Assumed Liabilities substantially in the form of Exhibit B;

(d)    the officer's certificate required to be delivered pursuant to Section 9.1(a), Section 9.1(b) and Section 9.1(e); and

(e)    all other instruments or agreements of conveyance and transfer, in form and substance acceptable to Buyer, as may be necessary to convey the Purchased Assets to Buyer.

Section 4.3    **Deliveries by Buyer.**  At the Closing, Buyer shall deliver to Sellers:

(a)     the Cash Payment, in immediately available funds;

(b)    a duly executed assignment and assumption agreement with respect to the Purchased Contracts and Assumed Liabilities substantially in the form of Exhibit B; and

(c)    all other instruments of conveyance and transfer, in form and substance acceptable to Sellers, as may be necessary to convey the Purchased Assets to Buyer and for Buyer to assume the Assumed Liabilities.

Section 4.4    **Termination of Agreement.**  This Agreement may be terminated prior to the Closing as follows:

(a)    by mutual written consent of Sellers and Buyer;

(b)    by Sellers or Buyer:

(i)    if any of the conditions set forth in Section 9.3 shall have become incapable of fulfillment other than as a result of, or caused by, a breach by the Sellers or Buyer, as applicable, of any covenant or agreement contained in this Agreement, and such condition is not waived in writing by the non-breaching party;

(ii)    if there shall be in effect a Final Order of a Governmental Body of competent jurisdiction permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; it being agreed that the Parties hereto shall promptly appeal any adverse determination which is appealable (and pursue such appeal with reasonable diligence and mutual cooperation in good faith); or

(iii)    if the Closing shall not have occurred on or before the close of business on the date which is thirty (30) days after the entry of the Sale Order (the "**Termination Date**"); provided, however, that if the Closing shall not have occurred on or before the Termination Date due to a material breach of any of the representations, warranties, covenants or agreements contained in this Agreement by a Party, then the breaching Party may not terminate this Agreement pursuant to this Section 4.4(b)(iii); or

23

       (c)     by Buyer:

           (i)     if there shall be a material breach by Sellers of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in Section 9.1 or Section 9.3 and which breach cannot be cured or has not been cured by the earlier of (A) ten (10) Business Days after the giving of written notice by Buyer to Sellers of such breach and (B) the Termination Date;

           (ii)     in the event (A) the Auction, has not been completed by April 21, 2014, (B) the hearing to approve the Sale Order has not concluded by April 29, 2014, (C) the Bankruptcy Court has not entered the Sale Order by April 30, 2014, (D) the Sale Order has not become a Final Order within fourteen (14) days after the entry thereof, and/or (E) the Sale Order shall have been stayed, vacated, modified or supplemented without Buyer's prior written consent;

           (iii)     if the Sale Order with respect to the transactions contemplated by this Agreement has been entered and (A) Buyer has provided Sellers with written notice that it is prepared to consummate the transactions contemplated by this Agreement, (B) the conditions to Closing in Article IX have been satisfied (or waived, to the extent permissible, by the Party entitled to the benefit of such condition), other than those conditions that by their nature can only be satisfied at Closing) and (C) the Closing Date does not occur within five (5) Business Days of Buyer providing Sellers with such notice;

           (iv)     if, prior to the Closing, any Seller files a plan of reorganization inconsistent with the terms of this Agreement or seeks to modify or withdraw the Sale Motion or have the Bankruptcy Court enter an Order dismissing, or converting into cases under Chapter 7 of the Bankruptcy Code, any of the Bankruptcy Cases, or appointing a trustee in any of the Bankruptcy Cases or appointing a responsible officer or an examiner with enlarged powers relating to the operation of Sellers' businesses (beyond those set forth in Section 1106(a)(3) or (4) of the Bankruptcy Code) under Bankruptcy Code Section 1106(b), or such an Order of dismissal, conversion or appointment is entered for any reason;

           (v)     if Sellers enter into or consummate an Alternative Proposal or Buyer is determined not to be the Winning Bidder or Back-Up Bidder in accordance with the Bid Procedures Order;

           (vi)     if any of the conditions to the obligations of Buyer set forth in Section 9.1 shall have become incapable of fulfillment other than as a result of a breach by Buyer of any covenant or agreement contained in this Agreement, and such condition is not waived by Buyer;

           (vii)     if there has been a Material Adverse Effect between the Execution Date and the Closing; or

       (d)     by Sellers:

           (i)     if any condition to the obligations of Sellers set forth in Section 9.2 shall have become incapable of fulfillment other than as a result of a breach by Sellers of any covenant or agreement contained in this Agreement, and such condition is not waived by Sellers;

(ii)     if there shall be a material breach by Buyer of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in <u>Section 9.2</u> or <u>Section 9.3</u> and which breach cannot be cured or has not been cured by the earlier of (A) ten (10) Business Days after the giving of written notice by Sellers to Buyer of such breach and (B) the Termination Date;

(iii)     if the Sale Order with respect to the transactions contemplated by this Agreement has been entered and is not subject to any stay on enforcement and (A) Sellers have provided Buyer with written notice that it is prepared to consummate the transactions contemplated by this Agreement, (B) the conditions to Closing in Article IX have been satisfied (or waived, to the extent permissible, by the Party entitled to the benefit of such condition), other than those conditions that by their nature can only be satisfied at Closing) and (C) the Closing Date does not occur within five (5) Business Days of Sellers providing Buyer with such notice; or

(iv)     if Buyer is neither the Winning Bidder nor Back-Up Bidder in accordance with the Bid Procedures Order.

Section 4.5    **Buyer Deposit.**  If this Agreement is terminated by Sellers pursuant to <u>Section 4.4(d)(ii)</u> or <u>Section 4.4(d)(iii)</u>, then Sellers shall retain the Buyer Deposit.  The Parties expressly agree and acknowledge that the Sellers' actual damages in the event of such a breach by Buyer would be extremely difficult or impracticable to ascertain and that the Buyer Deposit represents the parties' reasonable estimate of such damages.  Notwithstanding any other provision of this Agreement, Sellers shall have no other remedy for any breach by Buyer under this Agreement and Sellers' right under this <u>Section 4.5</u> shall be (i) full liquidated damages for any and all failures to act, defaults or breaches hereunder by Buyer and (ii) constitute the sole and exclusive remedy of Sellers for all claims for such failures to act, defaults or breaches under this Agreement and Sellers shall not have any further cause of action for damages, specific performance or any other legal or equitable relief against Buyer or its Affiliates or their respective employees, members, shareholders, officers, or directors under this Agreement.

Section 4.6    **Effect of Termination.**  In the event that this Agreement is validly terminated in accordance with <u>Section 4.4</u>, this Agreement shall terminate and each of the Parties shall be relieved of its respective duties and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to Buyer or Sellers; <u>provided</u>, <u>however</u>, that the obligations of the Parties set forth in <u>Section 4.5</u>, <u>Section 8.3</u>, <u>Section 8.5</u> and <u>Article XII</u> hereof shall survive any such termination and shall be enforceable hereunder.

## ARTICLE V
## <u>REPRESENTATIONS AND WARRANTIES OF SELLERS</u>

Sellers hereby jointly and severally represent and warrant to Buyer that the statements contained in this <u>Article V</u> are true and correct as of the date of this Agreement and as of the Closing, except as expressly set forth herein and in the Disclosure Letter delivered by Sellers to Buyer herewith (the "**Seller Disclosure Letter**"). The Seller Disclosure Letter shall be arranged in paragraphs corresponding to the numbered and lettered paragraphs contained in this Agreement:

Section 5.1    **Organization of Sellers; Authorization of Agreement.**  Subject to the entry of the Sale Order:  (a) each Seller is duly organized and validly existing under the laws of its state of organization and has all requisite power, authority and legal capacity to own, lease and operate its properties and assets (subject to the provisions of the Bankruptcy Code); (b) each Seller is duly qualified or licensed to do business in each jurisdiction in which the property owned, leased or operated by it or the nature of the business conducted by it makes such qualification or licensing necessary, except where the failure to be so qualified or licensed would not have a Material Adverse Effect; (c) each Seller has all requisite power and authority to execute and deliver this Agreement and each Seller has all requisite power, authority and legal capacity to execute and deliver each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by any Seller in connection with the consummation of the transactions contemplated by this Agreement (the "**Seller Documents**"), to perform their respective obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby; and (d) this Agreement has been, and each of the Seller Documents will be at or prior to the Closing, duly and validly executed and delivered by each Seller and (assuming the due authorization, execution and delivery by the other Parties hereto and thereto and the entry of the Sale Order) this Agreement constitutes, and each of the Seller Documents when so executed and delivered will constitute, legal, valid and binding obligations of each Seller, enforceable against each Seller in accordance with their respective terms.

Section 5.2    **No Conflicts.**

(a)    Except as set forth on Schedule 5.2(a), none of the execution and delivery by any Seller of this Agreement or the Seller Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by any Seller with any of the provisions hereof or thereof will result in the creation of any Lien (other than a Permitted Exception) upon the Purchased Assets, or conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, result in any violation or breach of, or give rise to a right of payment, termination, modification, acceleration cancellation under any provision of (i) the certificate of incorporation and by-laws or comparable organizational documents of any Seller; (ii) subject to entry of the Sale Order, any material Contract or Permit to which any Seller is a party or by which any of the properties or assets of any Seller are bound, which constitute a Purchased Asset; (iii) subject to entry of the Sale Order, any Order of any Governmental Body applicable to any Seller or any of the material properties or assets of any Seller as of the Execution Date; or (iv) subject to entry of the Sale Order, any applicable Law, other than, in the case of clauses (ii), (iii) and (iv), compliance with the applicable requirements of the HSR Act or other Antitrust Laws if required and such other as have not had or would not reasonably be expected to have a Material Adverse Effect.

(b)    Subject to entry of the Sale Order, and except as set forth on Schedule 5.2(b), no consent, waiver, approval, Order, Permit or authorization of, or registration or declaration or filing with, or notification to any Person or Governmental Body is required on the part of any Seller in connection with the execution and delivery of this Agreement or the Seller Documents, the compliance by any Seller with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by such Seller of any other action contemplated hereby or thereby, except for such failure to obtain such consents, waivers, approvals, Orders, Permits, authorizations, registrations, declarations, filings and notifications as have not had or would not reasonably be expected to have a Material Adverse Effect.

26

Section 5.3    **Title to Purchased Assets.**  Other than the real property subject to the Real Property Leases and the personal property subject to the Personal Property Leases, Sellers have good title to the Purchased Assets and, at the Closing, Buyer, pursuant to the Sale Order, shall acquire good title in, to and under (subject to the Purchased Contracts (other than Purchased Contracts assumed or assigned post-Closing) being assumed and assigned in accordance with Section 2.1) all of such Purchased Assets, in each case free and clear of all Liens, other than Permitted Exceptions and Assumed Liabilities, to the fullest extent permissible under Section 363(f) of the Bankruptcy Code.  The Purchased Assets constitute all of the assets, rights, interests and properties of every nature and kind whatsoever used or held for use by Sellers in connection with the Business, or otherwise necessary for Buyer to conduct and operate the Business immediately after the Closing, except with respect to any Excluded Assets that are designated by Buyer after the date hereof in accordance with Section 2.1 and Section 2.2.  No Person other than Sellers is engaged in the operation of, or hold rights, title and interest in, the Purchased Assets.

Section 5.4    **Real Property Leases**.  Schedule 1.1(a) sets forth a complete list of all real property and interests in real property leased by Sellers (individually, a "**Real Property Lease**" and collectively, the "**Real Property Leases**") as lessee or lessor.  Sellers have a valid and enforceable leasehold interest under each Real Property Lease under which it is a lessee, free and clear of all Liens of any nature whatsoever except Permitted Exceptions.  Buyer has received true and complete copies of the Real Property Leases and any and all amendments, modifications, supplements, exhibits and restatements thereto and thereof in effect as of the Execution Date.  To the Knowledge of Sellers, each Real Property Lease is in full force and effect, and is valid and enforceable in accordance with its terms.  To the Knowledge of the Sellers, except as set forth on Schedule 5.4, no Seller has received any written notice of any default or event that with notice or lapse of time, or both, would constitute a default by any Seller under any of the Real Property Leases that are currently in effect and eligible to be assumed by Buyer.  Except as set forth on Schedule 5.4, there has been no default or event that with notice or lapse of time, or both, would constitute a material default by the Company or any Subsidiary under any of the Real Property Leases.

Section 5.5    **Tangible Personal Property.**  Schedule 1.1(a) sets forth all leases of material personal property ("**Personal Property Leases**") relating to personal property used by Sellers or to which any Seller is a party or by which the properties or assets of any Seller are bound, in each case relating to the Business.  Sellers have a valid and enforceable leasehold interest under each Personal Property Lease under which it is a lessee, free and clear of all Liens of any nature whatsoever except Permitted Exceptions.  Buyer has received true and complete copies of the Personal Property Leases and any and all amendments, modifications, supplements, exhibits and restatements thereto and thereof in effect as of the Execution Date.  Each Personal Property Lease is in full force and effect, and is valid and enforceable in accordance with its terms except as has not had and would not reasonably be expected to have a Material Adverse Effect.  To the Knowledge of the Sellers, except as set forth on Schedule 5.5, no Seller has received any written notice of any default or event that with notice or lapse of time, or both, would constitute a default by any Seller under any of the Personal Property Leases that are currently in effect and eligible to be assumed by Buyer except as has not had and would not reasonably be expected to have a Material Adverse Effect.  Except as set forth on Schedule 5.5, there has been no default or event that with notice or lapse of time, or both, would constitute a default by the Company or any Subsidiary under any of the Personal Property Leases except as has not had and would not reasonably be expected to have a Material Adverse Effect.

Section 5.6    **Intellectual Property.**  Schedule 1.1(c) sets forth an accurate and complete list of all material Intellectual Property (excluding Trade Secrets) used in the Business as currently conducted.  Sellers exclusively own all right, title and interest to, or are licensees with respect to, or otherwise possess the right to use, the Purchased Intellectual Property, and can convey such property free and clear of Liens pursuant to the Sale Order.  To the Knowledge of Sellers, (i) no Person is engaging in any activity that infringes any material Purchased Intellectual Property in any material respect, and (ii) no claim has been asserted in writing to any Seller that the use of any material Purchased Intellectual Property or the operation of the Business infringes or violates the Intellectual Property of any third party in any material respect.  The Purchased Intellectual Property and the rights under the Purchased Contracts include the rights to use all Intellectual Property required to operate the Business as currently conducted.

Section 5.7    **Financial Statements.**  Sellers have delivered to Buyer true and correct copies of (i) the audited consolidated balance sheets of Sellers as of June 30, 2013 and July 1, 2012 and the related audited consolidated statements of income and of cash flows of Sellers for the years then ended, and (ii) the unaudited consolidated balance sheet of the Sellers as of December 29, 2013, and the related consolidated statement of income and cash flows of Sellers for the six (6) months then ended (such audited and unaudited statements, including the related notes and schedules thereto, are referred to herein as the "**Financial Statements**").  Each of the Financial Statements has been prepared in accordance with GAAP consistently applied without modification of the accounting principles used in the preparation thereof throughout the periods presented and presents fairly in all material respects the consolidated financial position, results of operations and cash flows of Sellers as of the dates and for the periods indicated therein, subject to normal year-end adjustments and the absence of complete notes in the case of the unaudited statements.  No Seller has any material Liabilities (including contingent Liabilities) that would be required by GAAP to be reflected on a consolidated balance sheet (or the notes thereto) of the Company and its Subsidiaries and would be assumed by Buyer pursuant to this Agreement and the Sale Order, except for liabilities and obligations (a) reflected or reserved against in the Company's consolidated balance sheet as of December 29, 2013 (or the notes thereto) included in the Financial Statements, (b) incurred in the Ordinary Course of Business since January 1, 2014, (c) which have been discharged or paid in full prior to the date of this Agreement, or (d) incurred pursuant to the transactions contemplated by this Agreement.  Since June 30, 2013, to the Knowledge of Sellers, no Seller has received any written complaint, allegation, assertion or claim regarding the accounting or auditing practices, procedures, methodologies or methods of Sellers or their respective internal accounting controls.  The pro forma balance sheet set forth on Schedule 5.7 is, to the best of Sellers' knowledge and information, a true and accurate statement of the anticipated pro forma balance sheet for the Company at Closing.

Section 5.8    **Financial Advisors.**  No Person has been engaged to act, directly or indirectly, as a broker, finder or financial advisor for Sellers in connection with the transactions contemplated by this Agreement, and no Person is entitled to any fee or commission or like payment from Buyer or Sellers in respect thereof, in each case other than as set forth on Schedule 5.8 (which shall also disclose the amount of any such fee or commission or like payment).  For the avoidance of doubt, Buyer shall not be responsible for, or have any liability on account of, any fees, commissions or like payments due to any entity set forth in Schedule 5.8.

Section 5.9    **Litigation.**  Except as set forth on Schedule 5.9, there is no suit, action, litigation, investigation, claim, arbitration proceeding or governmental proceeding or audit, including

appeals and applications for review, in progress, pending or, to Sellers' Knowledge, threatened against any Seller, or its officers or employees (in their capacity as such), or any judgment, decree, injunction, deficiency, rule or order of any court, governmental department, commission, agency, instrumentality or arbitrator which, in any case, (a) seeks to enjoin the ability of any Seller to enter into this Agreement or to consummate the transactions contemplated hereby or (b) has had or would reasonably be expected to have a Material Adverse Effect.

Section 5.10   **Compliance with Laws.**   Except as set forth on Schedule 5.10, since January 1, 2012 Sellers have conducted, and Sellers are presently conducting, the Business in material compliance with all applicable Laws.  Except as set forth in Schedule 5.10, no Seller has received any written notice of or been charged with the violation of any Laws, except where such violation would not reasonably be expected to be material to the ownership and operation of Business.

Section 5.11   **Permits.**   Schedule 5.11 sets forth all material Permits used by Sellers in the Business.  Sellers are in compliance with the material terms of all such Permits, and all such Permits are valid and in full force and effect, and no Proceeding is pending or, to the Knowledge of Sellers, threatened, the object of which is to revoke, limit or otherwise affect any such Permit.  No Seller is in material default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation) of any term, condition or provision of any Permit to which it is a party, except where such default or violation would not be material to the ownership and operation of the Business.

Section 5.12   **Contracts.**   Schedule 1.1(a) contains a complete list of all Contracts, including any and all amendments thereto and thereof in effect as of the date of this Agreement. Except as set forth in Schedule 1.1(a), no Seller has assigned, delegated or otherwise transferred to any third party any of its rights or obligations with respect to any such Contract.  The Purchased Contracts include all Contracts material to the ownership and/or operation of the Business, except with respect to any Excluded Assets that are designated by Buyer after the date hereof in accordance with Section 2.1 and Section 2.2.  Sellers have not, and, to the best of Sellers' Knowledge, no other party to any Purchased Contract has, commenced any action against any of the parties to any Purchased Contract or given or received any written notice of any default or violation under any Purchased Contract that has not been withdrawn or dismissed except to the extent such default or violation will be cured as a result of the payment of the applicable Cure Amounts or would not reasonably be expected to be material to the ownership and operation of the Business.  Each Purchased Contract is, or will be upon the Closing, valid, binding and in full force and effect in accordance with its terms.

Section 5.13   **Taxes.**

(a)      All material Tax Returns required to have been filed on or prior to the Closing Date by Sellers have been duly filed (taking into account any applicable extension of time within which to file), all such Tax Returns are true, correct and complete in all material respects, and all material Taxes required to be paid have been paid;

(b)      No material federal, state or local Tax Return audits are pending with respect to any Seller, except for those set forth on Schedule 5.13;

(c)      No Seller has received written notice from any Governmental Body of future material federal, state or local Tax Return audits;

(d)      There are no Liens with respect to material Taxes upon any of the Purchased Assets, other than Permitted Exceptions;

(e)      All material Taxes required to be withheld, collected or deposited by or with respect to the Sellers have been timely withheld, collected or deposited as the case may be, and to the extent required, have been paid to the relevant taxing authority; and

(f)      No Seller has (i) waived any statute of limitations in respect of any material Tax Returns or (ii) agreed to any extension of time with respect to the assessment of Taxes.

Section 5.14      **Employee Benefits.**

(a)      Schedule 5.14 sets forth all "employee benefit plans", as defined in Section 3(3) of ERISA, and all other material employee benefit arrangements, employment agreements or payroll practices maintained by Sellers or to which Sellers contribute or are obligated to contribute thereunder for Employees (the "**Benefit Plans**").  Neither Sellers nor any trade or business (whether or not incorporated) which is or has ever been under common control, or which is or has ever been treated as a single employer, with any Seller under Section 414(b), (c), (m) or (o) of the Code has in the last six years contributed or has been obligated to contribute to any "employee pension plans", as defined in Section 3(2) of ERISA, subject to Title IV of ERISA or Section 412 of the Code, including a "multiemployer plan", as defined in Section 3(37) of ERISA.  None of the Benefit Plans provide for post-employment life or health insurance, benefits or coverage for any participant or any beneficiary of a participant, except as may be required under COBRA and at the expense of the participant or the participant's beneficiary.

(b)      True, correct and complete copies of the following documents, with respect to each of the Benefit Plans, have been made available or delivered to Buyer by Sellers, to the extent applicable: (i) any plans, all amendments thereto and related trust documents, and amendments thereto; (ii) the most recent Forms 5500 and all schedules thereto; (iii) the most recent IRS determination letter; (iv) the most recent summary plan descriptions; and (v) material written communications to employees relating to the Benefit Plans within the last two (2) years.

(c)      The Benefit Plans have been maintained, in all material respects, in accordance with their terms and with all provisions of ERISA, the Code and other applicable federal and state laws and all contributions required to have been made under any of the Benefit Plans to any funds or trusts established thereunder or in connection therewith have been made, in all material respects, by the due date thereof (including any valid extension).

Section 5.15      **Labor Matters.**

(a)      Other than as set forth on Schedule 5.15(a), (i) no Seller is a party to any labor or collective bargaining agreement with respect to its Employees, (ii) no Employee of any Seller is represented by any labor organization, (iii) no labor organization or group of Employees of any Seller has made a pending demand for recognition or request for certification, (iv) and there are no representation or certification proceedings or petitions seeking a representation election presently

pending or, to the Knowledge of Sellers, threatened, to be brought or filed with the National Labor Relations Board or other labor relations tribunal involving any Seller.

(b)     There are no strikes, lockouts, work stoppages or slowdowns pending or, to the Knowledge of Sellers, threatened against or involving any Seller.

(c)     There are no unfair labor practice charges, arbitrations, grievances or complaints pending or, to the Knowledge of Sellers, threatened in writing against any Seller relating to the employment or termination of employment of any individual by any Seller except those which, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

(d)     There are no complaints, charges, administrative proceedings or claims against any Seller pending or, to the Knowledge of Sellers, threatened in writing to be brought or filed with any Governmental Body based on or arising out of the employment by any Seller of any Employee except those which, individually or in the aggregate would not reasonably be expected to have a Material Adverse Effect.

(e)     Other than any liability or obligation arising as a consequence of the transactions contemplated by this Agreement or as a consequence of the instructions of Buyer in accordance with Section 8.7 below, Sellers have not incurred any liability or obligation under the WARN Act or similar state Laws, which remains unpaid or unsatisfied.

(f)     Except as set forth on Schedule 5.15(f), the employment of each Employee of Sellers is at-will.  Schedule 5.15(f) lists all written (and includes a summary of all legally binding oral) employment and consulting agreements to which any Seller is a party or by which it is bound. Complete and correct copies of the agreements or arrangements listed and summarized on Schedule 5.16(f) have been provided or made available to Buyer.

Section 5.16     **Suppliers.**  To Sellers' Knowledge, there is no single supplier of Sellers that could not be readily replaced and, if the services of such supplier were lost, would result in a Material Adverse Effect.

Section 5.17     **Insurance.**  Schedule 5.17 contains an accurate and complete list as of the date of this Agreement of all material policies of fire, liability, workmen's compensation and other forms of insurance owned by or applicable to the Business or the Sellers, including the name of the insurer, amount of coverage, expiration date, policy number and carrier (the "**Insurance Policies**"). The Sellers have made available to the Buyer true and correct copies of each of the Insurance Policies.  The Insurance Policies are in full force and effect, and there is no material claim in respect of the Business pending under any of the Insurance Policies. All premiums payable under all such policies and bonds have been timely paid and the Sellers have otherwise complied in all material respects with the terms and conditions of all such policies and bonds. To the Knowledge of the Sellers, there is no threatened termination of, suspension, revocation, modification or cancellation of coverage under, any of the Insurance Policies. The amount of coverage under the Insurance Policies is sufficient to satisfy all obligations to maintain a minimum level of insurance as set forth in any Contract to which any Seller is party, as is required under applicable law or as is reasonably necessary and prudent in light of the Business.  For the avoidance of doubt, Buyer shall not be

responsible for, or have any liability on account of, any amounts due under any such Insurance Policy to the extent related to or arising from any prepetition claim.

Section 5.18    **[Intentionally Omitted.]**

Section 5.19    **No Other Agreements to Purchase.**  Sellers have not entered into any agreement with any other Person (written or oral) which grants such third party the right or option purchase or acquire from Sellers any Purchased Asset, other than purchase orders for Inventory accepted by Sellers in the Ordinary Course of Business, and the Stalking Horse APA.

Section 5.20    **Environmental Matters.**  Except as disclosed on <u>Schedule 5.20</u>, and except as would not, individually or in the aggregate, be reasonably likely to result in any material liability to Sellers, (a) Sellers are in compliance with all Environmental Laws (which compliance includes, but is not limited to, the possession of all Permits required under applicable Environmental Laws and compliance with the terms and conditions thereof in connection with the Business), (b) there are no Environmental Liabilities, (c) there are no Environmental Conditions, (d) there is no pending or, to the Knowledge of Sellers, threatened (in writing) action, suit, proceeding, or claim regarding an Environmental Condition with respect to the Business or real property, and (e) Sellers have not received a written notice from a Governmental Authority alleging a violation of any Environmental Law which has not been addressed and cured in accordance with Environmental Laws.  Sellers have delivered or made available to Buyer true and complete copies of any material reports, studies, correspondence, and submissions to a Governmental Authority to the extent in the possession of or initiated by Sellers pertaining to Hazardous Substances in, on, beneath or adjacent to any property currently or formerly owned, operated or leased by Sellers, or regarding compliance by Sellers with applicable Environmental Laws or any liabilities arising under Environmental Laws.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Sellers that:

Section 6.1    **Organization and Good Standing.**  Buyer is [_____], duly organized, validly existing and in good standing under the Laws of the State of [_____].

Section 6.2    **Authorization of Agreement.**  Buyer has full power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by Buyer in connection with the consummation of the transactions contemplated by this Agreement (the "**Buyer Documents**"), to perform their respective obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance by Buyer of this Agreement and each Buyer Document have been duly authorized by all necessary action on behalf of Buyer.  This Agreement has been, and each Buyer Document will be at or prior to the Closing, duly and validly executed and delivered by Buyer, and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each Buyer Document when so executed and delivered will constitute, legal, valid and binding obligations of Buyer, enforceable against Buyer, in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies

32

generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

Section 6.3      **No Conflicts.**

(a)      None of the execution and delivery by Buyer of this Agreement or the Buyer Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by Buyer with any of the provisions hereof or thereof will result in any violation of or default (with or without notice or lapse of time, or both) under, result in any violation or breach of, or give rise to a right of payment, termination, modification, acceleration cancellation under any provision of (i) the certificate of incorporation and by-laws or comparable organizational documents of Buyer; (ii) any material Contract to which Buyer is a party or by which any of the properties or assets of Buyer is bound; (iii) any Order of any Governmental Body applicable to Buyer or any of the material properties or assets of Buyer as of the Execution Date; or (iv) subject to entry of the Sale Order, any applicable Law, other than, in the case of clauses (ii), (iii) and (iv), compliance with the applicable requirements of the HSR Act or other Antitrust Laws if required and such other conflicts, violations, defaults, terminations, modifications, accelerations or cancellations that would not have a material and adverse effect on the ability of Buyer to consummate the transactions contemplated by this Agreement.

(b)      Subject to entry of the Sale Order, no consent, waiver, approval, Order, Permit or authorization of, or registration or declaration or filing with, or notification to any Governmental Body is required on the part of Buyer in connection with the execution and delivery of this Agreement or the Buyer Documents, the compliance by Buyer with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Buyer of any other action contemplated hereby or thereby, except for such consents, waivers, approvals, Orders, Permits, authorizations, registrations, declarations, filings and notifications, the failure of which to obtain or make would not reasonably be expected to have a material and adverse effect on the ability of Buyer to consummate the transactions contemplated by this Agreement.

Section 6.4      **Financial Advisors.**  Other than as set forth on <u>Schedule 6.4</u>, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for Buyer in connection with the transactions contemplated by this Agreement and no person is entitled to any fee or commission or like payment in respect thereof.

Section 6.5      **Litigation.**  There is no suit, action, litigation, arbitration proceeding or governmental proceeding or audit, including appeals and applications for review, in progress, pending or, to Buyer's knowledge, threatened against or relating to Buyer or any judgment, decree, injunction, deficiency, rule or order of any court, governmental department, commission, agency, instrumentality or arbitrator which, in any case, might materially and adversely affect the ability of Buyer to enter into this Agreement or to consummate the transactions contemplated hereby.

Section 6.6      **Adequate Assurances Regarding Purchased Contracts and Certain Real Property.**  As of the Closing, Buyer will be capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Purchased Contracts and any Real Property Lease being assumed and assigned to Buyer.

Section 6.7 **Independent Investigation.** Buyer acknowledges and affirms that it has completed its own independent investigation, analysis and evaluation of the Purchased Assets, that it has made all such reviews and inspections as it deems necessary and appropriate, and that in making its decision to enter into this Agreement and consummate the transactions contemplated hereby, it has relied on its own investigation, analysis, and evaluation with respect to all matters without reliance upon any express or implied representations or warranties except as expressly set forth in this Agreement and the other Seller Documents.

Section 6.8 **Commitments.** At Closing, Buyer will have sufficient capital to satisfy its obligations hereunder, including funding the Cash Payment. Buyer does not require financing to perform its obligations hereunder. Buyer has not incurred any obligation, commitment, restriction or Liability of any kind that would materially impair Buyer's ability to satisfy its payment and funding obligations under this Agreement.

## ARTICLE VII
## BANKRUPTCY COURT APPROVAL

Section 7.1 **Competing Transaction.**

(a) This Agreement is subject to approval by the Bankruptcy Court and the consideration by Sellers of higher or better competing bids (each a "**Competing Bid**"), subject to the terms of the Bid Procedures Order. Subject to the terms of the Bid Procedures Order, from the Execution Date until the completion of the Auction or as otherwise directed by the Bankruptcy Court, Sellers are permitted to cause their representatives and Affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Buyer and its Affiliates, agents and representatives) in connection with any sale or other disposition of the Purchased Assets. In addition, Sellers shall be permitted to respond to any inquiries or offers to purchase all or any part of the Purchased Assets (each, an "**Alternative Proposal**"), provided that such Person enters into a non-disclosure agreement in favor of Sellers and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable Law, including supplying information relating to the Business and the assets of Sellers to prospective buyers. Within one (1) Business Day of receipt thereof, Sellers shall provide to Buyer a copy of any such Alternative Proposal and any written response of Sellers thereto and regularly update Buyer as to the status of any negotiations in connection therewith. Sellers shall promptly furnish to Buyer all information, documents and data concerning Sellers that is provided to any prospective buyer that has not been furnished to Buyer.

(b) Following completion of the Auction, without the prior written consent of Buyer, Sellers are not permitted to cause their representatives and Affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (excluding Buyer and its agents and representatives) in connection with any sale or other disposition of the Purchased Assets. In addition, without the prior written consent of Buyer, Sellers shall not after completion of the Auction respond to any Alternative Proposal or perform any other acts related thereto, including supplying information relating to the Business and the assets of Sellers to prospective buyers of the Purchased Assets.

Section 7.2 **Bankruptcy Court Filings.** Sellers shall use commercially reasonable efforts to obtain entry of the Sale Order by April 30, 2014.  Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of demonstrating that Buyer is a "good faith" Buyer under Section 363(m) of the Bankruptcy Code.  Sellers shall consult with Buyer and its representatives concerning any Order of the Bankruptcy Court relating to this Agreement, the Auction or the Bankruptcy Cases and provide Buyer with copies of applications, pleadings, notices, proposed Orders and other documents relating to such proceedings as soon as reasonably practicable prior to any submission thereof to the Bankruptcy Court, with such applications, pleadings, notices, and other documents relating to such proceedings being in form and substance reasonably acceptable to Buyer.  All Orders of the Bankruptcy Court relating to this Agreement shall be in form and substance acceptable to Buyer.  If any Order of the Bankruptcy Court relating to this Agreement shall be appealed by any Person other than the Buyer or, with the Buyer's approval, a third party (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or re-argument shall be filed with respect to any such Order), Sellers shall diligently defend against such appeal, petition or motion and shall use its reasonable best efforts to obtain an expedited resolution of any such appeal, petition or motion; provided, that Sellers shall consult with Buyer regarding the status of any such actions.  Any changes to the form of the Sale Order must be approved by Buyer.  Sellers further covenant and agree that, after the Closing, any chapter 11 plan submitted to the Bankruptcy Court or any other court by or with the support of Sellers for confirmation shall be a Liquidating Plan.

Section 7.3 **Buyer Deposit.**  Buyer hereby agrees to deposit, for the benefit of Sellers and in accordance with the Bid Procedures Order, cash in an amount equal to five percent (5%) of Purchase Price (the "**Buyer Deposit**") contemporaneously with execution of this Agreement.  If the Closing occurs, the Buyer Deposit shall be applied to the Purchase Price.  Sellers' right to retain the Buyer Deposit shall be governed by Section 4.5.  Following any termination of this Agreement, other than a termination by Sellers pursuant to Section 4.4(d)(ii) or Section 4.4(d)(iii), the Buyer Deposit shall be returned to the Buyer.  Sellers shall promptly execute all documentation reasonably required by Buyer to reflect the intent and purpose of the foregoing.

## ARTICLE VIII
## COVENANTS

Section 8.1 **Access to Information.**  Sellers agree that, prior to the Closing, Buyer shall be entitled, through its officers, employees and representatives (including their respective legal advisors and accountants), to make such investigation and inspection of any and all properties, businesses and operations of Sellers and the Business and such examination of the books, records and financial condition of Sellers, the Business, the Purchased Assets and the Assumed Liabilities as they reasonably request and to make extracts and copies of such books and records.  Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances and shall be subject to restrictions under applicable Law.  Sellers shall cause their respective officers, employees, consultants, agents, accountants, attorneys and other representatives to cooperate reasonably with Buyer and Buyer's representatives in connection with such investigation and examination, and Buyer shall, and shall cause its representatives to,  cooperate reasonably with Sellers and their respective representatives

and each of them shall use their reasonable efforts to minimize any disruption to the Business. Notwithstanding the foregoing, prior to the Auction, Buyer shall not be permitted to contact any customers, suppliers, licensors, licensees, or other business partners of Sellers about the Bankruptcy Cases without Sellers' prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.

Section 8.2    **Further Assurances.**

(a)    Further Assurances. Each of Sellers and Buyer shall use commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the transactions contemplated by this Agreement on or prior to the Termination Date and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement.

(b)    HSR Act; Anti-Trust Laws. Sellers and Buyer shall, if required in connection with the transactions contemplated hereby, (i) promptly make the filings required by any Governmental Body, including under the HSR Act or any other Antitrust Laws and, in any event, within ten (10) Business Days after the date of this Agreement in the case of all filings required under the HSR Act and all other filings required by other Antitrust Laws, (ii) comply at the earliest practicable date with any request for additional information, documents or other materials received from any Governmental Body, whether such request is formal or informal, (iii) cooperate with the other Parties in connection with resolving any investigation or other inquiry concerning the transactions contemplated by this Agreement commenced by any Governmental Body, and (iv) cooperate with the other Parties in connection with any other Party's filing.  Each Party shall be responsible for the payment of its respective fees and expenses, including legal fees and expenses, in complying with any request for additional information or documentary material from any Governmental Body; provided that all filing fees required to be paid in connection with any filings hereunder shall be borne by Buyer.  Each Party shall promptly inform the other Parties of any oral communication with, and provide copies of written communications with, any Governmental Body regarding any such filing.  No Party shall independently participate in any formal meeting with any Governmental Body in respect of any such filings, investigation, or other inquiry without giving the other Parties prior notice of the meeting and, to the extent permitted by such Governmental Body, the opportunity to attend and/or participate.  Subject to applicable Laws, the Parties will consult and cooperate with one another in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party hereto relating to proceedings under the HSR Act or any other Antitrust Law, if any.

(c)    Each of Buyer and each Seller shall use its commercially reasonable efforts to obtain any required approval from any Governmental Body and to resolve such objections, if any, as may be asserted by any Governmental Body with respect to the transactions contemplated by this Agreement under the HSR Act, the Sherman Act, as amended, the Clayton Act, as amended, the Federal Trade Commission Act, as amended, and any other United States federal or state or foreign Laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade (collectively, the "**Antitrust Laws**").  Each of Buyer and each Seller shall use its commercially reasonable efforts to take such action as may be required to cause the expiration of the notice periods under the HSR Act or other Antitrust Laws with respect to such transactions as promptly as practicable after the execution of this Agreement.  In connection with

36

and without limiting the foregoing, each of Buyer and each Seller agrees to use its commercially reasonable efforts to take promptly any and all steps necessary to avoid or eliminate each and every impediment under any Antitrust Laws that may be asserted by any federal, state and local and non-United States antitrust or competition Governmental Body, so as to enable the Parties to close the transactions contemplated by this Agreement as expeditiously as possible.

(d)     Notwithstanding anything to the contrary set forth in this Agreement, in no event shall Buyer or any of its Affiliates be required to (A) proffer to, or agree to, sell, divest, lease, license, transfer, dispose of or otherwise encumber or hold separate and agree to sell, divest, lease, license, transfer, dispose of or otherwise encumber before or after the Closing, any of the Purchased Assets or any material assets, licenses, operations, rights, product lines, businesses or interest therein of Buyer or any of its Affiliates (or to consent to any sale, divestiture, lease, license, transfer, disposition or other encumbrance by Sellers of any of the Purchased Assets or to any agreement by any Seller to take any of the foregoing actions) or to agree to any material change (including through a licensing arrangement) or restriction on, or other impairment of Buyer's ability to own or operate any of the Purchased Assets, (B) take any other action under this Section 8.2 if the U.S. Department of Justice or the U.S. Federal Trade Commission authorizes its staff to seek a preliminary injunction, restraining order or other Legal Proceeding to enjoin consummation of the transactions contemplated by this Agreement, or (C) make any material payments, other than filing fees required by Law, or provide any other material consideration in connection with any waiver or consent reasonably necessary, proper or advisable to consummate and make effective the transactions contemplated hereby (or to consent to any material payment, other than filing fees required by Law, or provide any other material consideration in connection with such waivers or consents).

(e)     Buyer shall not acquire or agree to acquire, by merging with or into or consolidating with, or by purchasing a substantial portion of the assets of or equity in, or by any other manner, any business or any corporation, partnership, association or other business organization or division thereof, or otherwise acquire or agree to acquire any assets, if entering into a definitive agreement relating to, or the consummation of such acquisition, merger or consolidation could reasonably be expected to: (i) impose any delay in the obtaining of, or increase the risk of not obtaining, any consents of any Governmental Body necessary to consummate the transaction contemplated hereby or the expiration or termination of any applicable waiting period; (ii) increase the risk of any Governmental Body entering an order prohibiting the consummation of the transactions contemplated hereby; (iii) increase the risk of not being able to remove any such order on appeal or otherwise; or (iv) delay or prevent the consummation of the transactions contemplated hereby.

Section 8.3     **Confidentiality.**

(a)     Buyer acknowledges that the confidential information provided to Buyer in connection with this Agreement, including under Section 8.1, and the consummation of the transactions contemplated hereby, is subject to the terms and conditions of that certain confidentiality agreement executed by the Parties, as amended from time to time.

(b)     Following the completion of the Auction, Sellers agree to maintain, and shall cause their respective Affiliates to maintain, unless disclosure is required by applicable Law, the

37

confidentiality of any confidential information regarding the Business which is in Sellers' or any of their respective Affiliate's possession or of which Sellers or any of their respective Affiliates are aware.  Sellers hereby further agree, unless disclosure is required by applicable Law, to take all appropriate steps, consistent with Sellers' past practice, and to cause each of their respective Affiliates to take all appropriate steps, consistent with Sellers' past practice, to safeguard such confidential information and to protect it against disclosure, misuse, espionage, loss and theft.  In furtherance and not in limitation of the foregoing, Sellers shall not, and shall cause their respective Affiliates not to, unless required by applicable Law, disclose to any Person (i) any confidential information regarding the Business, or (ii) any of the discussions or negotiations conducted with Buyer in connection with this Agreement, provided, that Sellers shall be entitled to disclose (A) any information required to be disclosed by Sellers to the Bankruptcy Court, the United States Trustee, parties in interest in the Bankruptcy Cases, other Persons bidding on assets of Sellers, (B) any information required to be disclosed by Sellers pursuant to any applicable Law (including the Bankruptcy Code), Legal Proceeding or Governmental Body, or (C) any information to Sellers' counsel or other representatives who agree to the terms of this Section 8.3; provided, that, in each case, such disclosure shall be limited to the information that is so required to be disclosed and the Person(s) to whom such disclosure is required.  Notwithstanding anything in this Section 8.3 to the contrary, unless disclosure is required by applicable Law, the confidentiality of any Trade Secrets of the Business or Buyer shall be maintained for so long as such Trade Secrets continue to be entitled to protection as Trade Secrets of the Business and Buyer, respectively.

Section 8.4    **Preservation of Records.**  Sellers (or any subsequently appointed bankruptcy estate representative, including, but not limited to, a trustee, a creditor trustee or a plan administrator) and Buyer agree that each of them shall preserve and keep the books and records held by it or their respective Affiliates relating to the pre-Closing Business for a period of six (6) months from the Closing Date and shall make such books and records available to the other parties (and permit such other party to make extracts and copies of such books and records at its own expense) as may be reasonably required by such party in connection with, among other things, any insurance claims by, Legal Proceedings or Tax audits against or governmental investigations of Sellers or Buyer or any of their Affiliates, the Bankruptcy Cases or in order to enable Sellers or Buyer to comply with their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby or thereby.  In the event Sellers, on the one hand, or Buyer, on the other hand, wish to destroy such records during such six (6) month period, such Party shall first give twenty (20) days' prior written notice to the other and such other Party shall have the right at its option and expense, upon prior written notice given to such Party within that twenty (20) day period, to take possession of the records within thirty (30) days after the date of such notice.

Section 8.5    **Publicity.**  Neither Sellers, on the one hand, nor Buyer, on the other hand, shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other Parties hereto, which approval will not be unreasonably withheld, conditioned or delayed, unless, in the sole judgment of Buyer or Sellers, disclosure is otherwise required by applicable Law or with respect to filings to be made with the Bankruptcy Court in connection with this Agreement.  Notwithstanding the foregoing, the Parties may publicly disclose the existence of this Agreement.

Section 8.6    **Operation of Business.**  Until the Closing, Sellers shall, except as otherwise required, authorized or restricted pursuant to the Bankruptcy Code or an Order of the Bankruptcy

Court, operate the Business in the Ordinary Course of Business and in accordance with the Approved Budget (among other things, Sellers will not incur unreasonable liabilities, including inappropriate increases in Inventory or factoring of Accounts Receivable).  Sellers shall use commercially reasonable efforts to (A) preserve intact their respective business organizations, (B) maintain the Business and the Purchased Assets (normal wear and tear excepted), (C) keep available the services of their respective officers and Employees, (D) maintain satisfactory relationships with licensors, licensees, suppliers, contractors, distributors, consultants, customers and others having business relationships with Sellers in connection with the operation of the Business (other than payment of pre-petition claims), (E) pay all of their respective post-petition obligations in the Ordinary Course of Business and in accordance with the Approved Budget, including with respect to required filing, processing, registration or other fees to maintain the validity of Sellers' rights in, to, under or relating to any material Purchased Intellectual Property, (F) continue to operate the Business in all material respects in compliance with all Laws applicable to the Business and Sellers, (G) maintain cash management procedures consistent with past practices, (H) maintain all material Permits of Sellers, including those used in the operation of the Business, and (I) maintain any insurance policy or coverage in effect on the Execution Date.  Without limiting the generality of the foregoing, and except (i) as otherwise expressly provided in or contemplated by this Agreement, or (ii) required, authorized or restricted pursuant to the Bankruptcy Code or an Order of the Bankruptcy Court, on or prior to the Closing, Sellers may not, without the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), take any of the following actions with respect to the Business:

(a)    (i) modify in any manner the compensation of any of the directors, Employees, or officers, or accelerate the payment of any such compensation (other than in the Ordinary Course of Business), (ii) grant any unusual or extraordinary bonus, benefit or other direct or indirect compensation to any director, Employee or officer, or (iii) change the title, authority or duties of any director or officer;

(b)    engage any new Employee other than in the Ordinary Course of Business, provided, however, that Sellers shall not engage any new Employee whose aggregate annual compensation exceeds $60,000 (except for replacements of existing, non-executive officer positions at the same or lower salary level, but only if such salary level is less than $100,000), except as set forth on Schedule 8.6(b);

(c)    remove or permit to be removed from any building, facility, or real property any Purchased Asset or any Inventory other than in the Ordinary Course of Business;

(d)    sell, pledge, lease or otherwise dispose of, mortgage, hypothecate or otherwise encumber any Purchased Asset (other than sales of Inventory in the Ordinary Course of Business and other than any Liens provided for in the DIP Order) with a value in excess of $100,000 in the aggregate;

(e)    amend, terminate or renew any Purchased Contract or Real Property Lease except as set forth on Schedule 8.6(e);

(f)    make any unusual, atypical or extraordinary efforts to collect and/or accelerate any outstanding Accounts Receivable or give any discounts or concessions for early payment of such

Accounts Receivable outside of the Ordinary Course of Business and make any sales of, or, other than Liens provided for in the DIP Order, convey any interest in any Accounts Receivable, obligation, liability or Indebtedness to any third party;

(g)    other than transactions pursuant to Contracts in effect on the Petition Date as set forth on Schedule 8.6(g), engage in any transaction with any Affiliate, subsidiary, shareholder, officer or director of any Seller (other than in the Ordinary Course of Business), incur or assume any long term or short term debt with or on behalf of any such Person or guarantee, endorse or otherwise be liable or responsible (whether directly, indirectly, contingently or otherwise) for the obligations of any such Person;

(h)    make any change in their method of accounting, except as required by GAAP;

(i)    other than with respect to the Stalking Horse APA, a Competing Bid or as set forth on Schedule 8.6(i), enter into any Contract that would survive the Closing (other than in the Ordinary Course of Business and provided that the term of such Contract does not exceed one (1) year and that such Contract does not create an obligation of any Seller in excess of $100,000);

(j)    accelerate the payment of any obligation, Liability or Indebtedness of any Seller;

(k)    subject any of the Purchased Assets to any Lien, except for Permitted Exceptions or any Liens created consistent with the DIP Order;

(l)    acquire any material properties or assets or sell, assign, license, transfer, convey, lease or otherwise dispose of any material properties or assets (except pursuant to an existing Contract for fair consideration in the Ordinary Course of Business or for the purpose of disposing of obsolete or worthless assets);

(m)    enter into any commitment or Contract for any expenditures in excess of $50,000 for any individual commitment and $125,000 for all commitments and Contracts in the aggregate except as set forth in Schedule 8.6(m);

(n)    make any material changes to advertising or marketing plans of Sellers other than in the Ordinary Course of Business;

(o)    compromise, settle or agree to settle any pending or threatened action, suit or Legal Proceeding, or consent to the same, other than compromises, settlements or agreements that involve only the payment of money damages not in excess of $100,000 in the aggregate;

(p)    enter into any agreement that would restrict the Sellers' ability to engage in business or compete; and

(q)    agree, whether in writing or otherwise, to do any of the foregoing.

Nothing contained in this Agreement shall give Buyer, directly or indirectly, the right to control or direct Sellers' operations prior to the Closing, and nothing contained in this Agreement shall give Sellers, directly or indirectly, the right to control or direct Buyer's operations prior to the Closing.

Prior to the Closing, each of Sellers and Buyer shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its respective operations.

Section 8.7    **WARN Act Notices.**  At any time prior to the Closing, Buyer may direct Sellers to issue, and Sellers shall promptly thereafter issue, in accordance with applicable law, any WARN Act notices to Employees identified by Buyer (either by name, position or function, but not any applicable Employee under a collective bargaining agreement unless in compliance with such collective bargaining agreement) and any previously terminated employees of Sellers who are required by the WARN Act to receive such notice on account of the notices being provided at the direction of the Buyer (each such Employee and previously terminated Employee receiving a WARN Act notice pursuant to this Section 8.7 is hereinafter referred to as, a "**Noticed Employee**"), and any other Person required to receive notice in connection therewith pursuant to the WARN Act; provided that Buyer shall be responsible (i) to pay any administrative expenses associated with giving such notices and (ii) for all Liabilities relating to claims or Legal Proceedings by or on behalf of the Noticed Employees who were Employees identified by Buyer asserting that their termination failed to comply with applicable Law other than with respect to the WARN Act (such liabilities collectively, "**Noticed Employee Liabilities**"), provided that, in the event of any such Legal Proceeding, Buyer shall control the defense of such Legal Proceeding and have the right to approve any compromise or settlement thereof.  Buyer shall be required to comply with applicable Law and the terms of any applicable collective bargaining agreement in determining to provide WARN Act notices to any Employees prior to the Closing.

Section 8.8    **Notification of Certain Matters.**  Sellers, on the one hand, and Buyer, on the other hand, shall use their commercially reasonable efforts to promptly inform each other in writing in reasonable detail of (i) the occurrence or non-occurrence of any event, the occurrence or non-occurrence of which, as the case may be, would cause any of the representations or warranties in this Agreement of any Party to be untrue or inaccurate in any material respect at or prior to the Closing and (ii) any material failure of any Party to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it under this Agreement; provided, however, that the delivery of any notice pursuant to this Section 8.8 shall not limit or otherwise affect the remedies available to any Party under this Agreement.

Section 8.9    **Prospective Employees.**

(a)    Subject to the first sentence in Section 8.9(b), Sellers shall reasonably assist Buyer to engage, in Buyer's sole and absolute discretion, the services of Sellers' Employees currently engaged in staffing the Business ("**Prospective Employees**"), on terms and conditions satisfactory to Buyer and such Prospective Employees and that comply with the terms of Section 8.9(b).  Sellers shall not, and shall not attempt to, engage or transfer the services of any of the Prospective Employees to any other business operated by Sellers or their successors; provided, however, that in the event Buyer engages and then later terminates the services of any Prospective Employee, Sellers may later re-engage the services of such individuals.  Buyer shall be provided access to, and be allowed to communicate with, such Prospective Employees.

(b)    Buyer agrees to offer employment on an "at will" basis effective as of the Closing to each then-current Employee (only to the extent such Employee is (i) employed by Sellers as of the date of such offer, and (ii) not a Noticed Employee), provided such Employee (x) continues

41

to be employed by Sellers as of the Closing, on substantially similar terms (including base salary or wages, bonus eligibility, vacation and equivalent employee benefits in effect in the Ordinary Course of Business), in the aggregate, as those under which each such Employee was employed immediately prior to the Closing and (y) agrees to be paid any accrued payroll and benefits in the Ordinary Course of Business following Closing.  Such individuals who accept such offer and continue employment with Buyer are hereinafter referred to as the "**Buyer Employees**."  Nothing herein shall obligate Buyer to employ any Buyer Employee for any particular length of time following the Closing.

(c)     Buyer shall, subject to restrictions imposed by the Bankruptcy Code, as such may be modified by order of the Bankruptcy Court, be responsible for payment in the Ordinary Course of Business of all accrued payroll and benefits (to the extent not paid as of the Closing Date) due to Buyer Employees and incurred in the Ordinary Course of Business, including any unpaid wages, salary, unused vacation or sick leave or other paid time off, health and other welfare benefit plan contributions (employer and employee) incurred in the Ordinary Course of Business.  Buyer shall, subject to restrictions imposed by the Bankruptcy Code, as such may be modified by order of the Bankruptcy Court, also be responsible for (i) the payment of unused vacation or sick leave or other paid time off to Noticed Employees, regardless of whether their applicable notice periods expired prior to the Closing, and (ii) any Liabilities arising out of or relating to the failure to pay unused vacation or sick leave or other paid time off to Buyer Employees in accordance with applicable Law as a result of their termination of employment by or with Seller .

(d)     Effective as of the Closing Date, Buyer shall either (i) assume in its sole and absolute discretion some or all of the Benefit Plans or (ii) provide the Buyer Employees with other employee benefit plans as determined by Buyer in its sole and absolute discretion, provided that such Buyer Employees shall be credited for service earned on and prior to the Closing Date with Sellers in addition to service earned with Buyer on or after the Closing Date to the extent that any Benefit Plan that is a Purchased Asset or the employee benefit plans of Buyer, as applicable, take into account service for purposes of eligibility, vesting or the calculation of vacation, sick days, severance, layoff and similar benefits (but not for purposes of pension benefit accruals).  To the extent Buyer determines to assume, on an ongoing basis, any of the Benefit Plans, Sellers shall use commercially reasonable efforts to assist Buyer in connection with any such assumption.

(e)     On or as soon as reasonably practicable after the Closing Date, Seller shall (i) cause the trustee of Sellers' 401(k) Plan (the "**Seller 401(k) Plan**") to segregate the assets of the Seller 401(k) Plan representing the full account balances of Buyer Employees as of the Closing Date, (ii) make any and all filings and submissions to the appropriate Governmental Bodies arising in connection with such segregation of assets and (iii) make all necessary amendments to the Seller 401(k) Plan and related trust agreement to provide for such segregation of assets and the transfer of assets as described below.  As soon as practicable (but no later than thirty (30) days) after the Closing Date, Buyer shall establish or designate an individual account plan for the benefit of Buyer Employees (the "**Buyer 401(k) Plan**"), shall use commercially reasonable efforts to take all necessary action, if any, to qualify such plan under the applicable provisions of the Code and make any and all filings and submissions to the appropriate Governmental Bodies required to be made by it in connection with the transfer of assets described below.  As soon as practicable (but no later than sixty (60) days) following the Closing Date, Sellers shall cause the trustee of the Seller 401(k) Plan to transfer in the form of cash (or promissory notes representing outstanding loans of the Buyer

42

Employees) the full account balances of the Buyer Employees under the Seller 401(k) Plan (which account balances will have been credited with appropriate earnings attributable to the period from the Closing Date to the date of transfer described herein), reduced by any necessary benefit or withdrawal payments to or in respect of Buyer Employees occurring during the period from the Closing Date to the date of transfer described herein, to the appropriate trustee as designated by Buyer under the trust agreement forming a part of Buyer 401(k) Plan.

(f)     As of the Closing, Buyer shall be obligated to provide continuation health care coverage, to the extent required by and in accordance with Section 4980B of the Code and Sections 601 to 608, inclusive, of ERISA ("**COBRA**"), to Employees and former employees of the Sellers (and their qualified beneficiaries) who left employment or otherwise experienced a COBRA qualifying event on or prior to the Closing Date and who retain a right to a benefit under any of the Benefit Plans subject to COBRA.  Immediately prior to the Closing, Sellers will provide to Buyer a list of all Employees (i) terminated by Sellers within the ninety (90) days immediately preceding the Closing, and (ii) receiving COBRA coverage on the Closing Date.

(g)     Except for Liabilities explicitly assumed pursuant to Sections 2.4(j) and 8.9(c) above, Sellers shall retain all Liabilities, if any, for any severance or termination costs relating to Employees who, on or at the Closing, experience a termination of employment by Sellers as a result of the transactions contemplated by this Agreement.

(h)     Nothing herein expressed or implied is intended to confer on any Person other than the Parties hereto or their respective successors and assigns any rights, remedies, obligations or liabilities under or by reason of this Section 8.9.

(i)     Nothing contained in this Section 8.9 or elsewhere in this Agreement shall be construed to prevent the termination of employment of any individual Buyer Employee or any change in the employee benefits available to any individual Buyer Employee.  Nothing herein shall obligate Buyer to employ any Buyer Employee for any particular length of time following the Closing.

Section 8.10     **Name Change.**  Within fourteen (14) days after the Closing, Sellers shall take all steps necessary to effect a change in their respective corporate names to remove the words "Special Event Holding", "Event Rentals", "Events", "Classic", "Party Rentals" and any derivation thereof (collectively, the "**Seller Names**") from such names.  Sellers agree that they shall (i) as soon as practicable after the Closing Date and in any event within fourteen (14) days following the Closing Date, cease to make any use of the Seller Names or any service marks, trademarks, trade names, identifying symbols, logos, emblems, signs or insignia related thereto or any of the Purchased Intellectual Property or containing or comprising the foregoing, including any name or mark confusingly similar thereto (collectively, the "**Seller Marks**"), and (ii) immediately after the Closing, cease to hold themselves out as having any affiliation with the Business.  As promptly as practicable but in no event later than thirty (30) days following the Closing Date, Sellers shall remove, strike over, cover, block or substantially obliterate all Seller Marks from any vehicles, displays, signs, promotional materials or other similar materials then owned by them.

Section 8.11     **Certain Financing Matters.**  In order to assist with the consummation and effectiveness of any financing necessary to consummate the transactions contemplated in this

43

Agreement, Sellers shall use commercially reasonable efforts to cause their respective consultants, advisors and auditors to provide such cooperation as Buyer may reasonably request in connection therewith.

Section 8.12    **Rejected Contracts.**  No Seller shall reject any Contract or Real Property Lease in any bankruptcy proceeding following the Execution Date without the prior written consent of Buyer.

Section 8.13    **Disclaimer of Warranties.**  Notwithstanding anything contained in this Agreement, it is the explicit intent of each Party that Sellers are not making any representation or warranty, express or implied, beyond those given in Article V (including with respect to income to be derived or expenses to be incurred in connection with the Purchased Assets, the physical condition of any personal property comprising Purchased Assets or which is the subject of any Real Property Lease or Purchased Contract, the environmental condition or other matters relating to the physical condition of any real property, the zoning of any real property, the value of the Purchased Assets, the transferability of the Purchased Assets, the terms, amount, validity, collectability or enforceability of any Assumed Liabilities or any Real Property Lease or Purchased Contract, the title to any Purchased Assets, the merchantability or fitness of any Purchased Assets for any particular purpose, or any other matter relating to the Purchased Assets, and it is understood that, except for such representations and warranties, Buyer takes the Purchased Assets "AS IS", "WHERE IS", and "WITHOUT FAULTS".  Without limiting the generality of the immediately foregoing, except for the representations and warranties specifically contained in Article V, Seller hereby expressly disclaims and negates any representation or warranty, express or implied, at common law, by statute, or otherwise, relating to the Purchased Assets, it being the intention of the Parties that the Purchased Assets are, subject to Article IX, to be accepted by Buyer at Closing in their present condition and state of repair.

**ARTICLE IX**
**CONDITIONS TO CLOSING**

Section 9.1    **Conditions Precedent to Obligations of Buyer.**  The obligation of Buyer to consummate the transactions contemplated by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Buyer in whole or in part to the extent permitted by applicable Law):

(a)    The representations and warranties of Sellers set forth in (i) Sections 5.1 (Organization of Sellers; Authorization of Agreement), 5.2 (No Conflicts), 5.3 (Title to Purchased Assets), 5.6 (Intellectual Property), the first sentence of 5.7 (Financial Statements), and 5.8 (Financial Advisors) of this Agreement qualified as to materiality shall be true and correct and those not so qualified shall be true and correct in all material respects at and as of the Closing as if made at and as of such time (except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties qualified as to materiality shall be true and correct and those not so qualified shall be true and correct in all material respects, on and as of such earlier date), and (ii) all other Sections of this Agreement shall be true and correct at and as of the Closing as if made at and as of such time (except to the extent such representations and warranties expressly relate to an earlier date which shall be true and correct at and as of such earlier date), except for such failures to be true and correct that do not have, individually or in the

44

aggregate, a Material Adverse Effect; and Buyer shall have received a certificate signed by an authorized officer of each Seller, dated the Closing Date, to the foregoing effect;

(b)     Sellers shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by them prior to the Closing Date, and Buyer shall have received a certificate signed by an authorized officer of each Seller, dated the Closing Date, to the foregoing effect;

(c)     Sellers shall have delivered, or caused to be delivered, to Buyer all of the items set forth in Section 4.2;

(d)     Buyer shall have obtained all material Permits reasonably necessary to operate the Business;

(e)     Since June 30, 2013, (i) there shall have been no Material Adverse Effect and (ii) each Seller shall have delivered to Buyer a certificate, dated as of the Closing Date, to such effect;

(f)     The Bid Procedures Order shall have become a Final Order (unless this condition shall have been waived in writing by Buyer); and

(g)     The Sale Order shall have become a Final Order (unless this condition shall have been waived in writing by Buyer).

Section 9.2     **Conditions Precedent to Obligations of Sellers.**  The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Sellers in whole or in part to the extent permitted by applicable Law):

(a)     The representations and warranties of Buyer set forth in this Agreement qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, at and as of the Closing, except, in all cases, (i) to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties qualified as to materially shall be true and correct, and those not so qualified shall be true and correct in all material respects, on and as of such earlier date), and (ii) to the extent that any inaccuracy in such representations and warranties, individually or in the aggregate would not reasonably be expected to materially and adversely affect Buyer's ability to consummate the transactions contemplated by this Agreement; and Sellers shall have received a certificate signed by an authorized officer of Buyer, dated the Closing Date, to the foregoing effect;

(b)     Buyer shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Buyer on or prior to the Closing Date; and Sellers shall have received a certificate signed by an authorized officer of Buyer, dated the Closing Date, to the foregoing effect;

(c)     Buyer shall have delivered, or caused to be delivered, to Sellers the Purchase Price in accordance with Section 3.1; and

(d)    the Sale Order shall have been entered and not be subject to any stay on enforcement.

Section 9.3    **Conditions Precedent to Obligations of Buyer and Sellers.**  The respective obligations of Buyer and Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Buyer and Sellers in whole or in part to the extent permitted by applicable Law):

(a)    there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; and

(b)    the waiting period applicable to the transactions contemplated by this Agreement under the HSR Act and any other applicable Antitrust Laws, if required, shall have expired or early termination shall have been granted.

Section 9.4    **Frustration of Closing Conditions.**  Neither Sellers nor Buyer may rely on the failure of any condition set forth in Section 9.1, Section 9.2 or Section 9.3, as the case may be, if such failure was caused by such Party's failure to comply with any provision of this Agreement.

## ARTICLE X
## NO SURVIVAL

Section 10.1    **No Survival of Representations and Warranties.**  The Parties hereto agree that the representations and warranties contained in this Agreement shall not survive the Closing hereunder, and none of the Parties shall have any liability to each other after the Closing for any breach thereof.  The Parties hereto agree that the covenants contained in this Agreement to be performed after the Closing shall survive the Closing hereunder, and each Party hereto shall be liable to the other after the Closing for any breach thereof.

## ARTICLE XI
## TAX MATTERS

Section 11.1    **Transfer Taxes.**  Buyer shall be responsible for all Transfer Taxes to the extent set forth on Schedule 11.1.

Section 11.2    **Purchase Price Allocation.**  Within sixty (60) days following the Closing, Buyer shall deliver to Sellers an allocation of the Purchase Price (including the Assumed Liabilities and any other amounts properly included therein) among the Purchased Assets in accordance with Section 1060 of the Code and Treasury Regulations thereunder (and any similar provision of state, local or foreign law, as applicable).  Sellers shall have thirty (30) days following receipt of Buyer's proposed allocation to review and comment on such proposed allocation and Buyer shall consider such comments in good faith.  If and to the extent the Parties are unable to agree on the allocation, the Parties shall retain a mutually agreed upon accounting firm of national repute (the "**Arbitrator**") to resolve such dispute.  The determination of the Arbitrator with respect to any such disagreement shall be final and binding upon each party hereto (absent fraud or manifest error) and the decision of the Arbitrator shall constitute an arbitral award that is final, binding and non-appealable (absent

fraud or manifest error) and upon which a judgment may be entered by a court having jurisdiction thereover.  Thereafter, Buyer shall provide Sellers with Buyer's final allocation schedule (the "**Final Allocation**").  If Sellers and Buyer submit any dispute to the Arbitrator for resolution pursuant to this <u>Section 11.2</u>, Sellers and Buyer shall each pay their own costs and expenses incurred under this <u>Section 11.2</u>.  Each of Buyer and Sellers shall bear fifty percent (50%) of the costs and expenses of the Arbitrator incurred pursuant to this <u>Section 11.2</u>.  Sellers and Buyer agree to cooperate with each other in preparing IRS Form 8594 (including any subsequent adjustments required thereto) in a manner consistent with such Final Allocation, and to furnish the other with a copy of such form prepared in draft form within a reasonable period before its filing due date.  If such Final Allocation is disputed by any Tax authority or other Governmental Body, Buyer or any Seller receiving notice of such dispute will promptly notify the other Party and the Parties will use their reasonable best efforts to sustain the Final Allocation.  Neither Buyer nor Sellers shall take any position (including in any Tax Returns, reports, audits or otherwise) that is inconsistent with such allocation, unless otherwise required pursuant to a final determination by a court of competent jurisdiction or pursuant to a closing agreement with the IRS entered into pursuant to Section 7121 of the Code.  The Purchase Price allocation determined in connection with this <u>Section 11.2</u> shall be utilized for Tax reporting purposes only.  For the avoidance of doubt, such allocation shall not be binding upon any Party for purposes other than Tax reporting or used as evidence, or for any other purpose, in connection with any dispute regarding valuation or allocation of the Purchase Price and/or Assumed Liabilities.  Notwithstanding any other provision of this Agreement, the terms and provisions of this <u>Section 11.2</u> shall survive the Closing without limitation.

Section 11.3    **Withholding.**  Buyer shall be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement to any Seller or any other Person such amounts as Buyer is required to deduct and withhold under the Code, or any Tax law, with respect to the making of such payment; provided that Buyer shall consult with the affected Seller in good faith at least fifteen (15) days prior to making such withholding or deduction and the Parties hereto shall cooperate to reduce or eliminate any such amounts.  To the extent that amounts are so withheld, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deductions and withholding was made.

## ARTICLE XII
## MISCELLANEOUS

Section 12.1    **Expenses.**  Except for (a) Transfer Taxes (which shall be governed by <u>Section 11.1</u>), (b) filing fees as set forth in <u>Section 8.2(b)</u>, (c) the expenses that may become payable by Buyer under <u>Section 8.7</u>, and (d) the Buyer Deposit that may become owed by Buyer to Sellers pursuant to <u>Section 4.5</u>, if any, each of Sellers and Buyer shall bear their own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby.

Section 12.2    **Submission to Jurisdiction; Consent to Service of Process.**

(a)    Without limiting any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement, any Seller Document, and any Buyer Document and to decide any claims or disputes

which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in <u>Section 12.7</u> hereof; <u>provided</u>, <u>however</u>, that if the Bankruptcy Cases have closed or the Bankruptcy Court refuses to exercise jurisdiction, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the District of Delaware and any appellate court thereof, for the resolution of any such claim or dispute. The Parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the Parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b)    Each of the Parties hereto hereby consents to process being served by any Party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of <u>Section 12.7</u>.

Section 12.3    **Waiver of Right to Trial by Jury.**  Each Party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

Section 12.4    **Power of Attorney.**  From and after the Closing, Buyer shall, in its sole discretion, have power of attorney, coupled with an interest that may not be revoked or cancelled by Sellers, to take actions in the name of Sellers, with full power of substitution, as Sellers' true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of Sellers and in the name of Sellers or in their own name, to exercise all legal and any and other rights of Sellers with respect to the Purchased Assets, including to ask, demand, sue for, recover, collect and receive each and every sum of money, debt, interest, and dividends (which now is or hereafter shall become due, owing or payable), to use and take any lawful means for the recovery thereof by legal process or otherwise, and to execute and deliver a satisfaction and/or release therefor, together with the right and power to negotiate, compromise or settle any matters relating thereto.

Section 12.5    **Entire Agreement; Amendments and Waivers.**  This Agreement (including the Schedules and Exhibits hereto) represents the entire understanding and agreement between the Parties hereto with respect to the subject matter hereof.  This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought or, if such amendment, supplement, modification or waiver can be so construed, by both Parties.  No action taken pursuant to this Agreement, including any investigation by or on behalf of any Party, shall be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.  The waiver by any Party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall

48

any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

Section 12.6   **Governing Law.**  This Agreement shall be governed by and construed in accordance with the law of the State of Delaware applicable to contracts made and performed in the State of Delaware, except to the extent that such Laws are superseded by the Bankruptcy Code.

Section 12.7   **Notices.** All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand (with written confirmation of receipt), (ii) when sent by facsimile (with written confirmation of transmission) or electronic mail (and no notice of failure of delivery was received within a reasonable time after such message was sent) or (iii) one (1) Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses, facsimile numbers and e-mail addresses (or to such other address, facsimile number or e-mail address as a Party may have specified by notice given to the other Party pursuant to this provision):

If to Sellers, to:

> Special Event Holding, Inc.
> 901 West Hillcrest Blvd
> Inglewood, CA 90301
> Attention:  Jeff Black
> Facsimile:  (310) 966-4923
> Email:  jblack@classicpartyrentals.com

> with a copy to (which shall not constitute notice):

> White & Case LLP
> 200 South Biscayne Boulevard, Suite 4900
> Miami, FL 33131-2352
> Attention:  John K. Cunningham, Esq.
> Facsimile:  (305) 358-5744
> Email:  john.k.cunningham@whitecase.com

If to the Buyer, to:

> [BUYER TO BE DESIGNATED]
> c/o Apollo Capital Management, L.P.
> 9 West 57th Street
> New York, NY 10019
> Attention: Jason Scheir
> Facsimile: (212) 882-0447
> Email: jscheir@apollolp.com

with a copy to (which shall not constitute notice):

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Attention: Jeffrey D. Saferstein, Esq. and Lauren Shumejda, Esq.
Facsimile:  (212)497-0347
Email:  jsaferstein@paulweiss.com, lshumejda@paulweiss.com

Each Party entitled to notice may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving all other Parties notices in the manner herein set forth.

Section 12.8    **Severability.**  If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any Law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

Section 12.9    **Binding Effect; Assignment.**  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns, including any chapter 11 trustee hereinafter appointed for any of Sellers' estates or any trustee appointed in a chapter 7 case if the Bankruptcy Cases are converted from chapter 11.  Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any person or entity not a party to this Agreement except as provided below and in Sections 12.11 and 12.12.  No assignment of this Agreement or of any rights or obligations hereunder may be made by either Sellers, on the one hand, or Buyer, on the other hand, (by operation of law or otherwise) without the prior written consent of the other Parties hereto and any attempted assignment without the required consents shall be void; provided, however, that Buyer may, without the consent of Sellers, assign its rights, interests, and obligations hereunder to one or more of its designees.  Provided that Buyer is declared to be the Winning Bidder under the Bid Procedures Order and that any designee(s) of Buyer shall have entered into an agreement with Buyer whereby, among other things, such designee(s) will be sufficiently capitalized to pay the Purchase Price and to assume the Assumed Liabilities in connection with any such designation (it being acknowledged and agreed that, among other things, a finding by the Bankruptcy Court that such designee(s) have demonstrated adequate assurance of future performance as required by Sections 365(b)(1)(C) and/or 365(f)(2)(B) of the Bankruptcy Code shall be deemed to satisfy such condition) and that Sellers shall be intended third party beneficiaries of such provisions of such agreement, then upon any such permitted assignment, the references in this Agreement to Buyer shall apply solely to such designee(s), and the Parties hereto agree that the entity originally identified as Buyer shall have no liability or continuing obligations of any kind whatsoever hereunder.

Section 12.10  **Injunction.**  The Parties agree that damages at law would be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement by any Seller, and, accordingly, Buyer shall be entitled to injunctive relief (without the posting of any bond) with respect to any such breach, including specific performance of such covenants, promises or agreements or an order enjoining any Seller from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement.  The rights set forth in this Section 12.10 shall be in addition to any other rights which Buyer may have at law or in equity in connection with this Agreement.  Notwithstanding anything to the contrary set forth in this Agreement (including the foregoing sentences of this Section 12.10 or Section 8.2), Sellers acknowledge and agree that Sellers shall not seek specific performance for any reason to require Buyer to consummate the transactions (or any portion thereof) contemplated hereby under any circumstance and the sole and exclusive remedy of Sellers for any breach of this Agreement by Buyer, resulting in Buyer's failure to consummate such transactions shall be the forfeiture of the Buyer Deposit.

Section 12.11  **No Recourse.**  The Parties acknowledge that (i) no past, present or future direct or indirect equity holder of Sellers, Buyer or any of their respective Affiliates, (ii) no past, present or future member of any board of directors of Sellers, Buyer or any of their respective Affiliates, and (iii) no past, present or future director, officer, member, or employee of Sellers, Buyer or any of their respective Affiliates (such Persons described in clauses (i)-(iii) above, the "**Non-Recourse Parties**") is a party to this Agreement, the Seller Documents or the Buyer Documents. The Parties further acknowledge that none of the Non-Recourse Parties, whether individually or collectively, shall have any liability whatsoever of any kind or description for any obligations or liabilities of Sellers or Buyer, respectively, under this Agreement or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby or thereby.  Accordingly, the Parties hereby agree that in the event (a) there is any alleged breach or alleged default or breach or default by any Party under this Agreement or (b) any Party has or may have any claim arising from or relating to the terms of this Agreement, no Party shall, or shall have any right to, commence any proceedings or otherwise seek to impose any Liability whatsoever of any kind or description on or against the Non-Recourse Parties, whether collectively or individually, by reason of such alleged breach, default or claim.

Section 12.12  **Releases.**

(a)      Effective as of the Closing, Buyer, in its capacity as such, hereby irrevocably releases Sellers, their respective Affiliates, and their respective shareholders, directors, officers, employees, attorneys, agents and representatives (collectively, the "**Seller Released Parties**") from any and all Liabilities, actions, rights of action, contracts, indebtedness, obligations, claims, causes of action, suits, damages, demands, costs expenses and attorneys' fees whatsoever, of every kind and nature, known or unknown, disclosed or undisclosed, accrued or unaccrued, existing at any time, arising from or relating to Sellers or any direct or indirect subsidiary thereof (including with respect to the Business, the Bankruptcy Cases, the negotiation or execution of this Agreement or otherwise), other than those arising out of the knowing or willful fraud or criminal misconduct of such Seller Released Party, in all circumstances, arising prior to Closing, that Buyer and its successors and assigns have or may have against any of the Seller Released Parties; *provided, however*, that the foregoing shall not release any Seller or its respective bankruptcy estate of any obligations under this Agreement or any other agreement or instrument entered into in connection herewith, the Sale Order, any indebtedness,

51

or any rights under the Seller Documents, all of which expressly survive the Closing; *provided further, however*, that the effectiveness of any release of any Affiliate of the Sellers is conditioned on and subject to the receipt of a corresponding mutual release of the Buyer's and its Affiliates' respective shareholders, directors, officers, employees, attorneys, consultants, financial advisors, agents and representatives from such Affiliate.  Each Seller Released Party who is not a Party hereto shall be an intended third party beneficiary of this <u>Section 12.12(a)</u> (but not any other provision of this Agreement).

(b)    Effective as of the Closing, Sellers, on behalf of themselves and their respective bankruptcy estates (including any trustee, assignee or successor thereto and any Person purporting to assert standing on behalf thereof) hereby irrevocably waive and release Buyer, the Lenders in any capacity, the Agent, their respective Affiliates, and their respective shareholders, directors, officers, employees, attorneys, consultants, financial advisors, agents and representatives (collectively, the "**Buyer Released Parties**") from any and all Liabilities, actions, rights of action, contracts, indebtedness, obligations, claims, causes of action, suits, damages, demands, costs, expenses and attorneys' fees whatsoever, of every kind and nature, known or unknown, disclosed or undisclosed, accrued or unaccrued, existing at any time, arising from or relating to Sellers or any direct or indirect subsidiary thereof (including with respect to the Business, the Financing Agreement, the loans under the Financing Agreement, any rights to challenge or contest the claims, priorities, liens or security interests arising under the Financing Agreement, the Bankruptcy Cases, the negotiation or execution of this Agreement or otherwise), other than those arising out of the knowing or willful fraud or criminal misconduct of such Buyer Released Party, that any Seller or its Affiliates and all such Persons' respective successors and assigns, including Sellers' bankruptcy estates, ever had, have or may have against any of the Buyer Released Parties; *provided, however*, that the foregoing shall not release any rights under Buyer Documents which expressly survive the Closing.  Each Buyer Released Party who is not a Party hereto shall be an intended third party beneficiary of this <u>Section 12.12(b)</u> (but not any other provision of this Agreement).

Section 12.13  **[Intentionally Omitted].**

Section 12.14  **Counterparts.**  This Agreement may be executed in one or more counterparts (including by facsimile or electronic mail), each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

*[Signature Pages Follow]*

     **IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

<div align="center">

**SELLERS:**

</div>

**SPECIAL EVENT HOLDING, INC.**
**EVENT RENTALS, INC.**
**DUBO ACQUISITION CORPORATION**
**DBO ACQUISITION CORPORATION**
**CLASSIC PARTY RENTALS LP**
**CLASSIC PARTY RENTALS, INC.**
**CLASSIC MIDWEST, INC.**
**CLASSIC NORTHEAST, INC.**
**CLASSIC PANACHE, INC.**
**CLASSIC/PRIME, INC.**
**CLASSIC SOUTHEAST, INC.**
**UNIQUE TABLETOP RENTALS, INC.**
**GRAND EVENTS AND PARTY RENTALS, INC.**

By: _____
     Name: _____
     Title: _____

**<u>BUYER</u>:**                              **[BUYER TO BE DESIGNATED]**


By: _____
    Name:   _____
    Title:    _____

**EXHIBIT A**

**Sale Order**[3]

---

[3]    Conforming changes to be made to draft of Sale Order previously filed with the Bankruptcy Court.