**FINAL VERSION**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| After-Party2, Inc. (f/k/a Event Rentals, Inc.), *et al.*,[1,2] | Case No. 14-10282 (PJW) |
| Debtors. | Jointly Administered |

## FIRST AMENDED DISCLOSURE STATEMENT WITH RESPECT TO THE CHAPTER 11 PLAN FOR AFTER-PARTY2, INC. (F/K/A EVENT RENTALS, INC.) AND ITS AFFILIATED DEBTORS PROPOSED BY THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

Dated: July 16, 2014

**WHITE & CASE LLP**
John K. Cunningham
Craig H. Averch
Southeast Financial Center
200 South Biscayne Boulevard, 49th Floor
Miami, Florida 33131
(305) 371-2700

**FOX ROTHSCHILD LLP**
Jeffrey M. Schlerf (No. 3047)
John H. Strock (No. 4965)
L. John Bird (No. 5310)
Citizens Bank Center
919 North Market Street, Suite 300
Wilmington, Delaware 19801
(302) 654-7444

*Attorneys for the Debtor and Debtors in Possession*

**PACHULSKI STANG ZIEHL & JONES LLP**
Bradford J. Sandler (No. 4142)
John D. Fiero
Michael R. Seidl (No. 3889)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899
(302) 652-4100

*Attorneys for the Creditors' Committee*

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are: After-Party, Inc. (f/k/a Special Event Holding, Inc.) (5659); After-Party2, Inc. (f/k/a Event Rentals, Inc.) (9443); After-Party3, Inc. (f/k/a DUBO Acquisition Corporation) (8795); After-Party4, Inc. (f/k/a DBO Acquisition Corporation) (1923); LRAP5, LP (f/k/a Classic Party Rentals LP) (0583); After-Party6, Inc. (f/k/a Classic Party Rentals, Inc.) (3911); After-Party7, Inc. (f/k/a Classic Midwest, Inc.) (9934); After-Party8, Inc. (f/k/a Classic Northeast, Inc.) (9871); After-Party9, Inc. (f/k/a Classic Panache, Inc.) (1237); After-Party10, Inc. (f/k/a Classic/Prime, Inc.) (7149); After-Party11, Inc. (f/k/a Classic Southeast, Inc.) (0700); After-Party12, Inc. (f/k/a Unique Tabletop Rentals, Inc.) (4327); and After-Party13, Inc. (f/k/a Grand Events & Party Rentals, Inc.) (7940). The list of the Debtors' alternate names is located on the docket for Case No. 14-10282 [D.I. 3 as amended by D.I. 92] and is also available at http://www.kccllc.net/CPR.

[2] On June 10, 2014, the Bankruptcy Court entered an order approving a modification to the caption of the Debtors' cases. Pursuant to the Asset Purchase Agreement and the Sale Order, the Debtors were required to cease using the "Event Rentals" name after the closing of the Sale.

# TABLE OF CONTENTS

I. INTRODUCTION .................................................................................................................1

II. NOTICE TO HOLDERS OF CLAIMS .............................................................................2

III. EXPLANATION OF CHAPTER 11 ...............................................................................4
    A.    Overview of Chapter 11. .......................................................................................4
    B.    Chapter 11 Plan. ....................................................................................................5
    C.    Confirmation of a Chapter 11 Plan. .....................................................................5

IV. OVERVIEW OF THE PLAN ...........................................................................................6
    A.    Summary of the Terms of the Plan. ......................................................................6
    B.    Summary of Distributions Under the Plan. ...........................................................8

V. GENERAL INFORMATION ............................................................................................12
    A.    Business of the Debtors. ......................................................................................12
    B.    Prepetition Capital and Debt Structure. ..............................................................13
    C.    The Debtors' Management. ..................................................................................15
    D.    Events Precipitating the Commencement of the Chapter 11 Cases. ....................16
          1.    Proposed Sale of Substantially All of the Debtors' Assets. ....................16

VI. THE CHAPTER 11 CASES .............................................................................................17
    A.    First Day Pleadings and Orders. ..........................................................................17
    B.    Appointment of Chief Restructuring Officer. ......................................................17
    C.    Employment of Professionals for the Debtors. ....................................................18
    D.    Appointment of the Committee. ..........................................................................18
    E.    Final DIP Order. ...................................................................................................18
    F.    Continued Operations. .........................................................................................19
    G.    Sale of the Debtors' Businesses. ..........................................................................19
    H.    Settlement with the Committee and the Liquidity Parties. ..................................20
    I.    Settlement by and Among the Committee Parties, the Prepetition Agent, the
        Settling Prepetition Lenders, the DIP Agent, the Settling DIP Lenders, and
        the Buyer. .............................................................................................................20
    J.    Wind-Down Letter Agreement. ...........................................................................21
    K.    Claims Bar Date. ..................................................................................................22

VII. POTENTIAL LITIGATION ...........................................................................................22
    A.    Estate Causes of Action. ......................................................................................22
    B.    Pending Litigation. ...............................................................................................22

VIII. THE CHAPTER 11 PLAN ............................................................................................23
    A.    Plan Treatment of Claims and Equity Interests. .................................................23
        (a)    Class 1 – Priority Claims. ........................................................................23
        (b)    Class 2 – Non-Lender Secured Claims. ..................................................23
        (c)    Class 3 – Prepetition Lender Claims. ......................................................23
        (d)    Class 4 – Unsecured Claims. ...................................................................24
        (e)    Class 5 – Liquidity Claims & Opt-Out Unsecured Claims. ....................25
        (f)    Class 6 - Equity Interests. ........................................................................25

|     |     | B. | Release and Exculpation Provisions | 25 |
|     |     |     | (a) Secured Facility Settlement Agreement Releases | 25 |
|     |     |     | (b) Liquidity Settlement Agreement Releases | 26 |
|     |     |     | (c) Supplemental Releases | 26 |
|     |     |     | (d) Exculpation | 26 |
|     |     |     | (e) Propriety of the Releases | 27 |
|     |     | C. | Liquidation Trust | 28 |
|     |     |     | (a) Execution of the Liquidation Trust Agreement. | 28 |
|     |     |     | (b) Purpose of the Liquidation Trust. | 28 |
|     |     |     | (c) Vesting of Assets in the Liquidation Trust; Dissolution of the Debtors. | 28 |
|     |     |     | (d) Governance of Liquidation Trust. | 29 |
|     |     |     | (e) Role of the Liquidation Trustee. | 29 |
|     |     |     | (f) Cash. | 29 |
|     |     |     | (g) Compensation of the Liquidation Trustee. | 30 |
|     |     |     | (h) Retention of Professionals by the Liquidation Trustee. | 30 |
|     |     |     | (i) Noncertificated Liquidation Trust Interests. | 30 |
|     |     |     | (j) Dissolution of the Liquidation Trust. | 30 |
|     |     |     | (k) Securities Exempt. | 30 |
|     |     | D. | Plan Controls. | 31 |

**IX. RISK FACTORS** ... 31
- A. General Considerations. ... 31
- B. Certain Bankruptcy Considerations. ... 31
- C. Claims Estimation ... 31
- D. Liquidation Trust Administration ... 32

**X. CONFIRMATION AND CONSUMMATION PROCEDURES** ... 32
- A. Overview. ... 32
- B. Confirmation of the Plan. ... 34
    - 1. Elements of Section 1129 of the Bankruptcy Code. ... 34
    - 2. Acceptance. ... 35
    - 3. Best Interests of Creditors Test. ... 35
    - 4. Feasibility. ... 36
- C. Cramdown. ... 36
    - 1. No Unfair Discrimination. ... 37
    - 2. Fair and Equitable Test. ... 37
- D. Effect of Confirmation. ... 38

**XI. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES** ... 38
- A. U.S. Federal Income Tax Consequences of Receipt of Plan Consideration to Holders of Allowed Claims. ... 39
    - 1. General Tax Considerations for Holders of Allowed Claims. ... 39
    - 2. Certain Other Tax Considerations for Holders of Allowed Claims. ... 40
    - 3. Tax Consequences to Certain Holders of Allowed Claims. ... 41
- B. U.S. Federal Income Tax Consequences to Holders of Contested Claims. ... 42
- C. Tax Treatment of the Liquidation Trust. ... 42
- D. Consequences to Pre-Bankruptcy Holders of Equity Interests. ... 44

XII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ......44
    A.      Liquidation Under Chapter 7 of the Bankruptcy Code. .......................................44

XIII. CONCLUSION ...................................................................................................................45

## SCHEDULES AND EXHIBITS

List of Defined Terms ........................................................................................... Schedule 1
Chapter 7 Liquidation Analysis ............................................................................ Schedule 2
Closing Funds Flow Summary ............................................................................. Schedule 3
Buyer Pay Claims.................................................................................................. Schedule 4
Chapter 11 Plan ...................................................................................................... Exhibit A
Disclosure Statement Order ................................................................................... Exhibit B
Final DIP Order ...................................................................................................... Exhibit C
Sale Order ............................................................................................................... Exhibit D

# I.

## INTRODUCTION

**Each capitalized term used in the Disclosure Statement and not defined herein shall have the meaning ascribed to such term in the Plan (*see* Section 1.1 of the Plan, Definitions).  For ease of reference, all defined terms used in the Disclosure Statement that are not defined in the Plan are listed on Schedule 1 to this Disclosure Statement with reference to the page number where the term is defined.  Unless otherwise stated, all references herein to "Schedules" and "Exhibits" are references to schedules and exhibits to this Disclosure Statement, respectively.**

BY ORDER DATED JULY 16, 2014 (THE "DISCLOSURE STATEMENT ORDER"), THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE (THE "BANKRUPTCY COURT") APPROVED THE DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") RELATING TO THE CHAPTER 11 PLAN FOR AFTER-PARTY2, INC. (F/K/A EVENT RENTALS, INC.) AND ITS AFFILIATED DEBTORS (COLLECTIVELY, THE "DEBTORS") PROPOSED BY THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS (THE "COMMITTEE").  THE DISCLOSURE STATEMENT INCLUDES AND DESCRIBES THE CHAPTER 11 PLAN FOR THE DEBTORS, DATED JUNE 11, 2014 (THE "PLAN"), A COPY OF WHICH IS ATTACHED HERETO AS EXHIBIT A.  CLASS 1 – PRIORITY CLAIMS AND CLASS 2 – NON-LENDER SECURED CLAIMS ARE UNIMPAIRED UNDER THE PLAN AND ARE NOT ENTITLED TO VOTE ON THE PLAN.  CLASS 6 – EQUITY INTERESTS WILL NOT RECEIVE A DISTRIBUTION UNDER THE PLAN AND IS NOT ENTITLED TO VOTE ON THE PLAN.  CLASS 3 – PREPETITION LENDER CLAIMS, CLASS 4 - UNSECURED CLAIMS, AND CLASS 5 – LIQUIDITY CLAIMS & OPT-OUT CLAIMS ARE ENTITLED TO VOTE ON THE PLAN.  ACCORDINGLY, THE DEBTORS ARE SOLICITING ACCEPTANCES OF THE PLAN FROM HOLDERS OF CLASS 3, CLASS 4, AND CLASS 5 CLAIMS.

THE DEBTORS AND THE COMMITTEE BELIEVE THAT THE PLAN IS IN THE BEST INTEREST OF AND PROVIDES THE HIGHEST AND MOST EXPEDITIOUS RECOVERIES TO HOLDERS OF CLAIMS.  ALL HOLDERS OF CLASS 3, CLASS 4, AND CLASS 5 CLAIMS ARE URGED TO VOTE IN FAVOR OF THE PLAN.

VOTING INSTRUCTIONS ARE CONTAINED IN THE DISCLOSURE STATEMENT ORDER, A TRUE AND CORRECT COPY OF WHICH IS ATTACHED HERETO AS EXHIBIT B.  IN ADDITION, THE SOLICITATION PACKAGE ACCOMPANYING EACH OF THE BALLOTS CONTAINS APPLICABLE VOTING INSTRUCTIONS.  **TO BE COUNTED, YOUR BALLOT MUST BE DULY COMPLETED, EXECUTED, AND ACTUALLY RECEIVED BY 4:00 P.M. (PREVAILING EASTERN TIME), ON AUGUST 20, 2014 (THE "VOTING DEADLINE").**

FOR YOUR ESTIMATED PERCENTAGE RECOVERY UNDER THE PLAN, PLEASE SEE THE CHART SET OUT IN "OVERVIEW OF THE PLAN – SUMMARY OF DISTRIBUTIONS UNDER THE PLAN," BELOW.

## II.

## NOTICE TO HOLDERS OF CLAIMS

The purpose of this Disclosure Statement is to enable you, as a creditor whose Claim is impaired under the Plan, to make an informed decision in exercising your right to accept or reject the Plan. *See* "Confirmation and Consummation Procedures."

THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN. PLEASE READ THIS DOCUMENT WITH CARE.

PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN AND TO THE EXHIBITS AND SCHEDULES ANNEXED TO THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL GOVERN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (THE "BANKRUPTCY RULES") AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING SECURITIES OR CLAIMS OF THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTORS.

On July 16, 2014, after notice and a hearing, the Bankruptcy Court entered the Disclosure Statement Order pursuant to section 1125 of the Bankruptcy Code, finding that the Disclosure Statement contains information of a kind, and in sufficient detail, adequate to enable a hypothetical, reasonable investor typical of the holders of the Claims against the Debtors to make an informed judgment with respect to the acceptance or rejection of the Plan. **APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT OF THE FAIRNESS OR MERITS OF THE PLAN OR OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.**

Each holder of a Claim entitled to vote to accept or reject the Plan should read this Disclosure Statement and the Plan in their entirety before voting.  No solicitation of votes to accept or reject the Plan may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code.  Except for the Debtors and certain of the professionals they have retained, no person has been authorized to use or promulgate any information concerning the Debtors, their businesses, or the Plan other than the information contained in this Disclosure Statement, and if other information is given or made, such information may not be relied upon as having been authorized by the Debtors.  You should not rely on any information relating to the Debtors, their businesses, or the Plan other than that contained in this Disclosure Statement and the Schedules and Exhibits hereto.

After carefully reviewing this Disclosure Statement, including the attached Schedules and Exhibits, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed ballot, and return the same to the address set forth on the ballot, in the enclosed, postage prepaid, return envelope so that it will be actually received by Kurtzman Carson Consultants, LLC (the "Solicitation Agent" or "Claims Agent," as applicable), no later than the Voting Deadline.  All votes to accept or reject the Plan must be cast by using the appropriate ballot.  Votes which are cast in any other manner will not be counted.  **All ballots must be actually received by the Solicitation Agent no later than August 20, 2014 at 4:00 p.m., Prevailing Eastern Time.  For detailed voting instructions and the name, address, and phone number of the person you may contact if you have questions regarding the voting procedures, see the Disclosure Statement Order attached hereto as Exhibit B.**

**DO NOT RETURN ANY OTHER DOCUMENTS WITH YOUR BALLOT.**

You will be bound by the Plan if it is accepted by the requisite holders of Claims and confirmed by the Bankruptcy Court, even if you do not vote to accept the Plan or if you are the holder of an unimpaired Claim.  *See* "Confirmation and Consummation Procedures."

**Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan (the "Confirmation Hearing") on August 27, 2014, at 11:00 a.m., Prevailing Eastern Time, before the Honorable Peter J. Walsh, United States Bankruptcy Judge of the United States Bankruptcy Court for the District of Delaware.  The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed and served on or before August 19, 2014, in the manner described in the Disclosure Statement Order attached hereto as Exhibit B.**

**THE DEBTORS AND THE COMMITTEE BELIEVE THAT THE PLAN MAXIMIZES RECOVERIES TO CREDITORS AND URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN.**

### III.

### EXPLANATION OF CHAPTER 11

**A.      Overview of Chapter 11.**

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code pursuant to which a debtor may reorganize its business for the benefit of its creditors, equity holders, and other parties in interest.  On February 13, 2014 (the "Petition Date"), the Debtors filed their respective voluntary petitions for relief under chapter 11 of the Bankruptcy Code, thereby commencing their jointly administered chapter 11 cases, Case No. 14-10282 (PJW) (the "Chapter 11 Cases").

The commencement of a chapter 11 case creates an estate comprising all the legal and equitable interests of a debtor in property as of the date the petition is filed.  Sections 1101, 1107, and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession" unless the bankruptcy court orders the appointment of a trustee.  In the Chapter 11 Cases, the Debtors remained in possession of their business assets and continued to operate their businesses as debtors in possession until the sale of substantially all of their assets was consummated on May 23, 2014 (the "Sale").  *See* "The Chapter 11 Cases – Continued Operations" and "The Chapter 11 Cases – Sale of the Debtors' Businesses."  The Debtors remain in possession of certain cash assets.  These assets will be used to wind down the Debtors' affairs and satisfy claims against the Debtors as set forth in the Plan.

The filing of a chapter 11 petition triggers the automatic stay provisions of the Bankruptcy Code.  Section 362 of the Bankruptcy Code provides, among other things, for an automatic stay of all attempts by creditors or other third parties to collect prepetition claims from the debtor or otherwise interfere with its property or business.  Exempted from the automatic stay are governmental authorities seeking to exercise regulatory or policing powers.  Except as otherwise ordered by the bankruptcy court, the automatic stay remains in full force and effect until the effective date of a confirmed chapter 11 plan.

The formulation of a chapter 11 plan is the principal purpose of a chapter 11 case.  The plan sets forth the means for satisfying claims against and interests in a debtor's estate.  Unless a trustee is appointed, only a debtor may file a plan during the first 120 days of a chapter 11 case (the "Filing Period"), and the debtor will have 180 days to solicit acceptance of such plan (the "Solicitation Period" and, together with the Filing Period, the "Exclusive Periods").  However, section 1121(d) of the Bankruptcy Code permits the bankruptcy court to extend or reduce the Exclusive Periods upon a showing of "cause."  The Filing Period and Solicitation Period may not be extended beyond 18 months and 20 months, respectively, from the date of the entry of the order for relief.  The Debtors have filed a motion requesting that the Filing Period and the Solicitation period be extended to October 13, 2014 and December 13, 2014, respectively [D.I. 520] (the "Motion to Extend Exclusivity").  Accordingly, if the Court grants the Motion to

Extend Exclusivity, no other creditor or party in interest may file a plan during the extended Exclusive Periods.

**B.      Chapter 11 Plan.**

A chapter 11 plan may provide anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of a debtor's assets.  In either event, upon confirmation of the plan, the plan becomes binding on the debtor and all of its creditors and equity holders, and the prior obligations owed by the debtor to such parties are compromised and exchanged for the obligations specified in the plan.  For a description of key components of the Plan, *see* "Overview of the Plan," below.

After a chapter 11 plan has been filed, the holders of impaired claims against and equity interests in a debtor are permitted to vote to accept or reject the plan.  Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires the debtor to prepare and file a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan.  **This Disclosure Statement is presented to holders of Prepetition Lender Claims, Unsecured Claims, Liquidity Claims, and Opt-Out Claims against the Debtors to satisfy the requirements of section 1125 of the Bankruptcy Code in connection with the Debtors' and the Committee's solicitation of votes on the Plan.**

**C.      Confirmation of a Chapter 11 Plan.**

If all classes of claims and equity interests accept a chapter 11 plan, the bankruptcy court may confirm the plan if the bankruptcy court independently determines that the requirements of section 1129(a) of the Bankruptcy Code have been satisfied.  *See* "Confirmation and Consummation Procedures – Confirmation of the Plan."  **The Debtors and the Committee believe that the Plan satisfies all the applicable requirements of section 1129(a) of the Bankruptcy Code.**

Chapter 11 of the Bankruptcy Code does not require that each holder of a claim or interest in a particular class vote in favor of a plan for the bankruptcy court to determine that the class has accepted the plan.  *See* "Confirmation and Consummation Procedures."

In addition, classes of claims or equity interests that are not "impaired" under a chapter 11 plan are conclusively presumed to have accepted the plan and thus are not entitled to vote.  Furthermore, classes that are to receive no distribution under the plan are conclusively deemed to have rejected the plan.  *See* "Confirmation and Consummation Procedures."  Accordingly, acceptances of a plan will generally be solicited only from those persons who hold claims or equity interests in an impaired class.  **Class 1 – Priority Claims and Class 2 – Non-Lender Secured Claims are unimpaired under the Plan and holders of such claims are not entitled to vote on the Plan.  Class 6 – Equity Interests will not receive a distribution under the Plan and the holders of such claims are not entitled to vote on the Plan.  Holders of Class 3 – Prepetition Lender Claims, Class 4 – Unsecured Claims, and Class 5 – Liquidity Claims & Opt-Out Claims are entitled to vote on the Plan.**

In general, a bankruptcy court also may confirm a chapter 11 plan even though fewer than all the classes of impaired claims against and equity interests in a debtor accept such plan. For a chapter 11 plan to be confirmed, despite its rejection by a class of impaired claims or equity interests, the plan must be accepted by at least one class of impaired claims (determined without counting the vote of insiders) and the proponent of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or equity interests that has not accepted the plan.  *See* "Confirmation and Consummation Procedures – Cramdown." **The Plan has been structured so that it will satisfy the foregoing requirements as to any Class that has rejected or is deemed to reject the Plan.**

IV.

**OVERVIEW OF THE PLAN**

The Plan provides for the treatment of Claims against and Equity Interests in the Debtors.

**A.**    **Summary of the Terms of the Plan.**

The Plan is built around the following key elements:

- On the Effective Date, the authority, power, and incumbency of the Debtors shall terminate, and vest in the Liquidation Trustee, and all Assets of the Debtors shall become assets of the Liquidation Trust.  The Debtors' Assets are largely limited to Cash following the Sale, described in Section VI.G. hereof, by which substantially all of the Assets (i.e. the Acquired Assets) were sold in the Chapter 11 Cases to CP OpCo, LLC (the "Buyer") for, among other things: (i) $125.25 million in Cash, and (ii) the assumption by the Buyer of certain specified liabilities, as described more fully in Section 2.4 of the Asset Purchase Agreement.  The Acquired Assets were subject to senior perfected liens and the proceeds of such assets were largely paid to satisfy the claims secured by such liens in accordance with the DIP Order and the Sale Order.

- The Liquidation Trustee shall, among other things, (i) be authorized to take all steps necessary to wind down the affairs of the Debtors; (ii) have the power and authority to hold, manage, sell, and distribute the assets of the Liquidation Trust to the holders of Allowed Claims; (iii) hold the assets of the Liquidation Trust for the benefit of the holders of Allowed Claims; (iv) have the power and authority to hold, manage, sell and distribute Cash and any non-Cash assets of the Liquidation Trust obtained through the exercise of its power and authority; (v) have the power and authority to object to Claims and otherwise reconcile all Claims against the Debtors; (vi) have the power and authority to perform such other functions as are provided in the Plan; and (vii) have the power and authority to administer the closure of the Chapter 11 Cases.

- The class of Allowed Priority Claims is unimpaired under the Plan, and holders of such claims shall be paid in full.

- The class of Non-Lender Secured Claims is unimpaired under the Plan, and holders of such claims shall be paid in full.

- The class of Prepetition Lender Claims is impaired under the Plan, and holders of such claims shall receive, on the Plan Distribution Date, its share (as determined by the Prepetition Agent in accordance with the terms of the Prepetition Credit Facility) of (a) any amount remaining in the Prepetition Prior Secured Creditor Reserve after application in accordance with paragraph 1 and paragraph 3 of the Wind-Down Letter Agreement; (b) any amount remaining in the Priority Sales Tax Reserve after application in accordance with paragraph 2 and paragraph 3 of the Wind-Down Letter Agreement; and (c) any amounts due to be remitted to the Prepetition Agent or the Prepetition Lenders pursuant to paragraph 4.c. of the Secured Facilities Settlement Agreement or paragraph 7(c) of the DIP Order (as has been amended from time to time).

  Each holder of a Prepetition Lender Claim shall also receive, on the Plan Distribution Date, (to the extent not previously paid) its share (as determined by the Prepetition Agent in accordance with the terms of the Prepetition Credit Facility) of any amounts due to be remitted to the Prepetition Agent or the Prepetition Lenders pursuant to paragraph 4(d) of the DIP Order. In the case of the fees and expenses of the Prepetition Agent and Prepetition Lenders (including, without limitation, the fees, costs and expenses of counsel and financial advisors for the Prepetition Agent and the Prepetition Lenders) such claims will be paid in Cash on the Effective Date for all fees and expenses incurred up to the Effective Date (to the extent not previously paid), subject to the Debtors' prior receipt of summary invoices and without the requirement to file a fee application with the Bankruptcy Court. Notwithstanding anything to the contrary, the Debtors shall not have to pay any amounts pursuant to this subparagraph (c)(ii) in excess of the amounts that may be funded from the Prepetition Lenders' Counsel Fee Sources.

- The class of Unsecured Claims is impaired under the Plan, and holders of such claims shall receive, on the applicable Plan Distribution Date, their Pro Rata Share of the Available Proceeds. The Opt-Out Carve Out will reduce the aggregate amount of Available Proceeds payable to the class of Unsecured Claims. The Debtors estimate that the Available Proceeds to be distributed to the class of Unsecured Claims should be approximately $606,250 minus the Opt-Out Carve Out.

- The class of Allowed Liquidity Claims & Opt-Out Unsecured Claims is impaired under the Plan, and holders of such claims shall receive, on the applicable Plan Distribution Date, their Pro Rata Share of the Opt-Out Carve Out, which is defined as the Available Proceeds, as defined in the Plan, to which holders of Allowed Opt-Out Unsecured Claims would have been entitled, in the aggregate, if such holders were not Opt-Out Parties.

- Allowed Equity Interests are impaired under the Plan, and on the Effective Date, all Equity Interests in the Debtors shall be cancelled, and each holder of an Equity Interest shall neither receive nor retain any property under the Plan on account of such Equity Interest.

7

**B.**     **Summary of Distributions Under the Plan.**

The following is a summary of the distributions under the Plan.  It is qualified in its entirety by reference to the full text of the Plan, which is attached to this Disclosure Statement as Exhibit A.  In addition, for a more detailed description of the terms and provisions of the Plan, *see* "The Chapter 11 Plan" section of this Disclosure Statement.

The claim amounts set forth below are based on information contained in the Debtors' Schedules and filed proofs of claim, and reflect what the Debtors believe to be reasonable estimates of the likely resolution of currently outstanding disputed Claims.   The amounts specified may differ materially from the outstanding filed Claim amounts.

The following chart summarizes the estimated Plan Distributions to holders of Allowed Claims and each class on the Plan Distribution Date (unless otherwise provided):[1]

**Administrative and Tax Claims**

| Claims[2] | Treatment of Claims |
|---|---|
| Administrative Claims<br>Estimated Allowed Claims: $9,257,000 | On the Plan Distribution Date, each holder of an Allowed Administrative Claim, shall receive (i) the amount of such holder's Allowed Administrative Claim in one Cash payment, or (ii) such other treatment as may be agreed upon in writing by the Liquidation Trustee and such holder; *provided*, that such treatment shall not provide a return to such holder having a present value as of the Effective Date in excess of such holder's Allowed Administrative Claim.  An Administrative Claim representing a liability incurred in the ordinary course of business of the Debtors may be paid at the Debtors' or Buyer's election, as applicable, in the ordinary course of business at any time prior to the occurrence of the Effective Date.<br><br>**Estimated Recovery: 100% of Allowed Claim** |

---

[1] There can be no assurance that the estimated Claim amounts set forth herein are correct, and the actual amount of Allowed Claims may differ from the estimates.  The estimated amounts are subject to certain risks, uncertainties, and assumptions.  Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual amount of Allowed Claims may vary from those estimated herein.

[2] Administrative Claims and Tax Claims are treated in accordance with section 1129(a)(9) of the Bankruptcy Code.  Pursuant to section 1123(a)(1) of the Bankruptcy Code, such Claims are not designated as classes of Claims for the purposes of the Plan.

| Claims[2] | Treatment of Claims |
|---|---|
| Tax Claims<br>Estimated Allowed Claims: $610,000 | Each holder of an Allowed Tax Claim will receive in full satisfaction of such Allowed Tax Claim (a) payments in Cash, in regular installments over a period ending not later than five (5) years after the Petition Date, of a total value, as of the Effective Date, equal to the Allowed amount of such Claim; (b) a lesser amount in one Cash payment as may be agreed upon in writing by the Litigation Trustee and such holder; or (c) such other treatment as may be agreed upon in writing by such holder; *provided*, that such agreed upon treatment may not provide such holder with a return having a present value as of the Effective Date that is greater than the amount of such holder's Allowed Tax Claim or that is less favorable than the treatment provided to the most favored nonpriority Unsecured Claims under the Plan. In the event of a dispute regarding the foregoing election, such dispute will be resolved by the Bankruptcy Court.  For the avoidance of doubt, certain Allowed Tax Claims shall be paid by the Buyer as, and to the extent, set forth in the Asset Purchase Agreement and the Sale Order.<br><br>**Estimated Recovery: 100% of Allowed Claim** |

**Claims and Equity Interests**

| Classes of Claims | Treatment of Classes of Claims |
|---|---|
| Class 1 – Priority Claims<br>Estimated Allowed Claims: $0.00<br><br>Unimpaired | Each holder of an Allowed Priority Claim against the Debtors shall be unimpaired under the Plan and, pursuant to section 1124 of the Bankruptcy Code, all legal, equitable and contractual rights of each holder of an Allowed Priority Claim in respect of such Claim shall be fully reinstated and retained, except as provided in section 1124(2)(A)-(D) of the Bankruptcy Code, and such holder of an Allowed Priority Claim shall be paid on the Plan Distribution Date in full and in Cash.<br><br>**Estimated Recovery: 100% of Allowed Claim** |

| Classes of Claims | Treatment of Classes of Claims |
|---|---|
| Class 2 – Non-Lender Secured Claims<br>Estimated Allowed Claims: $512,046<br><br>Unimpaired | Each holder of an Allowed Non-Lender Secured Claim against the Debtors shall be unimpaired under the Plan and, pursuant to section 1124 of the Bankruptcy Code, all legal, equitable, and contractual rights of each holder of an Allowed Non-Lender Secured Claim in respect of such Claim shall be fully reinstated and retained except as provided in section 1124(2)(A)-(D) of the Bankruptcy Code, and such holder of an Allowed Non-Lender Secured Claim shall be paid on the Plan Distribution Date in full and in Cash.<br><br>**Estimated Recovery: 100% of Allowed Claim** |

| Classes of Claims | Treatment of Classes of Claims |
|---|---|
| Class 3 – Prepetition Lender Claims<br>Estimated Allowed Claims: $0.00 - $750,000<br><br>Impaired | Each holder of an Allowed Prepetition Lender Claim shall receive, on the Plan Distribution Date, its share (as determined by the Prepetition Agent in accordance with the terms of the Prepetition Credit Facility) of (a) any amount remaining in the Prepetition Prior Secured Creditor Reserve after application in accordance with paragraph 1 and paragraph 3 of the Wind-Down Letter Agreement; (b) any amount remaining in the Priority Sales Tax Reserve after application in accordance with paragraph 2 and paragraph 3 of the Wind-Down Letter Agreement; and (c) any amounts due to be remitted to the Prepetition Agent or the Prepetition Lenders pursuant to paragraph 4.c. of the Secured Facilities Settlement Agreement or paragraph 7(c) of the DIP Order (as has been amended from time to time).<br><br>Each holder of an Allowed Prepetition Lender Claim shall also receive, on the Plan Distribution Date, (to the extent not previously paid) its share (as determined by the Prepetition Agent in accordance with the terms of the Prepetition Credit Facility) of any amounts due to be remitted to the Prepetition Agent or the Prepetition Lenders pursuant to paragraph 4(d) of the DIP Order.  In the case of the fees and expenses of the Prepetition Agent and Prepetition Lenders (including, without limitation, the fees, costs and expenses of counsel and financial advisors for the Prepetition Agent and the Prepetition Lenders) such claims will be paid in Cash on the Effective Date for all fees and expenses incurred up to the Effective Date (to the extent not previously paid), subject to the Debtors' prior receipt of summary invoices and without the requirement to file a fee application with the Bankruptcy Court.  Notwithstanding anything to the contrary, the Debtors shall not have to pay any amounts pursuant to this subparagraph (c)(ii) in excess of the amounts that may be funded from the Prepetition Lenders' Counsel Fee Sources.<br><br>**Estimated Recovery: N/A** |

| Classes of Claims | Treatment of Classes of Claims |
|---|---|
| Class 4 – Unsecured Claims<br>Estimated Allowed Claims: $29,096,673<br><br>Impaired | Each holder of an Allowed Unsecured Claim against the Debtors shall receive, on the Plan Distribution Date, its Pro Rata Share of the difference between (y) the Available Proceeds; and (z) the Opt-Out Carve Out.<br><br>**Estimated Recovery: 2% of Allowed Claim** |
| Class 5 – Liquidity Claims & Opt-Out Unsecured Claims<br>Estimated Allowed Claims: $40,091,000<br><br>Impaired | Each holder of an Allowed Liquidity Claim or an Allowed Opt-Out Unsecured Claim shall receive, on the Plan Distribution Date, its Pro Rata Share of the Opt-Out Carve Out.<br><br>**Estimated Recovery: .015% of Allowed Claim**<br><br>For example, a claimant holding a $200,000 general unsecured claim in Class 4 will receive a distribution of approximately $4,000.  If that same claimant elects to be included in Class 5 by opting out of the Plan Releases, such claimant will not have granted the voluntary release of the Released Parties and, as a consequence, will receive a distribution of only $30. |
| Class 6 – Equity Interests<br>Estimated Allowed Equity Interests: N/A<br><br>Impaired | On the Effective Date, all Equity Interests in the Debtors shall be cancelled, and each holder of an Equity Interest in the Debtors shall neither receive nor retain any property under the Plan on account of such interest.<br><br>**Estimated Recovery: None** |

## V.

## GENERAL INFORMATION

The discussion below briefly describes the Debtors, their businesses, and the events leading up to the Chapter 11 Cases.

### A.    Business of the Debtors.

Prior to the Sale, the Debtors comprised the nation's largest provider of event rental products and related services.  By operating thirty-nine showroom and warehouse locations across the country, the Debtors were able to to serve twenty-two markets, from San Francisco to Long Island to South Florida.  The Debtors had the largest offering of event equipment, value-added services, and temporary structure assets in the market, and provided services for over 145,000 events for approximately 55,000 customers annually.   Through the services of

approximately 2,500 employees (including seasonal employees), the Debtors generated $242.1 million of revenue and $23.0 million of adjusted-earnings before interest, taxes, depreciation, and amortization for the twelve months ending December 26, 2013. As of December 26, 2013, the Debtors' books and records (on a consolidated basis) showed assets totaling approximately $148 million and liabilities totaling approximately $246 million.

**B.      Prepetition Capital and Debt Structure.**

Prior to the Petition Date, the Debtors had four general types of debt obligations: (1) an aggregate of approximately $175 million in outstanding principal under a senior secured credit agreement, defined in the Plan as the Prepetition Credit Facility; (2) approximately $36 million in outstanding principal under certain unsecured and subordinated liquidity notes, defined in the Plan as the Liquidity Notes; (3) approximately $5.5 million in outstanding principal under certain unsecured and subordinated seller financing relating to business acquisitions; and (4) trade debt, as of December 26, 2013, totaling approximately $16.6 million. These obligations are discussed in greater detail below.

The Debtors' prepetition secured financing obligations arose under that certain Financing Agreement dated as of December 20, 2006 (as amended, the "Prepetition Credit Facility"), by and among the entities and institutions from time to time party thereto (the "Credit Agreement Parties"). As of the Petition Date, the Credit Agreement Parties consisted of Event Rentals, Inc. ("Event Rentals"), as borrower, Event Rentals' affiliated debtors, as guarantors, Ableco Finance LLC, as administrative agent (in such capacity, the "Prepetition Agent"), and various financial institutions, as lenders (the "Prepetition Lenders").

As of the Petition Date, the outstanding principal under the Prepetition Credit Facility was comprised of: (i) an approximately $16 million revolver (the "Revolver") that was fully drawn, (ii) approximately $123 million in term loans (the "Term Loans"), (iii) approximately $29 million in loans that were used to fund certain acquisitions by Event Rentals (the "Acquisition Loans"), and (iv) $6.5 million in administrative agent advances (the "Advances"). The Revolver was set to mature on June 30, 2014 (the "Revolver Maturity Date"). The Term Loans and Acquisition Loans were set to mature on December 31, 2014 (the "Term and Acquisition Maturity Date" and, together with the Revolver Maturity Date, the "Secured Maturity Dates"). The Advances were made by the Prepetition Agent at the Debtors' requests to allow the Debtors to continue to operate and prepare for an orderly bankruptcy filing based on the condition that such Advances would be repaid promptly following the bankruptcy filing. The obligations of the Debtors to the Prepetition Agent and the Prepetition Lenders under the Prepetition Credit Facility were secured by substantially all of the Debtors' assets pursuant to the terms of (i) that certain Security Agreement, dated as of December 20, 2006, by and among the Prepetition Agent and the Debtors; and (ii) that certain Pledge and Security Agreement of the same date and by and among the same parties.

The Debtors' obligations in respect of the Liquidity Notes arose as follows: The Debtors were party to that certain 2011 Liquidity Note Purchase Agreement, dated as of November 9, 2011 (the "2011 NPA") by and among Event Rentals, as issuer, Event Rentals' affiliated debtors, as guarantors, and Quad-C Principals LLC ("Quad-C Principals") and Quad-C Partners VII, L.P. ("Quad-C Partners" and, together with Quad-C Principals and their affiliates, "Quad-C"), as

purchasers. Pursuant to the 2011 NPA, Event Rentals issued $12.5 million in aggregate principal of certain senior subordinated unsecured notes (the "2011 Liquidity Notes"), which accrued interest at a rate of 20% per annum, payable in kind quarterly in arrears. The 2011 Liquidity Notes were subordinated in right of payment to obligations under the Prepetition Credit Facility pursuant to the terms of that certain 2011 Liquidity Note Subordination Agreement, dated November 9, 2011, by and among Quad-C and the Administrative Agent, and acknowledged by the Debtors. As of the Petition Date, the aggregate outstanding principal amount of the 2011 Liquidity Notes was approximately $19.1 million.

Further, pursuant to that certain First Amendment to Amended and Restated Liquidity Note Purchase Agreement, dated as of November 9, 2011 (the "First Amendment") by and among Event Rentals, as issuer, Event Rentals' affiliated debtors, as guarantors, and Quad-C, S.A.C. Domestic Capital Funding, Ltd. ("SAC Domestic"), S.A.C. Offshore Capital Funding Ltd. ("SAC Offshore" and, together with SAC Domestic, "SAC") and JPM Mezzanine Capital, LLC ("JPM" and, collectively with Quad-C and SAC, the "Liquidity Parties"), as purchasers, Event Rentals issued, in exchange for the cancellation of the Cancelled Liquidity Notes (as defined below), approximately $13.5 million in aggregate principal of certain senior subordinated unsecured notes (the "Amended Liquidity Notes" and, together with the 2011 Liquidity Notes, the "Liquidity Notes"), which accrued interest at a rate of 10% per annum, payable in kind quarterly in arrears.[3] The Amended Liquidity Notes were subordinated in right of payment to (i) the Prepetition Credit Facility, pursuant to the terms of that certain Liquidity Note Subordination Agreement, dated as of March 17, 2010 (as from time to time amended); and (ii) the 2011 Liquidity Notes, pursuant to the terms of that certain Existing Liquidity Note Subordination Agreement, dated November 9, 2011. As of the Petition Date, the aggregate outstanding principal amount of the Amended Liquidity Notes was approximately $16.9 million.

Third, the Debtors incurred seller financing obligations in connection with their prepetition business strategy to consolidate a fragmented industry. To accomplish this strategy, the Debtors executed numerous acquisitions between 2004 and 2008. Fourteen such acquisitions were financed with the Acquisition Loans, $21.7 million of additional equity financing from the Liquidity Parties, and seller financing. In total, the Debtors owed approximately $5.5 million in outstanding principal, as well as accrued but unpaid interest, to such sellers under seven separate notes issued in connection with the seller financing (collectively, the "Seller Notes"). Event Rentals was the obligor on each of the Seller Notes and the Seller Notes were unsecured and subordinated to the Debtors' obligations under the Prepetition Credit Facility.

---

[3] Pursuant to that certain Liquidity Note Purchase Agreement, dated as of March 17, 2010 (the "2010 NPA"), by and among Event Rentals, as issuer, Event Rentals' affiliated debtors, as guarantors, and the Liquidity Parties, as purchasers, Event Rentals issued $9 million in aggregate principal of certain senior subordinated unsecured notes (the "2010 Liquidity Notes"). The 2010 NPA was amended and restated in its entirety pursuant to that certain Amended and Restated Liquidity Note Purchase Agreement, dated as of March 31, 2011 (the "Restated 2010 NPA"), by and among Event Rentals, as issuer, Event Rentals' affiliated debtors, as guarantors, and the Liquidity Parties, as purchasers. Pursuant to the Restated 2010 NPA, Event Rentals issued an additional amount of approximately $1.4 million in aggregate principal of certain senior subordinated unsecured notes (the "Additional Liquidity Notes" and, together with the 2010 Liquidity Notes, the "Cancelled Liquidity Notes").

Finally, as of December 26, 2013, the Debtors owed approximately $16.6 million to trade creditors on account of the various goods and services used by the Debtors in operating their respective businesses.   Such trade creditors include, without limitation, tent manufacturers, furniture rental stores, insurance companies, and temporary employment agencies.   As of the Petition Date, the Debtors were in significant arrears to certain of their trade creditors.

Special Event Holding, Inc. ("Special Event"), directly or indirectly, owned 100% of the equity in Event Rentals and each of the other Debtors.   The equity interest in Special Event was held either as common shares or options to purchase common shares.   Without giving effect to certain outstanding options, Quad-C held approximately 71% of the outstanding common shares in Special Event, SAC held approximately 16%, and JPM held approximately 10%.   The remaining 3% of the outstanding common shares in Special Event was held among approximately 80 entities or individuals.

## C.    The Debtors' Management.

As of the Petition Date, the Debtors' officers, directors, and vice presidents were:

| Name | Title |
|---|---|
| Jeffrey Black | Director/Chief Executive Officer |
| Andre Oberholzer | Interim Chief Financial Officer |
| Carrie R. Blankenheim | Chief Financial Officer[4] |
| Patrick Piccininno | Chief Information Officer, Vice President  - Supply Chain |
| Andrew Hinkelman | Chief Restructuring Officer |
| Michael Stern | Regional Vice President |
| Susan Kidwell | Regional Vice President |
| William Jones | Regional Vice President |
| Robert Kraak | Regional Vice President |
| Thomas Siciliano | Regional Vice President |
| Matthew Wiltshire | Regional Vice President |
| Cesar Torres | Regional Vice President |
| Kathryn Trickey | Vice President – Sales |
| Angela Pennington | Vice President – Inventory |
| Michael Miner | Vice President - Marketing |
| Timothy W. Billings | Director – All Affiliated Debtors |
| Stephen M. Burns | Director – Special Event Holding, Inc. |
| Terrence D. Daniels | Director – Special Event Holding, Inc. |
| Robert W. Reistetter | Director – Special Event Holding, Inc. |

---

[4] Ms. Blankenheim was the Chief Financial Officer of all Debtor entities, with the exception of Special Event Holdings, Inc.

**D.    Events Precipitating the Commencement of the Chapter 11 Cases.**

Beginning in 2004, continuing after the Liquidity Parties' acquisition of the Debtors in 2006, and through 2008, the Debtors experienced a period of robust growth, which was driven by both increased consumer demand and strategic acquisitions of approximately thirty event rentals businesses.  The Debtors' acquisitions during this period were priced and financed based on projections that proved unattainable with the onset of the global financial crisis in fiscal year 2009 and the resultant significant and prolonged decline in customer demand for event rentals.

Reduced sales and earnings forced the Debtors to take a variety of measures to maintain short-term financial stability, including: amendments extending the maturity dates and reducing the debt obligations under the Prepetition Credit Facility, additional equity infusions by the Liquidity Parties, and a comprehensive restructuring in November of 2011.

Though sufficient to sustain the Debtors through an extended period of depressed earnings from 2009 through 2013, these measures proved inadequate to sufficiently deleverage the Debtors' capital structure and did not provide the Debtors with sufficient access to capital to make needed investments and optimally manage their businesses.

In short, as the Debtors failed to meet the revenue projections that supported their pre-recession-era acquisitions and financing activities, they found themselves unable to meet their debt obligations.

Faced with the impending Secured Maturity Dates in 2014, the Debtors engaged Jefferies LLC ("Jefferies"), a leading investment bank, to explore solutions to their financial problems.  Prior to the Petition Date, Jefferies extensively marketed the Debtors and explored various potential financing and sale transactions aimed at relieving the Debtors of their secured debt burden.  Unfortunately, despite receiving several written letters of interest and engaging in on-site diligence with interested parties, the Debtors were unable to secure a refinancing transaction or buyer prior to the Petition Date.

1.    **Proposed Sale of Substantially All of the Debtors' Assets.**

Prior to the commencement of the Chapter 11 Cases, the Debtors and their advisors determined that a sale of substantially all of the Debtors' assets was the optimal way for the Debtors to preserve their businesses as a going concern and provide recoveries to stakeholders of their estates that would otherwise be unavailable.  On or about the Petition Date, the Debtors agreed to the sale of substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code and a court-approved auction.  On February 14, 2014, the Debtors and CPR Acquisition Holdings, LLC (the "Stalking Horse Bidder" or the "Back-Up Bidder") entered into that certain Asset Purchase Agreement (as amended from time to time, the "Stalking Horse Asset Purchase Agreement"), pursuant to which CPR Acquisition Holdings, LLC agreed to serve as the Stalking Horse Bidder for the sale of substantially all of the Debtors' assets in a competitive and public chapter 11 process.  Moreover, the Debtors entered into that certain Senior Secured and Superpriority Financing Agreement, dated February 18, 2014, by and among the Debtors, certain lenders parties thereto (the "DIP Lenders"), and Ableco Finance LLC (in such capacity, the "DIP

Agent") for a debtor in possession facility (the "<u>DIP Facility</u>") in an amount up to $20 million to fund the Debtors' operations during the Chapter 11 Cases.

**VI.**

**THE CHAPTER 11 CASES**

**A.      First Day Pleadings and Orders.**

On or about the Petition Date, the Debtors filed the following motions for usual and customary relief with the Bankruptcy Court: (i) motion for the joint administration of cases; (ii) motion authorizing continued use of cash management system, bank accounts, and business forms and waiving investment and deposit requirements; (iii) motion authorizing payment of prepetition wages, compensation, employee benefits, and related obligations; (iv) motion authorizing payment of prepetition trust fund taxes and sales and uses taxes; (v) motion for order prohibiting utility companies from altering, refusing, or discontinuing service to the Debtors, deeming utility companies adequately assured of future payment, and establishing procedures for determining requests for additional adequate assurance; (vi) motion authorizing deposit payments to essential providers as assurance of payment on future orders, and payment of certain ordinary course obligations under prepetition vendor contracts relating to postpetition client events; (vii) motion authorizing Debtors to maintain insurance program, maintain insurance premium financing program, pay insurance premiums in the ordinary course, and pay all obligations associated therewith, and preventing insurance companies from giving any notice of termination or otherwise modifying any insurance policy without obtaining relief from the automatic stay; (viii) motion authorizing the maintenance of certain referral commission programs and honoring or paying related prepetition obligations in respect thereof; (ix) motion authorizing the Debtors to satisfy certain prepetition obligations in connection with current customer contracts and agreements, authorizing the Debtors to return customer deposits, and approving the form and manner of a supplemental customer notice of the commencement of the Chapter 11 Cases; (x) motion authorizing the Debtors to obtain postpetition financing, authorizing the use of cash collateral, granting adequate protection to the prepetition secured parties, granting liens and superpriority claims, modifying the automatic stay, and scheduling a final hearing; and (xi) motion authorizing and approving bid procedures to be employed in connection with the proposed sale of substantially all of the Debtors' assets, scheduling an auction and sale hearing, authorizing and approving assignment procedures to be employed in connection with the identification and assumption of certain contracts, leases, and intellectual property rights, and approving the manner and form of notice of the auction, sale hearing, and assignment procedures, and approving the agreement for the sale and purchase of the assets free and clear of liens, claims, encumbrances, and interests.  The Bankruptcy Court held hearings on February 18, 2014, March 14, 2014, and April 29, 2014 in connection with the above-referenced motions, and, between February 18, 2014 and April 29, 2014, the Bankruptcy Court entered orders granting the relief requested in such motions.

**B.      Appointment of Chief Restructuring Officer.**

Pursuant to an employment application filed with the Bankruptcy Court and a subsequent order entered by the Bankruptcy Court, Andrew Hinkelman of FTI Consulting, Inc. ("<u>FTI</u>") was

17

appointed as the Chief Restructuring Officer of the Debtors, and FTI was retained to assist Mr. Hinkelman in providing restructuring services.

**C.    Employment of Professionals for the Debtors.**

Pursuant to employment applications filed with and subsequent orders entered by the Bankruptcy Court, the Debtors employed the following professionals to assist them with the administration of the Chapter 11 Cases: (i) White & Case LLP as counsel; (ii) Fox Rothschild LLP as Delaware counsel; (iii) Jefferies as investment banker; (iv) A&G Realty Partners, LLC as real estate consultant; and (v) Kurtzman Carson Consultants LLC as Claims Agent.    All professionals retained by the Debtors have been, or will be, paid their allowed fees and expenses incurred on behalf of the Debtors pursuant to orders entered by the Bankruptcy Court.

**D.    Appointment of the Committee.**

On or about February 25, 2014, the Office of the United States Trustee constituted the Committee.  The Committee's members are: Herb Stone; Signature Systems Group, LLC; Stan White; Jomar Table Linens, Inc.; Ryder Truck Rental, Inc.; Designer 8 Event Rental, Inc.; and Aztec Tent.  The Committee engaged the law firm of Pachulski Stang Ziehl & Jones LLP to serve as its counsel and Conway MacKenzie, Inc. to serve as its financial advisor.  All professionals retained by the Committee have been, or will be, under the terms of the Plan, paid their allowed fees and expenses incurred on behalf of the Committee pursuant to orders entered by the Bankruptcy Court.  Moreover, the allowed expenses of the Committee members have been, or will be, paid pursuant to orders entered by the Bankruptcy Court.

**E.    Final DIP Order.**

On April 1, 2014, the Court entered the Final Order (i) Authorizing Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code; (ii) Authorizing the Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code; (iii) Granting Adequate Protection to the Prepetition Secured Parties Pursuant to Sections 361, 362, 363, and 364 of the Bankruptcy Code; (iv) Granting Liens and Superpriority Claims; and (v) Modifying the Automatic Stay [D.I. 277] (the "Final DIP Order"), attached hereto as Exhibit C.  The Final DIP Order approved the DIP Facility, by and among the Debtors, the DIP Lenders, and the DIP Agent for a debtor in possession facility in an amount up to $20 million to fund the Debtors' operations during the Chapter 11 Cases.  The Final DIP Order also contained an admission and stipulation by the Debtors that, as of the Petition Date, the outstanding balance on account of the Prepetition Credit Facility totaled $174,824,892.88 (the "Prepetition Lender Claims").

According to the Final DIP Order, each debtor and its respective estate was deemed to forever waive, discharge, and release any challenge to the validity of the Prepetition Lender Claims and any causes of action that it may have against the Prepetition Lenders.  These waivers and releases were to extend to and bind each party in interest, including the Committee, unless any such party in interest raised a challenge before the applicable deadline established in the Final DIP Order (the "Challenge Period").  If no challenge to the Prepetition Lender Claims was raised, upon the expiration of the Challenge Period, the Prepetition Lender Claims would be deemed to be fully allowed secured claims.

The DIP Order required that all proceeds from the sale of substantially all of the Debtors' assets first be used to repay the amounts owed under the DIP Facility and then applied in satisfaction of the Prepetition Lenders Claims.  Finally, the DIP Order reserved a wind-down budget from the proceeds of such sale to allow the Debtors to wind down their affairs and satisfy claims against the Debtors as set forth in the Plan.

## F.    Continued Operations.

During the period from the Petition Date until the closing of the Sale, the Debtors operated their businesses in the ordinary course.  Upon the closing of the Sale, the Debtors ceased operations but remained in possession of their remaining assets which are proposed to be expended and distributed as set forth in the Plan.

## G.    Sale of the Debtors' Businesses.

During the postpetition period Jefferies continued its comprehensive marketing process and re-contacted every party who was part of the prepetition process, described in Section V.D., above.  During this postpetition marketing period, Jefferies contacted forty-one new parties regarding their interest in all or some portion of the Debtors' assets.  Of these parties, twenty-one signed confidentiality agreements.  In addition, Jefferies worked with the Committee to identify additional parties that may have an interest in purchasing some, but not all, of the Debtors' assets.  The Debtors received eight indications of interest from various parties for portions of the Debtors' assets throughout the course of the Chapter 11 Cases and actively pursued such interest.

A hearing on approval of the bid procedures with respect to the proposed sale of substantially all of the Debtors' assets was held before the Bankruptcy Court on March 14, 2014. In accordance with the bid procedures approved by the Bankruptcy Court at the hearing, all qualified bids were due on April 14, 2014.  The auction was held on April 21, 2014.  Both Apollo Capital Management, L.P., on behalf of investment funds managed by it or any of its affiliates ("Apollo"), and the Stalking Horse Bidder submitted qualified bids for substantially all of the Debtors' assets.  In accordance with the bid procedures, the Debtors selected, after the auction and in consultation with the Prepetition Lenders and the Committee, the $125,250,000 bid of Apollo as the successful bid (the "Successful Bid") and the bid of the Stalking Horse Bidder as the back-up bid (the "Back-Up Bid").  The Debtors believe that the Successful Bid represents the highest and best offer for their assets.  As such, the Successful Bid represents the best possible outcome for the Debtors, their creditors, and all parties in interest.

By order dated April 29, 2014 (the "Sale Order"), attached hereto as Exhibit D, the Bankruptcy Court approved the Sale, finding, among other things, that: (i) the bidding and auction process was non-collusive, fair and reasonable, conducted in good faith and resulted in the Debtors obtaining the highest available value for their assets; (ii) the Debtors had demonstrated good, sufficient, and sound business purposes and justifications, and compelling circumstances, for the Sale pursuant to section 363(b) of the Bankruptcy Code prior to, and outside of, a chapter 11 plan; (iii) that the Asset Purchase Agreement by and among the Debtors and CP OpCo, LLC, dated April 28, 2014 (i.e., the Asset Purchase Agreement) was negotiated, proposed, and entered into without collusion, in good faith, and from arm's-length bargaining

positions; and (iv) that the consideration provided by the Buyer for the purchased assets was fair and reasonable, represented the highest and best offer for the purchased assets, and constituted reasonably equivalent value and fair consideration. Following approval by the Bankruptcy Court, the Sale closed on May 23, 2014 (the "Sale Closing Date").

**H.     Settlement with the Committee and the Liquidity Parties.**

On April 29, 2014, the Bankruptcy Court entered an order approving a settlement agreement by and among the Debtors, the Committee Parties, and the Liquidity Parties (i.e., the Liquidity Settlement Agreement). The Liquidity Parties or their affiliates own substantially all of the Equity Interests in the Debtors. Additionally, the Debtors owe the Liquidity Parties, in the aggregate, approximately $39.8 million on account of various obligations, which Claims are referred to collectively in the Plan as the "Liquidity Claims." Pursuant to the Liquidity Settlement Agreement, the Debtors, the Committee Parties, and the Liquidity Parties agreed that, in exchange for broad mutual releases and a commitment to seek equivalent global releases pursuant to a chapter 11 plan, the Liquidity Parties shall not receive any distribution from or in connection with the Chapter 11 Cases, and shall waive the Liquidity Claims, subject to two primary qualifications. First, the Liquidity Settlement Agreement will not become effective until the effective date of an "Acceptable Plan" within the meaning of the Liquidity Settlement Agreement. The Plan qualifies as such a plan. Accordingly, the Liquidity Settlement Agreement will become effective on the Effective Date of the Plan, if and when such date occurs. Second, the Liquidity Parties will be entitled to recover on account of their Liquidity Claims *pari passu* with any holder of an Unsecured Claim that effectively opts out of the releases in favor of the Liquidity Parties contained in Section 7.6 the Plan. The Liquidity Settlement Agreement is attached to the Plan as Exhibit B.

**I.     Settlement by and Among the Committee Parties, the Prepetition Agent, the Settling Prepetition Lenders, the DIP Agent, the Settling DIP Lenders, and the Buyer.**

On April 29, 2014, the Bankruptcy Court entered an order approving the settlement agreement by and among the Debtors, the Committee Parties, the Prepetition Agent, the settling Prepetition Lenders, the DIP Agent, the settling DIP Lenders, and the Buyer (the i.e., the Secured Facilities Settlement Agreement). Upon its formation, the Committee began conducting an investigation into the Debtors' businesses and financial affairs. On the basis of this investigation, the Committee believed that the Debtors' estates may have had certain claims or defenses in respect of the Prepetition Credit Facility. The Prepetition Agent and the Prepetition Lenders strongly disputed that the Debtors' estates had any such claims or defenses. In order to avoid a protracted fight over the terms of the Sale, which none of the parties believed would be in anyone's best interest, the Committee, the Buyer, the Prepetition Agent, the settling Prepetition Lenders, the DIP Agent, and the settling DIP Lenders reached a consensual resolution regarding the relief requested in the Sale Motion and entered into the Secured Facilities Settlement Agreement. The Secured Facilities Settlement Agreement eliminated any challenge or objection to the Sale, thereby clearing a substantial hurdle to approval of the Sale and an efficient, value-maximizing resolution of potential disputes regarding these Chapter 11 Cases.

As part of the Secured Facilities Settlement Agreement, the Debtors, the Committee Parties, and the Prepetition Lenders agreed: (i) to acknowledge the validity of the Debtors' obligations under the Prepetition Credit Facility and the liens securing such obligations and waive any challenge in respect of those obligations and liens; (ii) to revise the "Wind Down Budget" (as defined in the Asset Purchase Agreement) to provide for the additional transfer of at least (subject to the adjustments provided in the Secured Facilities Settlement Agreement) $600,000 free and clear of liens and claims of the Prepetition Lenders and of the DIP Lenders for distribution in accordance with the Bankruptcy Code and further order of the Bankruptcy Court; (iii) that the Committee consented to the Sale and approval of the Asset Purchase Agreement and agreed not to take any action that could negatively impact the Debtors' efforts to obtain Bankruptcy Court approval of the Sale; (iv) that the Prepetition Agent waived any right to receive any distribution from or in connection with the Chapter 11 Cases on account of any obligations under the Prepetition Credit Facility that are not satisfied in full upon consummation of the Sale (subject to certain reservations in the Secured Facilities Settlement Agreement and the Final DIP Order); (v) that the Buyer shall receive all rights, claims, and causes of action of the Debtors and their estates (the "Litigation Claims"), including those arising under chapter 5 of the Bankruptcy Code, but shall not seek affirmative recovery from any party on account of the Litigation Claims that arise under chapter 5 of the Bankruptcy Code; and (vi) to negotiate in good faith the provisions of a chapter 11 plan in these Chapter 11 Cases (an "Acceptable Plan"), which Acceptable Plan shall contain customary broad and mutual release provisions (the "Plan Releases") among the Debtors (and their respective officers and directors), the Committee, the Liquidity Parties, the Prepetition Lenders, and other participating creditors relating to the Debtors or their businesses, the Chapter 11 Cases, and other obligations and transactions set forth in the Secured Facilities Settlement Agreement.

Pursuant to the Final DIP Order, because the Challenge Period passed without a challenge to the Prepetition Lender Claims being asserted by any party in interest, the Prepetition Lender Claims became Allowed Claims, subject to the terms of the Secured Facilities Settlement Agreement.

The Secured Facilities Settlement Agreement is attached to the Plan as Exhibit A.

**J.    Wind-Down Letter Agreement.**

On June 2, 2014, the Bankruptcy Court entered an order approving a letter agreement between the Prepetition Agent, certain Prepetition Lenders thereto, and the Debtors (the "Wind-Down Letter Agreement"). Pursuant to the Wind-Down Letter Agreement, the parties resolved certain issues relating to the disbursement of the proceeds of the Sale and satisfaction of certain Claims. Among other things, the Wind-Down Letter Agreement established: (i) a reserve for satisfying Disputed Sales Tax Claims against the Debtors; and (ii) a reserve for satisfying Claims against the Debtors secured by liens in property of the Debtors sold pursuant to the Sale that were senior in priority to the Prepetition Lenders' liens. Pursuant to the Wind-Down Letter Agreement, the Debtors are entitled to apply excess funds in the Disputed Sales Tax Claims reserve and the Prepetition Prior Secured Creditor Reserve to pay priority tax claims and secured claims, and any excess not so applied must be returned to the Prepetition Agent for distribution to the Prepetition Lenders. Pursuant to the Wind-Down Letter Agreement, the Debtors are prohibited from paying "Disputed Sales Tax Claims" or "Unasserted Tax Audit Claims," as

those terms are defined in the Wind-Down Letter Agreement, from the Unencumbered Settlement Cash.  Pursuant to the Plan, the Liquidation Trustee shall be deemed the successor to the Debtors and the Committee with respect to the rights and duties contemplated by the Wind-Down Letter Agreement.  The Wind-Down Letter Agreement is attached to the Plan as Exhibit C.

### K.    Claims Bar Date.

On April 15, 2014, the Bankruptcy Court entered the Bar Date Order (i) establishing bar dates for filing certain proofs of claim; (ii) establishing ramifications for failure to comply therewith; (iii) approving proof of claim form and bar date notice; and (iv) approving publication notice and publication procedures.  Specifically, the Bar Date Order established the following bar dates: (i) May 27, 2014 at 4:00 p.m. Eastern Time as the deadline for each person or entity (other than governmental units, as defined in section 101(27) of the Bankruptcy Code) to file proofs of claim for prepetition claims against the Debtors; and (ii) August 12, 2014 at 4:00 p.m. Eastern Time as the deadline for governmental units to file proofs of claim.

## VII.

## POTENTIAL LITIGATION

### A.    Estate Causes of Action.

Pursuant to the Asset Purchase Agreement, the Sale Order, and the Sale, the Buyer acquired all Litigation Claims, including those arising under chapter 5 of the Bankruptcy Code, but shall not seek affirmative recovery from any party on account of the Litigation Claims that arise under chapter 5 of the Bankruptcy Code.  The Debtors did not retain any causes of action in existence as of the Sale Closing Date.

### B.    Pending Litigation.

As of the Petition Date, the following actions were pending: (i) *Jason Jackson v. Classic Party Rentals, Inc. et al.*, No. BC509202 before the Superior Court of the State of California for the County of Los Angeles; (ii) *Emau Hernandez v. Classic Party Rentals, Inc. et al.*, No. BC522074 before the Superior Court of the State of California for the County of Los Angeles; (iii) *Robert Donato v. Classic Party Rentals, Inc.*, No. 14K01637 before the Superior Court of the State of California for the County of Los Angeles; (iv) *Cesar Hernandez v. Classic Party Rentals, Inc.*, No. 37-2014-00304165 before the Superior Court of the State of California for San Diego County; (v) *Geraldine Grzelak and John Grzelak v. Classic Midwest, Inc. et al.*, No. 2013-L-012980 before the Illinois Circuit Court, Cook County; (vi) *John R. Ebbs Jr., et al. v. Tri-Rentals, Inc. and Classic Party Rentals, Inc.*, No. CV2010-011542 – consolidated before the Superior Court for the State of Arizona for the County of Maricopa; (vii) *Dawn Schroeder, et al. v. Classic Party Rentals Santa Barbara*, No. 1340095 before the Superior Court of the State of California for Santa Barbara County; (viii) *City of Fort Worth, et al. v. Grand Events & Party Rentals, Inc.*, No. 236-B46879-13 before the District Court of the State of Texas for Tarrant County; (ix) *Ismael Torres v. Classic Party Rentals d/b/a Ducky-Bob's*, No. 2013-001524-1 before the County Court at Law No. 1 for Tarrant County, Texas; (x) *Marie Johnson v.*

*Container Store, et al.*, No. 2013-CA018439 before the Circuit Court for the 15th Circuit of Florida; (xi) *Juan Serna aka Ilmer Aranis Rivera Mesida v. Classic Party Rentals; Old Republic General Ins. Corp., Administered by Gallagher Bassett*, No. ASJ7783834 before the Workers' Compensation Appeals Board of the State of California; (xii) *Robert Joseph Hiller v. Fernando Acuna, Arizona Tents and Events d/b/a Classic Party Rentals, Kenneth Flower & Carrie Flower d/b/a Arizona Party Rental, et al.,* No. CV14002944 before the Pima County Consolidated Justice Court; (xiii) *Classic Midwest, Inc. v. Tentco Global Events, Inc. et al.,* No. 2013 Ch 27790 before the Circuit Court of Cook County, Illinois, County Department, Chancery Division; (xiv) *Terry Mascolo v. Starbucks Corp., Int'l Players Championships, Inc., and Classic/Prime, Inc.*, No. 13-11360-CA-06 before the Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County, Florida.

## VIII.

## THE CHAPTER 11 PLAN

As a result of the Chapter 11 Cases and through the Plan, the Debtors and the Committee submit that creditors will obtain a greater recovery under the Plan than any recovery that would be available if the Assets were to be liquidated under chapter 7 of the Bankruptcy Code. The Plan is annexed hereto as Exhibit A and forms part of this Disclosure Statement. The summary of the Plan set forth below is qualified in its entirety by the Plan.

**A.    Plan Treatment of Claims and Equity Interests.**

The classes of Claims against the Debtors and Equity Interests in the Debtors shall be treated under the Plan as follows:

(a)    Class 1 – Priority Claims.

Each holder of an Allowed Priority Claim shall be unimpaired under the Plan and, pursuant to section 1124 of the Bankruptcy Code, all legal, equitable and contractual rights of each holder of an Allowed Priority Claim in respect of such Claim shall be fully reinstated and retained, except as provided in sections 1124(2)(A)-(D) of the Bankruptcy Code, and such holder of an Allowed Priority Claim shall be paid on the Plan Distribution Date in full and in Cash.

(b)    Class 2 – Non-Lender Secured Claims.

Each holder of an Allowed Non-Lender Secured Claim shall be unimpaired under the Plan and, pursuant to section 1124 of the Bankruptcy Code, all legal, equitable, and contractual rights of each holder of an Allowed Non-Lender Secured Claim in respect of such Claim shall be fully reinstated and retained, expect as provided in section 1124(2)(A)-(D) of the Bankruptcy Code, and such holder of an Allowed Non-Lender Secured Claim shall be paid on the Plan Distribution Date in full and in Cash.

(c)    Class 3 – Prepetition Lender Claims.

(i)    Each holder of an Allowed Prepetition Lender Claim shall receive, on the Plan Distribution Date, its share (as determined by the Prepetition Agent in accordance

with the terms of the Prepetition Credit Facility) of (a) any amount remaining in the Prepetition Prior Secured Creditor Reserve after application in accordance with paragraph 1 and paragraph 3 of the Wind-Down Letter Agreement; (b) any amount remaining in the Priority Sales Tax Reserve after application in accordance with paragraph 2 and paragraph 3 of the Wind-Down Letter Agreement; and (c) any amounts due to be remitted to the Prepetition Agent or the Prepetition Lenders pursuant to paragraph 4.c. of the Secured Facilities Settlement Agreement or paragraph 7(c) of the DIP Order (as has been amended from time to time).

(ii)        Each holder of an Allowed Prepetition Lender Claim shall also receive, on the Plan Distribution Date, (to the extent not previously paid) its share (as determined by the Prepetition Agent in accordance with the terms of the Prepetition Credit Facility) of any amounts due to be remitted to the Prepetition Agent or the Prepetition Lenders pursuant to paragraph 4(d) of the DIP Order.  In the case of the fees and expenses of the Prepetition Agent and Prepetition Lenders (including, without limitation, the fees, costs and expenses of counsel and financial advisors for the Prepetition Agent and the Prepetition Lenders) such claims will be paid in Cash on the Effective Date for all fees and expenses incurred up to the Effective Date (to the extent not previously paid), subject to the Debtors' prior receipt of summary invoices and without the requirement to file a fee application with the Bankruptcy Court.  Notwithstanding anything to the contrary, the Debtors shall not have to pay any amounts pursuant to this subparagraph (c)(ii) in excess of the amounts that may be funded from the Prepetition Lenders' Counsel Fee Sources.

(iii)        Notwithstanding anything else set forth in the Plan, Plan Distributions to which holders of Allowed Prepetition Lender Claims are entitled shall be paid by the Liquidation Trustee to the Prepetition Agent for distribution to holders of Allowed Prepetition Lender Claims in accordance with the Prepetition Credit Facility.  Pursuant to the DIP Order and the Secured Facilities Settlement Agreement, the Prepetition Lender Claims were finally Allowed and shall not be subject to any avoidance, reductions, setoff, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, disallowance, impairment, objection, or any challenges under any applicable law or regulation by any Person, and thus no Prepetition Lender Claims will be classified as Contested Claims or Disallowed Claims, or otherwise be subject to any objection, subordination, or estimation proceeding under or in connection with the Plan.

(d)    Class 4 – Unsecured Claims.

Each holder of an Allowed Unsecured Claim shall receive, on the Plan Distribution Date, its Pro Rata Share of the difference between (y) the Available Proceeds; and (z) the Opt-Out Carve Out. Available Proceeds is defined in the Plan as the Unencumbered Settlement Cash, as defined in the Secured Facilities Settlement Agreement[5] (i.e., $606,250 plus 75% of the Post-Sale Professional Fee Savings, as defined in and subject to the cap set forth in  the Secured Facilities Settlement Agreement, if any), less any (i) Administrative Claim other than a Fee Claim, (ii) Priority Claim, or (iii) Non-Lender Secured Claims, in each case that is not a Buyer Pay Claim and cannot be satisfied from the Debtors' other Assets, provided, however, that none of

---

[5] The Secured Facilities Settlement Agreement is attached to the Plan as Exhibit A.

the Unencumbered Settlement Cash shall be used to pay any Disputed Sales Tax Claims or Unasserted Tax Audit Claims without the prior written consent of the Committee, in its sole discretion, or as otherwise ordered by the Bankruptcy Court.  To the best of the Debtors' knowledge, based on their records and the filed proof of claims, there are approximately $29,096,673 of unsecured claims asserted against the Debtors.  The Debtors estimate that there will be no Post-Sale Professional Fee Savings, as such, the Available Proceeds to be distributed to Class 4 will be approximately $606,250 minus the Opt-Out Carve Out.  The extent of the Opt-Out Carve Out will depend on upon the extent of the Allowed Unsecured Claims held by Opt-Out Parties.

(e)     Class 5 – Liquidity Claims & Opt-Out Unsecured Claims.

Each holder of an Allowed Liquidity Claim or an Allowed Opt-Out Unsecured Claim shall receive, on the Plan Distribution Date, its Pro Rata Share of the Opt-Out Carve Out. To the extent any holder of a claim that would otherwise be classifiable as a General Unsecured Claim properly and timely opts out of the releases provided in the Plan, such holder shall share the portion of the Available Proceeds that it would have received had it not opted out of such releases ratably with the holders of (and shall be subject to dilution by) Liquidity Claims, which claims are estimated to total $39.8 million.  The Debtors' estimate that the holders of 1% of General Unsecured Claims will opt out of the Plan's releases.  Under these circumstances, the aggregate recovery for Class 5 would be $6,062.50, with each holder of an Allowed Class 5 claim receiving its Pro Rata Share of this aggregate amount.

(f)     Class 6 - Equity Interests.

On the Effective Date, all Equity Interests in the Debtors shall be cancelled, and each holder of an Equity Interest in the Debtors shall neither receive nor retain any property under the Plan on account of such interest.

**B.      Release and Exculpation Provisions**

The Plan provides for the following releases and exculpation:

(a)     **Secured Facility Settlement Agreement Releases**

1.      **On the Sale Closing Date, by operation of the Secured Facilities Settlement Agreement, the Committee Parties granted a release in favor of the Prepetition Agent, the Settling Prepetition Lenders, the DIP Agent, and the Settling DIP Lenders, and certain of each of their respective related Persons to the extent set forth in paragraph 8.a. of the Secured Facilities Settlement Agreement.  The "Lender Release," as defined in the Secured Facilities Settlement Agreement, is fully binding and effective and is incorporated into the Plan by reference as if fully set forth therein.**

2.      **On the Sale Closing Date, by operation of the Secured Facilities Settlement Agreement, the Prepetition Agent, the Settling Prepetition Lenders, the DIP Agent, and the Settling DIP Lenders, and certain of each of their respective related Persons, granted a release in favor of the Committee Parties and certain of each of their**

related Persons to the extent set forth in paragraph 8.b. of the Secured Facilities Settlement Agreement. The "Committee Parties Release," as defined in the Secured Facilities Settlement Agreement, is fully binding and effective and is incorporated into the Plan by this reference as if fully set forth in the Plan.

    (b)    **Liquidity Settlement Agreement Releases**

    1.    On the Sale Closing Date, by operation of the Liquidity Settlement Agreement, the Committee Parties and certain of their related Persons granted a release in favor of the Liquidity Parties and certain of their related Persons to the extent set forth in paragraph 2.a. of the Liquidity Settlement Agreement. Such release is fully binding and effective and is incorporated into the Plan by this reference as if fully set forth in the Plan.

    2.    On the Sale Closing Date, by operation of the Liquidity Settlement Agreement, the Liquidity Parties and certain of their related Persons granted a release in favor of the Committee Parties, the Debtors, and certain of each of their respective related Persons to the extent set forth in paragraph 2.b. of the Liquidity Settlement Agreement. Such release is fully binding and effective and is incorporated into the Plan by this reference as if fully set forth in the Plan.

    3.    On the Sale Closing Date, by operation of the Liquidity Settlement Agreement, the Debtors and certain of their related Persons granted a release in favor of the Committee Parties, the Liquidity Parties, and certain of each of their respective related Persons to the extent set forth in paragraph 2.c. of the Liquidity Settlement Agreement. Such release is fully binding and effective and is incorporated into the Plan by this reference as if fully set forth in the Plan.

    (c)    **Supplemental Releases**

On the Effective Date, for good and valuable consideration, each of the Release Parties shall be deemed to have released (i) each of the other Release Parties; and (ii) each of the Release Parties' respective affiliates, employees, officers, directors, managers, members, representatives, agents, attorneys, accountants, investment bankers, bankruptcy and restructuring advisors, financial advisors, direct or indirect equity holders, successors, predecessors, and assigns, each in their capacities as such, from any and all Causes of Action relating to the Debtors or their businesses, including the Chapter 11 Cases, the Plan, the Sale, the operation of the Debtors, the Prepetition Financing Agreement, the DIP Financing Agreement, the Liquidity Notes, the Liquidity Claims, and any transactions contemplated thereby or any action or omission in connection therewith, *provided, however,* that nothing in this Section shall modify, affect, or impair (a) the rights of any Release Party to recover on account of a Claim against the Debtors in accordance with the terms of the Plan; (b) the releases and other provisions contained in the Secured Facilities Settlement Agreement, the Liquidity Settlement Agreement, the Asset Purchase Agreement, or the DIP Order; or (c) the rights of any Opt-Out Party; *provided, further,* that nothing in this Section shall be construed to release any party from willful misconduct, gross negligence, or fraud as determined by a Final Order. With respect to the releases set

forth herein, by not electing to become an Opt-Out Party, each Release Party is deemed to understand and have voluntarily waived any and all protections of section 1542 of the California Civil Code (and any other similar provision of law) to which such Release Party might otherwise have been entitled, which section reads as follows:

> **"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."**

(d)    Opt-Out Election

All holders of Unsecured Claims, other than the Committee Parties, are entitled to opt-out of the Supplemental Releases set forth in Section 7.6 of the Plan by (a) indicating on their properly-completed Class 4 ballot their intention to opt-out of the Supplemental Releases and (b) delivering that ballot to the Debtors' Solicitation Agent, as set forth on the ballot, so that it is actually received on or before the Voting Deadline.  For the avoidance of doubt, the election to opt-out shall result in (i) the Opt-Out Party's claim being placed in Class 5 where it will then receive the less favorable treatment prescribed for that class and (ii) the Opt-Out Party being removed from the Release Parties, and thus not benefiting from the Supplemental Releases set forth in Section 7.6 of the Plan.

(e)    **Exculpation**

**None of the Debtors, the Committee Parties, or any of their respective officers, directors, members, employees, agents, or successors and assigns will have or incur any liability to any Person for any act or omission in connection with, arising out of, or relating to the Chapter 11 Cases or the pursuit and consummation of the Sale, the pursuit of confirmation of the Plan, the consummation of the Plan, or the implementation or administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence as finally determined by the Bankruptcy Court, and, in all respects shall be entitled to rely upon the advice of counsel and all information provided by other exculpated persons herein without any duty to investigate the veracity or accuracy of such information with respect to their duties and responsibilities under the Plan.**

(f)    Propriety of the Releases

The Debtors believe that the releases described above (the "Plan Releases") are appropriate, as the Liquidity Parties and Prepetition Lenders have contributed significantly to the Plan in a number of ways.  Both the Prepetition Lenders and the Liquidity parties waived a significant amount of claims that could have been asserted against the Debtors and their estates. Specifically, the Prepetition Lenders have agreed to waive any right to receive any distribution in connection with the Chapter 11 Plan on account of any deficiency claims under the Prepetition Credit Facility.  In addition, the Liquidity Parties have agreed to waive approximately $39.8

million of unsecured claims against the Debtors to the extent that unsecured creditors agree to the Plan Releases.  Additionally, the Prepetition Secured Lenders served as the Stalking Horse Bidder, provided a DIP Facility in an amount of up to $20 million dollars to fund the Debtors' operations during the Chapter 11 Cases, and have agreed to transfer of over $600,000 free and clear of their liens and claims for distribution to unsecured creditors.

The Plan Releases are essential to the Plan and the Debtors' reorganization.  Per the terms of the Liquidity Settlement Agreement and the Secured Facilities Settlement Agreement, the aforementioned contributions were contingent upon the inclusion of the Plan Releases.  As such, absent the inclusion of the Plan Releases the Debtors and the Creditors Committee would not have been able to secure meaningful recoveries for unsecured creditors.

Finally, the Plan Releases have the support of the Committee, the Prepetition Lenders, and the Liquidity Parties.  Importantly, the Committee has urged all unsecured creditors to elect to grant the Plan Releases and vote in favor of the Plan.

## C.    Liquidation Trust

(a)    Execution of the Liquidation Trust Agreement.

The Liquidation Trust Agreement, in a form reasonably acceptable to the Debtors and the Committee, shall be executed on or before the Effective Date, and all other necessary steps shall be taken to establish the Liquidation Trust and the beneficial interests therein, which shall be for the benefit of holders of all Allowed Claims.  A copy of the Liquidation Trust Agreement shall be filed with the Bankruptcy Court as a Plan Document and the terms of the Liquidation Trust Agreement are incorporated by reference and made a part of the Plan. Article VIII of the Plan sets forth certain of the rights, duties, and obligations of the Liquidation Trustee.  The Liquidation Trust Agreement will not be in any respect inconsistent with, or threaten, hinder, or prevent the implementation of any terms of the DIP Facility, the DIP Order, the Asset Purchase Agreement, the Sale Order, the Secured Facilities Settlement Agreement, the Liquidity Settlement Agreement, or the Wind-Down Letter Agreement.

(b)    Purpose of the Liquidation Trust.

The Liquidation Trust shall be established for the sole purpose of liquidating and distributing its assets, in accordance with Treasury Regulation section 301.7701-4(d), and as a "grantor trust" for federal income tax purposes, pursuant to sections 671 through 679 of the Internal Revenue Code, with no objective to continue or engage in the conduct of a trade or business.

(c)    Vesting of Assets in the Liquidation Trust; Dissolution of the Debtors.

On the Effective Date, the authority, power, and incumbency of the Debtors shall terminate, and vest in the Liquidation Trustee, and all Assets shall be deemed to have automatically been distributed to the Liquidation Trust Beneficiaries, who will immediately thereafter be deemed to have automatically transferred all such Assets to the Liquidation Trust, where the Liquidation Trustee shall be deemed the successor to the Debtors and the Committee

with respect to the rights and duties contemplated by the Wind-Down Letter Agreement. For the avoidance of doubt, such Assets are and shall remain subject to any and all interests of the Prepetition Agent and the Prepetition Lenders as provided by the DIP Order, as modified by the Secured Facilities Settlement Agreement and the Wind-Down Letter Agreement.

(d)    <u>Governance of Liquidation Trust.</u>

The Liquidation Trust shall be governed and administered by the Liquidation Trustee.

(e)    <u>Role of the Liquidation Trustee.</u>

In furtherance of and consistent with the purpose of the Liquidation Trust and the Plan, the Liquidation Trustee shall (i) be authorized to take all steps necessary to wind down the affairs of the Debtors, (ii) have the power and authority to hold, manage, sell, and distribute the assets of the Liquidation Trust to the holders of Allowed Claims, (iii) hold the assets of the Liquidation Trust for the benefit of the holders of Allowed Claims, (iv) have the power and authority to hold, manage, sell, and distribute Cash or non-Cash assets of the Liquidation Trust obtained through the exercise of its power and authority, (v) have the power and authority to object to Claims and otherwise reconcile all Claims against the Debtors, (vi) have the power and authority to perform such other functions as are provided in the Plan; and (vii) have the power and authority to administer the closure of the Chapter 11 Cases. The Liquidation Trustee shall be responsible for all decisions and duties with respect to the Liquidation Trust and its assets. In all circumstances, the Liquidation Trustee shall act in the best interests of all beneficiaries of the Liquidation Trust and in furtherance of the purpose of the Liquidation Trust.

Except as otherwise provided in Section 8.5 of the Plan, the Liquidation Trustee, together with any and all of its officers, directors, employees, agents, and representatives, are exculpated by all Persons, including holders of Claims and Equity Interests and all other parties in interest, from any and all Causes of Action arising out of the discharge of the powers and duties conferred upon the Liquidation Trustee, by the Plan, any Final Order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except solely for actions or omissions arising out of the Liquidation Trustee's willful misconduct or gross negligence. No Person shall have or pursue any Cause of Action (i) against the Liquidation Trustee or its officers, directors, employees, agents, and representatives for making Plan Distributions in accordance with the Plan; or (ii) against any holder of a Claim for receiving or retaining Plan Distributions as provided for by the Plan. Nothing contained in Section 8.5 of the Plan shall preclude or impair any holder of an Allowed Claim from bringing an action in the Bankruptcy Court against the Liquidation Trustee to compel the making of Plan Distributions contemplated by the Plan on account of such holder's Allowed Claim.

(f)    <u>Cash.</u>

The Liquidation Trustee may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code; *provided, however,* that such investments are investments permitted to be made by a liquidating trust within the

meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings, or other controlling authorities.

(g)    Compensation of the Liquidation Trustee.

The Liquidation Trustee shall be entitled to reasonable compensation as provided in the Liquidation Trust Agreement.

(h)    Retention of Professionals by the Liquidation Trustee.

The Liquidation Trustee may retain and reasonably compensate counsel and other professionals to assist in its duties as Liquidation Trustee on such terms as the Liquidation Trustee deems appropriate without Bankruptcy Court approval.  The Liquidation Trustee may retain any professional who represented parties in interest in the Chapter 11 Cases.

(i)    Noncertificated Liquidation Trust Interests.

The beneficial interests in the Liquidation Trust shall not be certificated, except as otherwise provided in the Liquidation Trust Agreement.

(j)    Dissolution of the Liquidation Trust.

The Liquidation Trustee and the Liquidation Trust shall be discharged or dissolved, as the case may be, at such time as (i) all assets of the Liquidation Trust have been liquidated and (ii) all distributions required to be made by the Liquidation Trustee under the Plan have been made, but in no event shall the Liquidation Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion within the six (6) month period prior to the fifth (5th) anniversary (and, in the case of any extension, within six (6) months prior to the end of such extension), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Liquidation Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the assets of the Liquidation Trust.  Under the terms of the Plan, the Liquidation Trustee shall not be discharged and the Liquidation Trust may not be dissolved until the Liquidation Trustee has made all distributions from the Liquidation Trust required under the Plan, including, without limitation, those distributions called for under the DIP Order, the Secured Facilities Settlement Agreement, and the Wind-Down Letter Agreement incorporated into the Plan.

(k)    Securities Exempt.

The issuance of any beneficial interests of the Liquidation Trust satisfies the requirements of section 1145 of the Bankruptcy Code and, therefore, such issuance is exempt from registration under the Securities Act of 1933, as amended, and any state or local law requiring registration.

**D.      Plan Controls.**

Unless otherwise specified, all section, article, and exhibit references in the Plan are to the respective section in, article of, or exhibit to the Plan, as the same may be amended, waived, or modified from time to time. Words denoting the singular number shall include the plural number and vice versa, and words denoting one gender shall include the other gender. This Disclosure Statement may be referred to for purposes of interpretation to the extent any term or provision of the Plan is determined by the Bankruptcy Court to be ambiguous.

IX.

**RISK FACTORS**

The holder of a Claim against the Debtors should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), before deciding whether to vote to accept or reject the Plan.

**A.      General Considerations.**

The formulation of a plan is a principal purpose of a chapter 11 case. The Plan sets forth the means for satisfying the Claims against the Debtors. Liquidation of the Debtors' assets under the proposed Plan also avoids the potentially adverse impact of a protracted and costly liquidation under chapter 7 of the Bankruptcy Code.

**B.      Certain Bankruptcy Considerations.**

If the Plan is not confirmed and consummated, there can be no assurance that any alternative plan of liquidation would be on terms as favorable to the holders of impaired Claims as the terms of the Plan. In addition, if liquidation under chapter 7 were to occur, it is likely that holders of Claims would receive less than they will receive under the Plan. See Section XII, infra, and Schedule 2 attached hereto.

**C.      Claims Estimation**

There can be no assurance that the estimated Claim amounts set forth herein are correct, and the actual amount of Allowed Claims may differ from the estimates. The estimated amounts are subject to certain risks, uncertainties, and assumptions. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual amount of Allowed Claims may vary from those estimated herein.

Additionally, the date by which governmental entities must file claims, August 12, 2014, has not passed. As such, the estimated amount of claims may change due to claims filed by governmental entities after this Disclosure Statement has been filed with the Court.

Finally, approximately two-hundred executory contracts may be rejected or assumed at the Buyer's discretion per the terms of the Sale Order and the Asset Purchase Agreement. Any

claims filed for rejection damages on account of those contracts may result in a greater number of unsecured Claims than estimated herein.

## D.    Liquidation Trust Administration

The Wind-Down Budget established by the Final DIP Order allocates $125,000 to the administration of the Liquidation Trust.  Any amounts incurred administering the Liquidation Trust in excess of $125,000 will be deducted from the Unencumbered Settlement Cash and reduce the return to Class 4 and 5 creditors.

X.

## CONFIRMATION AND CONSUMMATION PROCEDURES

## A.    Overview.

A chapter 11 plan may provide anything from a complex restructuring of a debtor's business and its related obligations to a liquidation of a debtor's assets.  In either event, upon confirmation of a plan, it becomes binding on the debtor and all of its creditors and equity holders, and the obligations owed by the debtor to such parties are compromised and exchanged for the obligations specified in the plan.  Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires the debtor to prepare and file a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan.  **This Disclosure Statement is presented to holders of Prepetition Lender Claims, Unsecured Claims, Liquidity Claims, and Opt-Out Unsecured Claims to satisfy the requirements of section 1125 of the Bankruptcy Code in connection with the Debtors' solicitation of votes on the Plan.**

If all classes of claims and equity interests accept a chapter 11 plan, the bankruptcy court may confirm the plan if the bankruptcy court independently determines that the requirements of section 1129(a) of the Bankruptcy Code have been satisfied.  Section 1129(a) sets forth the requirements for confirmation of a plan and, among other things, requires that a plan meet the "best interests of creditors" test and be "feasible."  The "best interests of creditors" test generally requires that the value of the consideration to be distributed to the holders of claims or equity interests under a plan may not be less than those parties would receive if the debtor were liquidated pursuant to a hypothetical liquidation occurring under chapter 7 of the Bankruptcy Code.  Under the "feasibility" requirement, the bankruptcy court generally must find that there is a reasonable probability that the debtor will be able to meet its obligations under its plan without the need for further financial reorganization.  **The Debtors and the Committee believe that the Plan satisfies all the applicable requirements of section 1129(a) of the Bankruptcy Code, including, in particular, the best interests of creditors' test and the feasibility requirement.**

The Bankruptcy Code does not require that each holder of a claim or interest in a particular class vote in favor of a chapter 11 plan for the bankruptcy court to determine that the class has accepted the plan.  Rather, a class of creditors will be determined to have accepted the plan if the bankruptcy court determines that the plan has been accepted by a majority in number and two-thirds in amount of those claims actually voting in such class.  Similarly, a class of

equity security holders will have accepted the plan if the bankruptcy court determines that the plan has been accepted by holders of two-thirds of the number of shares actually voting in such class.

In addition, classes of claims or equity interests that are not "impaired" under a chapter 11 plan are conclusively presumed to have accepted the plan and thus are not entitled to vote. Furthermore, classes that are to receive no distribution under the plan are conclusively deemed to have rejected the plan. Accordingly, acceptances of a plan will generally be solicited only from those persons who hold claims or equity interests in an impaired class. A class is "impaired" if the legal, equitable, or contractual rights associated with the claims or equity interests of that class are modified in any way under the plan. Modification for purposes of determining impairment, however, does not include curing defaults and reinstating maturity on the effective date of the plan. **Class 1 – Priority Claims and Class 2 – Non-Lender Secured Claims are unimpaired, and Class 6 – Equity Interests will not receive a distribution under the Plan. Accordingly, Class 3 – Prepetition Lender Claims, Class 4 - Unsecured Claims and Class 5 – Liquidity Claims & Opt-Out Unsecured claims are the only classes of claims entitled to vote on the Plan.**

The bankruptcy court also may confirm a chapter 11 plan even though fewer than all the classes of impaired claims and equity interests accept such plan. For a chapter 11 plan to be confirmed despite its rejection by a class of impaired claims or equity interests, the plan must be accepted by at least one class of impaired claims (determined without counting the vote of insiders) and the proponent of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or equity interests that has not accepted the plan.

Under section 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" as to a rejecting class of claims or equity interests if, among other things, the plan provides: (a) with respect to secured claims, that each such holder will receive or retain on account of its claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; and (b) with respect to unsecured claims and equity interests, that the holder of any claim or equity interest that is junior to the claims or equity interests of such class will not receive or retain on account of such junior claim or equity interest any property from the estate, unless the senior class receives property having a value equal to the full amount of its allowed claim.

A plan does not "discriminate unfairly" against a rejecting class of claims or equity interests if (a) the relative value of the recovery of such class under the plan does not differ materially from that of any class (or classes) of similarly situated claims or equity interests, and (b) no senior class of claims or equity interests is to receive more than 100% of the amount of the claims or equity interest in such class.

The Plan has been structured so that it will satisfy the foregoing requirements as to the rejecting class of Equity Interests, and can therefore be confirmed over the deemed rejection of Class 6 - Equity Interests.

**B.**     **Confirmation of the Plan.**

1.     **Elements of Section 1129 of the Bankruptcy Code.**

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the conditions to confirmation under section 1129 of the Bankruptcy Code are satisfied.

Such conditions include the following:

a.     The Plan complies with the applicable provisions of the Bankruptcy Code.

b.     The Debtors have complied with the applicable provisions of the Bankruptcy Code.

c.     The Plan has been proposed in good faith and not by any means proscribed by law.

d.     Any payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

e.     The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer or voting trustee of the Debtors or a successor to the Debtors under the Plan and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy, and the Debtors have disclosed the identity of any insider that will be employed or retained by the Debtors, and the nature of any compensation for such insider.

f.     With respect to each impaired class of Claims or Equity Interests, each holder of an impaired Claim or impaired Equity Interest either has accepted the Plan or will receive or retain under the Plan, on account of the Claims or Equity Interests held by such entity, property of a value, as of the Effective Date, that is not less than the amount that such entity would receive or retain if the Debtors were liquidated on such date under chapter 7 of the Bankruptcy Code.

g.     In the event that the Debtors do not move to confirm the Plan nonconsensually, each class of Claims or Equity Interests entitled to vote has either accepted the Plan or is not impaired under the Plan.

h.     Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Claims and Priority Claims will be paid in full, in cash, on the Effective Date and Tax Claims will be paid in regular installments over a period ending not later that five (5) years after the Petition Date, of a total value, as of the Effective Date, equal to the allowed amount of such Tax Claims.

i.       At least one impaired class of Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such class.

j.       Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any other successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

k.       All fees payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

**The Debtors and the Committee believe that the Plan will satisfy all of the applicable provisions of chapter 11 of the Bankruptcy Code, that the Debtors have complied or will have complied with all of the applicable provisions of the Bankruptcy Code, and that the Plan is being proposed and submitted to the Bankruptcy Court in good faith.**

2.       **Acceptance.**

A class of Claims will have accepted the Plan if the Plan is accepted, with reference to a class of Claims, by at least two-thirds in amount and more than one-half in number of the Allowed Claims of each such class of Claims.

3.       **Best Interests of Creditors Test.**

With respect to each impaired class of holders of Claims and Equity Interests, confirmation of the Plan requires that each such holder either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the applicable consummation date under the Plan, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

Ordinarily, to determine what holders of Claims and Equity Interests of each impaired class would receive if the Debtors were liquidated, the Bankruptcy Court must determine the proceeds that would be generated from the liquidation of the properties and interests in property of the Debtors in a chapter 7 liquidation case.  The proceeds that would be available for satisfaction of Claims against and Equity Interests in the Debtors would consist of the proceeds generated by disposition of the unencumbered equity in the properties and interests in property of the Debtors and the cash held by the Debtors at the time of the commencement of the liquidation case.  Such proceeds would be reduced by the costs and expenses of the liquidation and by such additional administration and priority claims that may result from the use of chapter 7 for the purposes of liquidation.

In the Chapter 11 Cases, the Liquidity Parties Settlement Agreement contains a key element relevant to the Bankruptcy Court's liquidation analysis.  In the Liquidity Parties Settlement Agreement, the Liquidity Parties agreed to waive any claim associated with the Liquidity Obligations (the "Liquidity Claims"); provided, however, that with respect to the holders of the Opt-Out Unsecured Claims, the Liquidity Parties did not waive and remain

entitled to assert the Liquidity Claims and, to the extent Allowed, will share ratably in any recovery to which holders of the Opt-Out Unsecured Claims would have been entitled under the Plan had such holders not elected to opt out of the Plan's releases. The Liquidity Claims total approximately $39.8 million dollars.

Per its terms, the Liquidity Parties Settlement Agreement is contingent on the effectiveness of an "Acceptable Plan" within the meaning of the Liquidity Settlement Agreement. The Plan qualifies as such a plan. On the other hand, if the Debtors were to liquidate under chapter 7, the Liquidity Parties Settlement Agreement would be of no force or effect and the Liquidity Parties would assert their $39.8 million in unsecured claims. The assertion of the Liquidity Claims would dilute the return for all holders of unsecured claims.

Additionally, the costs of liquidation under chapter 7 of the Bankruptcy Code would include the fees payable to a trustee in bankruptcy, and the fees that would be payable to additional attorneys and other professionals that such a trustee may engage, plus any unpaid expenses incurred by the Debtors during the Chapter 11 Cases, such as compensation for attorneys, financial advisors, accountants and costs that are allowed in the chapter 7 case. Whereas the Liquidation Trustee has the background and familiarity with the plan and claims against the Debtors, a chapter 7 trustee and the persons it employs will need time to develop the knowledge necessary to assist the chapter 7 trustee examine claims and distribute the Debtors' assets.

To determine if the Plan is in the best interests of each impaired class, the present value of the distributions which would be available in a liquidation scenario are compared to the net present value of the distributions projected under the Plan.

**After consideration of the effects that a chapter 7 liquidation would have on the distributions to creditors in the Chapter 11 Cases, including (i) the effect of the Liquidity Parties Settlement Agreement, and (ii) the additional costs associated with the appointment of the chapter 7 trustee, the Debtors and the Committee have determined that confirmation of the Plan will provide each holder of a Prepetition Lender Claim, Unsecured Claim, Liquidity Claim, or Opt-Out Claim with a greater recovery than it would receive pursuant to liquidation of the Debtors under chapter 7 of the Bankruptcy Code.**

4. **Feasibility.**

The Bankruptcy Code conditions confirmation of a chapter 11 plan on, among other things, a finding that it is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor. For purposes of determining whether the Plan satisfies this condition, the Debtors and the Committee have analyzed the Liquidation Trustee's capacity to service its obligations under the Plan. Based upon their analyses, the Debtors and the Committee believe that the Liquidation Trustee will be able to make all payments required to be made under the Plan.

**C.    Cramdown.**

Because Class 6 – Equity Interests is impaired and deemed to reject the Plan, the Debtors will move for confirmation of the Plan under the cramdown provisions of section 1129(b) of the

Bankruptcy Code.   To obtain such confirmation, the Debtors and the Committee must demonstrate to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such classes and any other classes of Claims that vote to reject the Plan.

1.    **No Unfair Discrimination.**

A chapter 11 plan "does not discriminate unfairly" if (a) the legal rights of a nonaccepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the nonaccepting class, and (b) no class receives payments in excess of that which it is legally entitled to receive for its Claims or Equity Interests. The Debtors and the Committee believe that under the Plan all impaired classes of Claims and Equity Interests are treated in a manner that is consistent with the treatment of other classes of Claims and Equity Interests that are similarly situated, if any, and no class of Claims or Equity Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims and Allowed Equity Interests in such class.   Accordingly, the Debtors and the Committee believe the Plan does not discriminate unfairly as to any impaired class of Claims or Equity Interests.

2.    **Fair and Equitable Test.**

The Bankruptcy Code establishes different "fair and equitable" tests for classes of secured claims, unsecured claims, and equity interests as follows:

a.    ***Secured Claims.***   Either (i) each holder of a claim in an impaired class of secured claims retains its liens securing its secured claim and it receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each holder of a claim in an impaired class of secured claims realizes the indubitable equivalent of its allowed secured claim, or (iii) the property securing the claim is sold free and clear of liens, with such liens to attach to the proceeds and the treatment of such liens on proceeds as provided in clause (i) or (ii) of this subparagraph.

b.    ***Unsecured Claims.***   Either (i) each holder of a claim in an impaired class of unsecured claims receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the chapter 11 plan, subject to the applicability of the judicial doctrine of contributing new value.

c.    ***Equity Interests.***   Either (i) each holder of an equity interest in an impaired class of interests will receive or retain under the chapter 11 plan property of a value equal to the greater of (A) the fixed liquidation preference or redemption price, if any, of such stock or (B) the value of the stock or (ii) the holders of interests that are junior to the stock will not receive any property under the chapter 11 plan, subject to the applicability of the judicial doctrine of contributing new value.

BECAUSE CLASS 6 – EQUITY INTERESTS IS DEEMED TO REJECT THE PLAN, IF CLASS 3 – PREPETITION LENDER CLAIMS, CLASS 4 - UNSECURED CLAIMS, OR CLASS 5 – LIQUIDITY CLAIMS & OPT-OUT CLAIMS ACCEPT THE PLAN, THE

DEBTORS AND THE COMMITTEE WILL SEEK CONFIRMATION OF THE PLAN PURSUANT TO THE CRAMDOWN PROVISIONS OF SECTION 1129(b) OF THE BANKRUPTCY CODE.

**D.      Effect of Confirmation.**

Under section 1141 of the Bankruptcy Code, the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor or equity security holder, whether or not the claim or interest of such creditor or equity security holder is impaired under the plan and whether or not such creditor or equity security holder voted to accept the plan.  Further, after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors and equity security holders, except as otherwise provided in the plan or the confirmation order.

**XI.**

**CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES**

The following discussion is a summary of certain U.S. federal income tax consequences expected to result from the implementation of the Plan.  This discussion is based on the Internal Revenue Code, as in effect on the date of this Disclosure Statement, and on United States Treasury Regulations in effect (or in certain cases, proposed) on the date of this Disclosure Statement, as well as judicial and administrative interpretations thereof available on or before such date.  All of the foregoing are subject to change, which change could apply retroactively and could affect the tax consequences described below.  There can be no assurance that the IRS will not take a contrary view with respect to one or more of the issues discussed below, and no ruling from the IRS has been or will be sought with respect to any issues that may arise under the Plan.

The following summary is for general information only and does not purport to address all of the U.S. federal income tax consequences that may be applicable to any particular holder of an Allowed Claim or Equity Interest.  The tax treatment of a holder of an Allowed Claim or Equity Interest, as the case may be, may vary depending upon such holder's particular situation. The following discussion does not address state, local or foreign tax considerations that may be applicable to the Debtors and holders of an Allowed Claim or Equity Interest.  This summary does not address tax considerations applicable to holders that may be subject to special tax rules, such as financial institutions, insurance companies, real estate investment trusts, regulated investment companies, grantor trusts, dealers or traders in securities or currencies, tax-exempt entities, persons that hold an equity interest or a security in a Debtor as a position in a "straddle" or as part of a "hedging," "conversion" or "integrated" transaction for U.S. federal income tax purposes, persons that have a "functional currency" other than the U.S. dollar, persons who acquired an equity interest or a security in a Debtor in connection with the performance of services, or persons who are not United States persons (as defined in the Internal Revenue Code).

EACH HOLDER OF AN ALLOWED CLAIM OR EQUITY INTEREST IS URGED TO CONSULT ITS OWN TAX ADVISOR WITH RESPECT TO THE U.S. FEDERAL, STATE,

LOCAL AND FOREIGN TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN.

**INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE**

PURSUANT TO INTERNAL REVENUE SERVICE CIRCULAR 230, WE HEREBY INFORM YOU THAT THE DESCRIPTION SET FORTH HEREIN WITH RESPECT TO U.S. FEDERAL TAX ISSUES WAS NOT INTENDED OR WRITTEN TO BE USED, AND SUCH DESCRIPTION CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING ANY PENALTIES THAT MAY BE IMPOSED ON THE TAXPAYER UNDER THE U.S. INTERNAL REVENUE CODE.  THIS DESCRIPTION IS LIMITED TO THE U.S. FEDERAL TAX ISSUES DESCRIBED HEREIN.  IT IS POSSIBLE THAT ADDITIONAL ISSUES MAY EXIST THAT COULD AFFECT THE U.S. FEDERAL TAX TREATMENT OF THE MATTER THAT IS THE SUBJECT OF THE DESCRIPTION NOTED HEREIN, AND THIS DESCRIPTION DOES NOT CONSIDER OR PROVIDE ANY CONCLUSIONS WITH RESPECT TO ANY SUCH ADDITIONAL ISSUES.  THIS DESCRIPTION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN.  TAXPAYERS SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

A.    **U.S. Federal Income Tax Consequences of Receipt of Plan Consideration to Holders of Allowed Claims.**

1.    <u>**General Tax Considerations for Holders of Allowed Claims.**</u>

The U.S. federal income tax consequences of the receipt of Plan consideration to holders of Allowed Claims may vary depending upon, among other things: the type of consideration received by the holder in exchange for its Claim, including the nature of the indebtedness owing to the holder; whether the holder has previously claimed a bad debt or worthless security deduction in respect of such holder's Claim; and whether such Claim constitutes a "security" for purposes of the reorganization provisions of the Internal Revenue Code.

As noted above, the U.S. Federal income tax consequences of the Plan to holders of Allowed Claims will depend, in part, on whether the indebtedness underlying their Claims constitutes securities for purposes of the reorganization provisions of the Internal Revenue Code. Neither the Internal Revenue Code nor the regulations thereunder define the term "securities." The determination of whether a Claim constitutes a "security" depends upon the nature of the indebtedness or obligation.  Important factors to be considered include, among other things, the length of time to maturity, the degree of continuing interest in the issuer, and the purpose of the borrowing.  Generally, corporate debt instruments with maturities when issued of less than five years are not considered securities, and corporate debt instruments with maturities when issued of ten years or more are considered securities.  Claims for accrued interest are generally not considered securities.

In general, to the extent a holder of a debt instrument receives property in satisfaction of interest accrued during the holding period of such instrument, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income).  Conversely, such holder may recognize a deductible loss to the extent that any accrued interest claimed or amortized original issue discount ("OID") was previously included in its gross income and is not paid in full.

2.      **Certain Other Tax Considerations for Holders of Allowed Claims.**

(i)      ***Bad Debt Deduction and Worthless Securities Deduction.***

A holder of an Allowed Claim that is not a security for purposes of section 165(g) of the Internal Revenue Code who receives, pursuant to the Plan, an amount of consideration that is less than such holder's tax basis in the claim in exchange of that claim, may be entitled in the year of receipt (or in an earlier year) to a bad debt deduction under section 166(a) of the Internal Revenue Code, or may be entitled to a loss under section 165(a) of the Internal Revenue Code in the year of receipt.  A holder of stock or securities, the Allowed Claim with respect to which is wholly worthless, may be entitled to a worthless securities deduction under sections 165(g) and 165(a) of the Internal Revenue Code.  The rules governing the timing and amount of such deductions place considerable emphasis on the facts and circumstances of the holder, the obligor, and the instrument with respect to which a deduction is claimed.  Any such loss would be limited to the holder's tax basis in the indebtedness or equity interest underlying its claim.  Holders of Allowed Claims or Equity Interests, therefore, are urged to consult their tax advisors with respect to their ability to claim such deductions.

(ii)      ***Market Discount.***

If a holder of an Allowed Claim purchased the underlying security or debt obligation at a price less than its issue price, the difference would constitute "market discount" for U.S. federal income tax purposes.  Any gain recognized by a holder on the exchange of its Allowed Claim on the Effective Date should be treated as ordinary income to the extent of any market discount accrued on the underlying securities or debt obligation by the holder on or prior to the date of the exchange.  Any additional accrued but unrecognized market discount should carry over to any securities or debt obligation received in a tax-free exchange pursuant to the Plan, and should be allocated among such securities or debt obligation based upon their relative fair market values as of the Effective Date.  Any gain recognized by such holder on a subsequent disposition of such securities or debt obligation received under the Plan may be treated as ordinary income to the extent of such accrued but unrecognized market discount.

3.    **Tax Consequences to Certain Holders of Allowed Claims.**

The following summary describes the material U.S. federal income tax consequences to certain holders of Allowed Claims against the Debtors.  A holder's tax treatment may vary depending on the holder's particular situation.  All holders of Allowed Claims against the Debtors are urged to consult their tax advisors concerning the federal, state, local, and other tax consequences of the Plan.

(i)    ***Class 4 – Unsecured Claims and Class 5 – Liquidity Claims & Opt-Out Unsecured Claims***

Pursuant to the Plan, each holder of an Allowed Class 4 – Unsecured Claim will receive, on the Plan Distribution Date, its Pro Rata Share of the difference between (y) the Available Proceeds; and (z) the Opt-Out Carve Out. *See* "The Chapter 11 Plan – Treatment of Classified Claims and Equity Interests – Class 4 – Unsecured Claims."  Each Holder of an Allowed Class 5 – Opt-Out Unsecured Claim will share the portion of the Available Proceeds that it would have received had it not opted out of such releases ratably with the holders of Liquidity Claims, which claims are estimated to total $39.8 million, in the amount such holder would have received if such holder had not elected to opt out of the Plan's releases.

In general, a holder of an Allowed Unsecured Claim will recognize gain or loss in an amount equal to the difference between (i) the "amount realized" by the holder in satisfaction of its Claim (other than any Claim for accrued but unpaid interest) and (ii) such holder's adjusted tax basis in such Claim (other than any Claim representing accrued but unpaid interest).

As discussed in Section VIII(B)(a), holders will receive a beneficial interest in the Liquidation Trust, entitling them to share in any proceeds from its assets.  However, for federal income tax purposes, because the Liquidation Trust has been structured to qualify as a "grantor trust," each holder of an Allowed Unsecured Claim will be treated as directly receiving, and as a direct owner of, its allocable percentage of the assets of the Liquidation Trust.  Accordingly, each holder should take into account in determining the "amount realized" in respect of its Claim its share of any cash and the fair market value of its undivided interest in the other underlying assets of the Liquidation Trust (subject to any liabilities assumed by the Liquidation Trust to which such assets are subject) as if received and held directly.  As soon as reasonably practicable, the Liquidation Trustee will make a good faith valuation of the assets of the Liquidation Trust, and all parties must consistently use such valuation for all federal income tax purposes.  The valuation will be made available as necessary for tax reporting purposes (on an asset or aggregate basis, as relevant).

Any amount a holder receives following the Effective Date as a distribution in respect of an interest in the Liquidation Trust should *not* be included for federal income tax purposes in the holder's amount realized in respect of its Allowed Claim but should be separately treated as a distribution received in respect of such holder's interest in the Liquidation Trust.  *See* "Tax Treatment of the Liquidation Trust."

Where gain or loss is recognized by a holder in respect of its Allowed Unsecured Claim, the character of such gain or loss (as long-term or short-term capital, or ordinary) will be

determined by a number of factors, including the tax status of the holder, whether the Claim in respect of which any property was received constituted a capital asset in the hands of the holder and how long it had been held, whether such Claim was originally issued at a discount or acquired at a market discount, and whether and to what extent the holder had previously claimed a bad debt deduction in respect of such Claim.

**B.**     **U.S. Federal Income Tax Consequences to Holders of Contested Claims.**

To the extent a Contested Claim is allowed, payments and distributions to the holder of such claim will be made in accordance with the provisions of the Plan governing the class of Allowed Claims to which the respective holder belongs, and will be subject to the same tax consequences that apply to the class of Allowed Claims to which the respective holder belongs.

**C.**     **Tax Treatment of the Liquidation Trust.**

Upon the Effective Date, the Liquidation Trust shall be established for the benefit of holders of Allowed Claims, whether Allowed on or after the Effective Date.

(i)     *Classification of the Liquidation Trust.*

The Liquidation Trust is intended to qualify as a liquidating trust for federal income tax purposes.  In general, a liquidating trust is not a separate taxable entity but rather is treated for federal income tax purposes as a "grantor" trust (i.e., a disregarded entity).

However, merely establishing a liquidating trust does not ensure that it will be treated as a grantor trust for federal income tax purposes.  The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan.  The Liquidating Trust has been structured with the intention of complying with such general criteria.  In conformity with Revenue Procedure 94-45, all parties (including the Liquidating Trustee and holders of Allowed Claims) are required to treat, for federal income tax purposes, the Liquidation Trust as a grantor trust of which the holders are the owners and grantors.  The following discussion assumes that the Liquidation Trust will be so respected for federal income tax purposes.  However, no ruling has been requested from the IRS and no opinion of counsel has been requested concerning the tax status of the Liquidation Trust as a grantor trust.  Accordingly, there can be no assurance that the IRS would not take a contrary position.  Were the IRS to successfully challenge such classification, the federal income tax consequences to the Liquidation Trust and the holders of Allowed Claims could vary from those discussed herein.

(ii)     *General Tax Reporting by the Trust and Beneficiaries.*

For all federal income tax purposes, all parties must treat the transfer of the Debtors' assets to the Liquidation Trust as a transfer of such assets directly to the holders (including the Contested Claims), followed by the transfer of such assets by the holders to the Liquidation Trust.  Consistent therewith, all parties must treat the Liquidation Trust as a grantor trust of which such holders are the owners and grantors.  Thus, such holders (and any subsequent holders of interests in the Liquidation Trust) will be treated as the direct owners of an undivided interest

in the assets of the Liquidation Trust for all federal income tax purposes.  Pursuant to the Plan, as soon as reasonably practicable, the Liquidation Trustee will determine the fair market value of the assets of the Liquidation Trust as of the Effective Date, and all parties, including the holders, must consistently use such valuation for all federal income tax purposes, such as in the determination of gain, loss and tax basis.  The valuation will be made available as necessary for tax reporting purposes (on an asset or aggregate basis, as relevant).

Accordingly, each holder will be required to report on its federal income tax return its allocable share of any income, gain, loss, deduction, or credit recognized or incurred by the Liquidation Trust.  *See* "Allocation of Taxable Income and Loss," below.  The character of items of income, deduction, and credit to any holder and the ability of such holder to benefit from any deductions or losses may depend on the particular situation of such holder.

The federal income tax reporting obligations of a holder are not dependent upon the Liquidation Trust distributing any cash or other proceeds.  Therefore, a holder may incur a federal income tax liability with respect to its allocable share of the income of the Liquidation Trust even if the Liquidation Trust has not made a concurrent distribution to the holder.  In general, a distribution of cash by the Liquidation Trust to a holder will not be taxable to the holder as such holder is regarded for federal income tax purposes as already owning the underlying assets or realizing the income.

The Liquidation Trustee will file with the IRS returns for the Liquidation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a).  The Liquidation Trustee will also send as soon as reasonably practicable to each record holder a separate statement setting forth the information necessary for such holder to determine its share of items of income, gain, loss, deduction, or credit and will instruct the holder to report such items on its federal income tax return or to forward the appropriate information to the beneficial holders with instructions to report such items on their federal income tax returns.  Such items generally would be reported on the holder's state and/or local tax returns in a similar manner.

(iii)     ***Allocation of Taxable Income and Loss.***

The Plan provides that allocations of Liquidation Trust taxable income shall be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (without regard to any restrictions on distributions described herein on in the Plan) if, immediately prior to such deemed distribution, the Liquidation Trustee had distributed all of its other assets (valued for this purpose at their tax book value) to the holders of the Liquidation Trust interests, taking into account all prior and concurrent distributions from the Liquidation Trust.  Similarly, taxable loss of the Liquidation Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining assets of the Liquidation Trust.  The tax book value of the assets of the Liquidation Trust for this purpose will equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the Internal Revenue Code, the regulations and other applicable administrative and judicial authorities and pronouncements.

**D.      Consequences to Pre-Bankruptcy Holders of Equity Interests.**

Pursuant to the Plan, on the Effective Date, all Class 6 – Equity Interests will be canceled, whether surrendered for cancellation or otherwise, and there shall be no distribution to the holders of Class 6 – Equity Interests. Section 165(g) of the Internal Revenue Code allows a "worthless security deduction" for any security that is a capital asset and becomes worthless within the taxable year. Thus, holders of Class 6 – Equity Interests may be entitled to worthless security deductions. The authority governing the timing and amount of a worthless security deduction places considerable emphasis on the facts and circumstances of the holder, the issuer and the instrument with respect to which the deduction is claimed. Holders are therefore urged to consult their tax advisors with respect to their ability to take a worthless security deduction with respect to their Class 6 – Equity Interest.

**THE ABOVE SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY. ALL HOLDERS OF ALLOWED CLAIMS AND EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE U.S. FEDERAL, STATE, LOCAL, OR FOREIGN TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN.**

**XII.**

**ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

The Debtors and the Committee have concluded that the Plan will maximize recoveries of holders of Claims. The following discussion provides a summary of the analysis of the Debtors attached hereto as Schedule 2 supporting their conclusion that a chapter 7 liquidation of the Debtors will not provide higher value to holders of Claims and Equity Interests.

**A.      Liquidation Under Chapter 7 of the Bankruptcy Code.**

If no chapter 11 plan can be confirmed, the Chapter 11 Cases of the Debtors may be converted to a case under chapter 7, in which event a trustee would be elected or appointed to liquidate the properties and interests in property of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code. The Debtors and the Committee believe that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for under the Plan because (i) the Liquidity Parties would assert their $39.8 million in unsecured claims that they conditionally waived under the Liquidity Parties Settlement Agreement, and (ii) the chapter 7 trustee's unfamiliarity with the Debtors, the claims against the Debtors, and these Chapter 11 Cases and its industry would lead to additional costs for the Estate. Accordingly, the Debtors and the Committee have determined that confirmation of the Plan will likely provide each holders of impaired Claims or Equity Interests with at least the same recovery they would receive under a chapter 7 liquidation scenario, and, in certain cases, more.

## XIII.

## CONCLUSION

The Debtors and the Committee believe that the Plan is in the best interest of all holders of Claims, and urge all such holders entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by returning their ballots in accordance with the instructions accompanying the Disclosure Statement.

Dated: July 16, 2014

Respectfully submitted,

**AFTER-PARTY2, INC. (F/K/A EVENT RENTALS, INC.) AND ITS AFFILIATED DEBTORS AND DEBTORS IN POSSESSION**

By: */s/ Andrew Hinkelman*
Name: Andrew Hinkelman
Title:   Chief Restructuring Officer

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR AFTER-PARTY2, INC (F/K/A EVENT RENTALS, INC.)**

By: */s/ Kevin P. Sauntry*
Name: Kevin P. Sauntry
Title: Co-Chair of the Committee

## SCHEDULE 1

## LIST OF DEFINED TERMS

**Terms in this Schedule 1 are defined in the Disclosure Statement at the pages indicated below.**[1]

2010 Liquidity Notes ...................................................................................................12
2010 NPA ...................................................................................................................12
2011 Liquidity Notes ...................................................................................................12
2011 NPA ...................................................................................................................12
Acceptable Plan ..........................................................................................................19
Acquisition Loans .......................................................................................................12
Additional Liquidity Notes .........................................................................................13
Amended Liquidity Notes ...........................................................................................12
Advances ....................................................................................................................12
Apollo .........................................................................................................................18
Back-Up Bid ...............................................................................................................18
Back-Up Bidder ..........................................................................................................15
Bankruptcy Court ..........................................................................................................1
Bankruptcy Rules ..........................................................................................................2
Buyer ............................................................................................................................6
Cancelled Liquidity Notes ..........................................................................................13
Challenge Period .........................................................................................................17
Chapter 11 Cases ...........................................................................................................4
Claims Agent ................................................................................................................3
Committee .....................................................................................................................1
Confirmation Hearing ....................................................................................................3
Credit Agreement Parties ............................................................................................11
Debtors ..........................................................................................................................1
DIP Agent ...................................................................................................................15
DIP Facility ................................................................................................................15
DIP Lenders ................................................................................................................15
Disclosure Statement .....................................................................................................1
Disclosure Statement Order ...........................................................................................1
Event Rentals ..............................................................................................................11
Exclusive Periods ..........................................................................................................4
Filing Period ..................................................................................................................4
Final DIP Order ..........................................................................................................17
First Amendment .........................................................................................................12
FTI ..............................................................................................................................16
Jefferies ......................................................................................................................15
JPM .............................................................................................................................12

---

[1] Certain terms listed on this Schedule 1 may also appear as defined terms in Section 1.1 of the Plan. To the extent there is a conflict between how such terms are defined in the Disclosure Statement and how such terms are defined in the Plan, the Plan shall control.

Liquidity Claims .................................................................................................................32
Liquidity Notes ..................................................................................................................12
Liquidity Parties................................................................................................................12
Litigation Claims ..............................................................................................................19
Motion to Extend Exclusivity ............................................................................................4
OID ...................................................................................................................................37
Petition Date.......................................................................................................................4
Plan ....................................................................................................................................1
Plan Releases ....................................................................................................................19
Prepetition Agent ..............................................................................................................11
Prepetition Credit Facility.................................................................................................11
Prepetition Lenders ...........................................................................................................11
Prepetition Lender Claims ................................................................................................17
Quad-C ..............................................................................................................................12
Quad-C Partners ................................................................................................................12
Quad-C Principals .............................................................................................................12
Restated 2010 NPA ...........................................................................................................13
Revolver ............................................................................................................................12
Revolver Maturity Date ....................................................................................................12
SAC ...................................................................................................................................12
SAC Domestic ...................................................................................................................12
SAC Offshore....................................................................................................................12
Sale......................................................................................................................................4
Sale Closing Date..............................................................................................................18
Sale Order .........................................................................................................................18
SEC .....................................................................................................................................2
Secured Maturity Dates.....................................................................................................12
Seller Notes.......................................................................................................................13
Solicitation Agent ...............................................................................................................3
Solicitation Period...............................................................................................................4
Special Event ....................................................................................................................13
Stalking Horse Asset Purchase Agreement.......................................................................15
Stalking Horse Bidder.......................................................................................................15
Successful Bid ...................................................................................................................18
Term and Acquisition Maturity Date ................................................................................12
Term Loans .......................................................................................................................12
Voting Deadline ..................................................................................................................1
Wind-Down Letter Agreement .........................................................................................20

**SCHEDULE 2**

**CHAPTER 7 LIQUIDATION ANALYSIS**

**Schedule 2**
*Chapter 7 Liquidation Analysis*

| $ in thousands | Claim Amount | | | Recovery Value | | | Recovery Percentage | | |
|---|---|---|---|---|---|---|---|---|---|
| | Chapter 7 Liquidation | Chapter 11 Low | Chapter 11 High | Chapter 7 Liquidation | Chapter 11 Low | Chapter 11 High | Chapter 7 Liquidation | Chapter 11 Low | Chapter 11 High |
| Cash Available for Distribution | | | | $ 10,985 | $ 10,985 | $ 10,985 | | | |
| | | | | | | | | | |
| Administrative Claims/Costs | | | | | | | | | |
| Chapter 7 Trustee Fees[1] | 353 | - | - | $ 353 | $ - | $ - | 100.0% | n/a | n/a |
| Chapter 7 Trustee Professionals[1] | 500 | - | - | 500 | - | - | 100.0% | n/a | n/a |
| KEIP / KERP Costs[2] | 1,129 | 1,129 | 1,129 | 1,129 | 1,129 | 1,129 | 100.0% | 100.0% | 100.0% |
| A&G Realty Partners[2] | 500 | 500 | 500 | 500 | 500 | 500 | 100.0% | 100.0% | 100.0% |
| Wind-Down Costs | 700 | 700 | 700 | 700 | 700 | 700 | 100.0% | 100.0% | 100.0% |
| Chapter 11 Professional & Court Fees | 6,928 | 6,928 | 6,928 | 6,928 | 6,928 | 6,928 | 100.0% | 100.0% | 100.0% |
| Cash Available to Secured/Priority Creditors | | | | $ 875 | $ 1,728 | $ 1,728 | | | |
| | | | | | | | | | |
| Secured and Priority Claims | | | | | | | | | |
| Non-Lender Secured Claims[3] | 512 | 512 | 512 | $ 512 | $ 512 | $ 512 | 100.0% | 100.0% | 100.0% |
| Disputed Sales Tax Claims[4] | 915 | 610 | 610 | 363 | 610 | 610 | 39.7% | 100.0% | 100.0% |
| Cash Available to Unsecured Creditors | | | | $ - | $ 606 | $ 606 | | | |
| | | | | | | | | | |
| Unsecured Claims | | | | | | | | | |
| Pre-Petition Lender Deficiency Claims[5] | 69,269 | - | - | $ - | $ - | $ - | 0.0% | n/a | n/a |
| Liquidity Claims[5] | 39,835 | - | - | - | - | - | 0.0% | n/a | n/a |
| General Unsecured Claims[6] | 77,753 | 77,753 | 35,556 | - | 583 | 558 | 0.0% | 0.8% | 1.6% |
| 502(b)(6) Claims[6] | 3,068 | 3,068 | 3,068 | - | 23 | 48 | 0.0% | 0.8% | 1.6% |
| Cash Available to Equity Holders | | | | $ - | $ - | $ - | | | |

[1] In a Chapter 7 scenario, these fees and expenses would have priority over any costs incurred during the Chapter 11 process.

[2] Any funds budgeted for KEIP / KERP Costs and A&G Realty Partners in excess of actual claim amounts are to be remitted to DIP Agent per the Final DIP Order [D.I. 277].

[3] Any funds budgeted for Non-Lender Secured Claims in excess of actual claim amounts are to be remitted to DIP Agent per the Wind-Down Letter Agreement [D.I. 533].

[4] Assumes that in a Chapter 7 scenario, certain Disputed Sales Tax Claims are reduced through ongoing negotiations.

[5] Per the Secured Facilities Settlement Agreement [D.I. 314], Pre-Petition Lenders and Liquidity Parties have agreed to waive unsecured claims under the Chapter 11 plan.

[6] Per the Secured Facilities Settlement Agreement [D.I. 314], unsecured creditors will receive $606,250 under the Plan to settle all outstanding claims.

**SCHEDULE 3**

**CLOSING FUNDS FLOW SUMMARY**

**Schedule 3**
*Closing Funds Flow Summary*

| Description | Payor | Payee | Estimated Amount |
|---|---|---|---|
| Asset Sale Proceeds | Apollo | Ableco | $119,037,500 |
| Purchase Price Deposit | White & Case | Ableco | $6,212,500 |
| Funding of CPR Wind-Down | Ableco | After-Party2, Inc. | ($10,379,228) |
| Payment to UCC (Available Proceeds) | Ableco | UCC | ($606,250) |
| Net Amount Retained By Prepetition Lenders | | | $114,264,522 |

# SCHEDULE 4

# BUYER PAY CLAIMS[1]

| Date Filed | Claim Number | Claimant | Claim Amount | Nature |
|---|---|---|---|---|
| 03/04/2014 | 31 | Piedmont Natural Gas Company | $8,253.92 | 503(b)(9) Claim |
| 03/04/2014 | 31 | Piedmont Natural Gas Company | $1,781.90 | 503(b)(9) Claim |
| 03/10/2014 | 52 | Cardlock Fuels System, Inc., a California Corporation | $3,848.20 | 503(b)(9) Claim |
| 03/10/2014 | 52 | Cardlock Fuels System, Inc., a California Corporation | $4,911.05 | 503(b)(9) Claim |
| 03/11/2014 | 59 | Cardlock Fuels System, Inc., a California Corporation | $3,848.20 | 503(b)(9) Claim |
| 03/11/2014 | 59 | Cardlock Fuels System, Inc., a California Corporation | $4,911.05 | 503(b)(9) Claim |
| 03/21/2014 | 95 | AZTEC TENTS | $180,210.21 | 503(b)(9) Claim |
| 03/21/2014 | 96 | Leeber Limited USA | $443.00 | 503(b)(9) Claim |
| 03/24/2014 | 99 | Liba Fabrics Corp. | $687.30 | 503(b)(9) Claim |
| 03/24/2014 | 99 | Liba Fabrics Corp. | $7,765.80 | 503(b)(9) Claim |
| 03/27/2014 | 127 | Pacific States Petroleum, Inc. | $17,888.74 | 503(b)(9) Claim |
| 03/28/2014 | 130 | Neal Distributors, Inc. | $4,616.92 | 503(b)(9) Claim |
| 03/28/2014 | 131 | Neal Distributors, Inc. | $4,616.92 | 503(b)(9) Claim |
| 03/28/2014 | 132 | Neal Distributors, Inc. | $4,616.92 | 503(b)(9) Claim |
| 03/28/2014 | 133 | Neal Distributors, Inc. | $4,616.92 | 503(b)(9) Claim |
| 03/28/2014 | 134 | Neal Distributors, Inc. | $4,616.92 | 503(b)(9) Claim |

---

[1] The inclusion of a Claim on Schedule 4 shall not constitute an admission by the Debtor or the Buyer as to the characterization of whether any such claim is or is not a Buyer Pay Claim, nor does it mean that the Claim will be treated as a Buyer Pay Claim under the Plan. The Debtors and Buyer reserve all rights with respect to the characterization and objection to any such claims and the substantive provisions of the APA and the procedural provision of the Plan will control the determination of whether a Claim is ultimately determined to be an allowed Buyer Pay Claim.

| Date Filed | Claim Number | Claimant | Claim Amount | Nature |
|---|---|---|---|---|
| 03/28/2014 | 135 | Neal Distributors, Inc. | $4,616.92 | 503(b)(9) Claim |
| 03/28/2014 | 136 | Neal Distributors, Inc. | $4,616.92 | 503(b)(9) Claim |
| 03/28/2014 | 137 | Neal Distributors, Inc. | $4,616.92 | 503(b)(9) Claim |
| 03/28/2014 | 138 | Neal Distributors, Inc. | $4,616.92 | 503(b)(9) Claim |
| 03/28/2014 | 139 | Neal Distributors, Inc. | $4,616.92 | 503(b)(9) Claim |
| 03/28/2014 | 140 | Neal Distributors, Inc. | $4,616.92 | 503(b)(9) Claim |
| 03/28/2014 | 141 | Neal Distributors, Inc. | $4,616.92 | 503(b)(9) Claim |
| 03/28/2014 | 142 | Neal Distributors, Inc. | $4,616.92 | 503(b)(9) Claim |
| 03/28/2014 | 144 | LIGHT SOURCE | $445.21 | 503(b)(9) Claim |
| 03/28/2014 | 149 | PARTY TIME TENTS | $5,750.00 | 503(b)(9) Claim |
| 03/31/2014 | 155 | MEADOWBROOK HARDWARE | $109.09 | 503(b)(9) Claim |
| 04/01/2014 | 158 | Petromex, Inc. | $8,889.25 | 503(b)(9) Claim |
| 04/01/2014 | 158 | Petromex, Inc. | $21,424.45 | 503(b)(9) Claim |
| 04/03/2014 | 173 | Desert Fire Extinguisher Co., Inc | $2,203.20 | 503(b)(9) Claim |
| 04/07/2014 | 178 | IMDC, Inc d/b/a 10 Strawberry Street | $2,757.13 | 503(b)(9) Claim |
| 04/07/2014 | 181 | ACORN GAS COMPANY | $4,924.61 | 503(b)(9) Claim |
| 04/07/2014 | 182 | RSS Distributors | $564.73 | 503(b)(9) Claim |
| 04/07/2014 | 184 | IMDC, Inc. d/b/a 10 Strawberry Street | $379.90 | 503(b)(9) Claim |
| 04/07/2014 | 185 | IMDC, Inc d/b/a 10 Strawberry Street | $1,435.91 | 503(b)(9) Claim |
| 04/07/2014 | 186 | Supreme Oil Co | $75,000.13 | 503(b)(9) Claim |
| 04/07/2014 | 189 | Temp Power Inc | $1,620.00 | 503(b)(9) Claim |
| 04/07/2014 | 190 | Temp Power Inc | $932.00 | 503(b)(9) Claim |
| 04/08/2014 | 192 | LAUNDRY & CLEANERS SUPPLY, INC. | $2,920.49 | 503(b)(9) Claim |
| 04/08/2014 | 192 | LAUNDRY & CLEANERS SUPPLY, INC. | $0.00 | 503(b)(9) Claim |
| 04/08/2014 | 193 | IMDC, Inc d/b/a 10 Strawberry Street | $63,248.37 | 503(b)(9) Claim |
| 04/10/2014 | 199 | Work Wear Safety Shoes | UNLIQUIDATED | 503(b)(9) Claim |
| 04/10/2014 | 200 | Office Depot, Inc. | $1,804.53 | 503(b)(9) Claim |
| 04/11/2014 | 201 | Coquitlam Industrial Intl Corp. | $43,597.00 | 503(b)(9) Claim |

| Date Filed | Claim Number | Claimant | Claim Amount | Nature |
|---|---|---|---|---|
| 04/11/2014 | 203 | COQUITLAM INDUSTRIAL INTL CORP. | $41,899.20 | 503(b)(9) Claim |
| 04/14/2014 | 208 | CCI Group LLC | $3,334.00 | 503(b)(9) Claim |
| 04/15/2014 | 216 | ZAL INDUSTRIAL | $350.76 | 503(b)(9) Claim |
| 04/15/2014 | 217 | GBS Linens | $21,890.67 | 503(b)(9) Claim |
| 04/15/2014 | 222 | Argo Partners | $53,295.00 | 503(b)(9) Claim |
| 04/15/2014 | 222 | Trinity Logistics, Inc. | $28,555.00 | 503(b)(9) Claim |
| 04/15/2014 | 224 | ZAL INDUSTRIAL | $1,725.02 | 503(b)(9) Claim |
| 04/15/2014 | 225 | ZAL INDUSTRIAL | $1,904.48 | 503(b)(9) Claim |
| 04/15/2014 | 225 | ZAL INDUSTRIAL | $0.00 | 503(b)(9) Claim |
| 04/17/2014 | 241 | SCANA Energy Marketing, Inc. d/b/a SCANA Energy | $3,299.73 | 503(b)(9) Claim |
| 04/17/2014 | 241 | SCANA Energy Marketing, Inc. d/b/a SCANA Energy | $7,903.91 | 503(b)(9) Claim |
| 04/17/2014 | 242 | Public Service Company of North Carolina, Inc. d/b/a PSNC Energy | $906.70 | 503(b)(9) Claim |
| 04/17/2014 | 242 | Public Service Company of North Carolina, Inc. d/b/a PSNC Energy | $2,144.02 | 503(b)(9) Claim |
| 04/18/2014 | 243 | Ryder Truck Rental, Inc. | $10,492.77 | 503(b)(9) Claim |
| 04/18/2014 | 245 | Sierra Liquidity Fund, LLC Assignee & Att-In-Fact for Millennium Steel & Rack - Assignor | $720.00 | 503(b)(9) Claim |
| 04/18/2014 | 246 | Sierra Liquidity Fund, LLC Assignee & Att-In-Fact for Surfas, Inc. - Assignor | $8,954.91 | 503(b)(9) Claim |
| 04/18/2014 | 253 | Jomar Table Linens, Inc. | $2,450.11 | 503(b)(9) Claim |
| 04/21/2014 | 255 | T.C. Transportation | $211.81 | 503(b)(9) Claim |
| 04/21/2014 | 257 | Ontario Refrigeration Service, Inc. | $808.38 | 503(b)(9) Claim |
| 04/21/2014 | 258 | Jomar Table Linens, Inc. | $16,144.91 | 503(b)(9) Claim |
| 04/21/2014 | 259 | Jimmys Permit Services | $19,922.36 | 503(b)(9) Claim |

| Date Filed | Claim Number | Claimant | Claim Amount | Nature |
|---|---|---|---|---|
| 04/21/2014 | 261 | Argo Partners | $3,046.74 | 503(b)(9) Claim |
| 04/21/2014 | 262 | Wholesale Tape & Supply Co. | $13,488.45 | 503(b)(9) Claim |
| 04/22/2014 | 264 | American Turf and Carpet, LLC | $64,796.03 | 503(b)(9) Claim |
| 04/22/2014 | 265 | PS Furniture, Inc | $18,536.74 | 503(b)(9) Claim |
| 04/23/2014 | 269 | Enterprise Rent-A-Truck | $169,155.84 | 503(b)(9) Claim |
| 04/23/2014 | 270 | MTY Enterprises LLC | $11,880.00 | 503(b)(9) Claim |
| 04/23/2014 | 271 | MTY Enterprises LLC | $6,107.50 | 503(b)(9) Claim |
| 04/23/2014 | 272 | MTY Enterprises LLC | $10,000.00 | 503(b)(9) Claim |
| 04/23/2014 | 274 | MTY Enterprises LLC | $34,470.00 | 503(b)(9) Claim |
| 04/23/2014 | 275 | MTY Enterprises LLC | $24,600.00 | 503(b)(9) Claim |
| 04/24/2014 | 278 | Sacramento Municipal Utility District | $3,227.45 | 503(b)(9) Claim |
| 04/24/2014 | 283 | Ecolab Inc | $1,601.17 | 503(b)(9) Claim |
| 04/24/2014 | 284 | Ecolab Inc | $13,390.16 | 503(b)(9) Claim |
| 04/24/2014 | 285 | Designer 8 Event Furniture Rental, Inc. | $115,138.20 | 503(b)(9) Claim |
| 04/24/2014 | 286 | Designer 8 Event Furniture Rental, Inc. | $23,239.42 | 503(b)(9) Claim |
| 04/24/2014 | 287 | Carrol Independent Fuel LLC | $5,338.97 | 503(b)(9) Claim |
| 04/25/2014 | 290 | Claims Recovery Group LLC | $1,606.02 | 503(b)(9) Claim |
| 04/25/2014 | 290 | J.A. FULMER & SON HARDWARE INC. | $7,374.59 | 503(b)(9) Claim |
| 04/25/2014 | 291 | Claims Recovery Group LLC | $1,413.46 | 503(b)(9) Claim |
| 04/25/2014 | 291 | KEEP CLEAN PRODUCTS, INC. | $1,309.84 | 503(b)(9) Claim |
| 04/25/2014 | 292 | Claims Recovery Group LLC | $14,117.96 | 503(b)(9) Claim |
| 04/25/2014 | 292 | International Acetex, Inc. | $1,857.91 | 503(b)(9) Claim |
| 04/25/2014 | 293 | CENTRAL SANITARY SUPPLY | $565.46 | 503(b)(9) Claim |
| 04/25/2014 | 293 | Claims Recovery Group LLC | $991.89 | 503(b)(9) Claim |

| Date Filed | Claim Number | Claimant | Claim Amount | Nature |
|---|---|---|---|---|
| 04/25/2014 | 294 | CDS OFFICE PRODUCTS | $887.25 | 503(b)(9) Claim |
| 04/25/2014 | 294 | Claims Recovery Group LLC | $376.74 | 503(b)(9) Claim |
| 04/25/2014 | 295 | Claims Recovery Group LLC | $1,214.60 | 503(b)(9) Claim |
| 04/25/2014 | 295 | Sals Propane Inc | $2,838.95 | 503(b)(9) Claim |
| 04/25/2014 | 297 | Claims Recovery Group LLC (As Assignee of Vestco Food Equipment) | $484.77 | 503(b)(9) Claim |
| 04/25/2014 | 298 | Claims Recovery Group LLC (As Assignee of Southwestern Bag Company) | $6,636.79 | 503(b)(9) Claim |
| 04/25/2014 | 299 | Claims Recovery Group LLC (As Assignee of Merles Automotive Supply) | $1,107.36 | 503(b)(9) Claim |
| 04/25/2014 | 300 | Claims Recovery Group LLC (As Assignee of Security Fire Protection) | $598.50 | 503(b)(9) Claim |
| 04/25/2014 | 301 | Claims Recovery Group LLC (As Assignee of Munro Fastenings & Textiles Inc) | $3,975.00 | 503(b)(9) Claim |
| 04/25/2014 | 302 | Claims Recovery Group LLC (As Assignee of CDS Office Products) | $376.74 | 503(b)(9) Claim |
| 04/25/2014 | 303 | Claims Recovery Group LLC (As Assignee of A-1 Products) | $231.79 | 503(b)(9) Claim |
| 04/25/2014 | 304 | Claims Recovery Group LLC (As Assignee of Miramar Fire Equipment) | $424.43 | 503(b)(9) Claim |
| 04/25/2014 | 305 | Claims Recovery Group LLC (As Assignee of California Combining) | $14,429.35 | 503(b)(9) Claim |
| 04/25/2014 | 306 | Claims Recovery Group LLC (As Assignee of Keep Clean Products, Inc) | $1,413.46 | 503(b)(9) Claim |

| Date Filed | Claim Number | Claimant | Claim Amount | Nature |
|---|---|---|---|---|
| 04/25/2014 | 307 | Claims Recovery Group LLC (As Assignee of J.A. Fulmer & Son Hardware Inc) | $1,606.02 | 503(b)(9) Claim |
| 04/25/2014 | 308 | Claims Recovery Group LLC | $6,636.79 | 503(b)(9) Claim |
| 04/25/2014 | 308 | SOUTHWESTERN BAG COMPANY | $10,573.29 | 503(b)(9) Claim |
| 04/25/2014 | 309 | Claims Recovery Group LLC | $484.77 | 503(b)(9) Claim |
| 04/25/2014 | 309 | VESTCO FOOD EQUIPMENT | $7,027.72 | 503(b)(9) Claim |
| 04/25/2014 | 310 | Claims Recovery Group LLC (As Assignee of International Acetex Inc.) | $14,117.96 | 503(b)(9) Claim |
| 04/25/2014 | 311 | Claims Recovery Group LLC (As Assignee of Central Sanitary Supply) | $991.89 | 503(b)(9) Claim |
| 04/25/2014 | 312 | Claims Recovery Group LLC | $598.50 | 503(b)(9) Claim |
| 04/25/2014 | 312 | SECURITY FIRE PROTECTION | $765.00 | 503(b)(9) Claim |
| 04/25/2014 | 313 | Avcogas Propane Sales & Services | $1,673.72 | 503(b)(9) Claim |
| 04/25/2014 | 314 | Claims Recovery Group LLC (As Assignee of Sals Propane Inc.) | $1,214.60 | 503(b)(9) Claim |
| 04/25/2014 | 315 | Claims Recovery Group LLC | $424.43 | 503(b)(9) Claim |
| 04/25/2014 | 315 | MIRAMAR FIRE EQUIPMENT | $597.00 | 503(b)(9) Claim |
| 04/25/2014 | 316 | Claims Recovery Group LLC | $1,107.36 | 503(b)(9) Claim |
| 04/25/2014 | 316 | Merles Automotive Supply | $1,260.36 | 503(b)(9) Claim |
| 04/25/2014 | 320 | Sierra Liquidity Fund, LLC Assignee & Att-In-Fact for H & R Fabrics-Assignor | $216.70 | 503(b)(9) Claim |
| 04/25/2014 | 321 | PALO VERDE COMPANIES | $307.80 | 503(b)(9) Claim |
| 04/25/2014 | 322 | Sierra Liquidity Fund, LLC Assignee & Att-In-Fact for Palo Verde Companies-Assignor | $1,022.36 | 503(b)(9) Claim |

| Date Filed | Claim Number | Claimant | Claim Amount | Nature |
|---|---|---|---|---|
| 04/25/2014 | 323 | Sierra Liquidity Fund, LLC Assignee & Att-In-Fact for Georgia Expo-Assignor | $4,596.55 | 503(b)(9) Claim |
| 04/25/2014 | 324 | PVC Tech Corp | $8,991.19 | 503(b)(9) Claim |
| 04/28/2014 | 325 | Cushman & Wakefield of California, Inc. | $86,636.23 | 503(b)(9) Claim |
| 04/28/2014 | 334 | Motion Industries | $155.45 | 503(b)(9) Claim |
| 04/29/2014 | 339 | Shi International Corp | $29,883.14 | 503(b)(9) Claim |
| 05/08/2014 | 457 | MTY ENTERPRISES, LLC | $2,720.00 | 503(b)(9) Claim |
| 05/12/2014 | 478 | Performance Contracting, Inc. | $1,850.00 | 503(b)(9) Claim |
| 05/13/2014 | 503 | EDWARD DON & COMPANY | $3,954.35 | 503(b)(9) Claim |
| 05/13/2014 | 503 | EDWARD DON & COMPANY | $8,537.67 | 503(b)(9) Claim |
| 05/14/2014 | 510 | Fastenal Company | $20,479.18 | 503(b)(9) Claim |
| 05/27/2014 | 658 | G3 Tapes | $3,050.92 | 503(b)(9) Claim |
| 05/5/2014 | 402 | Southern Counties Oil Co.dba SC Fuels | $3,848.20 | 503(b)(9) Claim |
| 03/25/2014 | 121 | Karen's Party Supplies | $40,180.00 | 503(b)(9) Claim |
| 02/19/2014 | 116 | Mansfield Oil Co. of Gainsville, Inc | $33,780.82 | 503(b)(9) Claim |
| 05/14/2014 | 510 | Fastenal Company | $20,479.18 | 503(b)(9) Claim |
| 05/01/2014 | 372 | Toyotalift of Arizona, Inc. | $1,572.85 | 503(b)(9) Claim |
| 05/01/2014 | 373 | Toyotalift of Arizona, Inc. | $4,559.70 | 503(b)(9) Claim |
| 05/01/2014 | 402 | Southern Counties Oil Co. dba SC Fuels | $3,848.20 | 503(b)(9) Claim |
| 02/21/2014 | 2 | Wildflower Linen, Inc. | $6,516.17 | 503(b)(9) Claim |
| 03/28/2014 | 146 | Los Angeles County Treasurer and Tax Collector | $31,655.49 | Post Petition Priority Tax Claims |
| 04/14/2014 | 209 | Tennessee Dept. of Revenue | $8,442.06 | Post Petition Priority Tax Claim |
| 04/14/2014 | 210 | Tennessee Dept. of Revenue | $6,949.65 | Post Petition Priority Tax Claim |
| 04/14/2014 | 212 | Tennessee Dept. of Revenue | $58,893.54 | Post Petition Priority Tax Claim |

| Date Filed | Claim Number | Claimant | Claim Amount | Nature |
|---|---|---|---|---|
| 04/14/2014 | 213 | Tennessee Dept. of Revenue | $952.60 | Post Petition Tax Claim |
| 04/21/2014 | 279 | Illinois Dept. of Employment Security | $51,076.94 | Post Petition Priority Tax Claim |
| 05/01/2014 | 371 | State of Utah | $379.40 | Post Petition Priority Tax Claim |
| 04/09/2014 | 194 | County of Orange | $5,751.58 | Post Petition Priority Tax Claim |
| 05/16/2014 | 528 | Franchise Tax Board | $822.02 | Post Petition Priority Tax Claim |
| 05/16/2014 | 529 | Franchise Tax Board | $822.02 | Post Petition Priority Tax Claim |
| 05/16/2014 | 530 | Franchise Tax Board | $822.02 | Post Petition Priority Tax Claim |
| 05/16/2014 | 531 | Franchise Tax Board | $822.02 | Post Petition Priority Tax Claim |
| 05/19/2014 | 559 | County of Loudoun, Virginia | $4,814.09 | Post Petition Priority Tax Claim |
| 05/07/2014 | 452 | Austin Edward Hills 2004 Trust & Justin Hills | $6,875.00 | Lease Cure Payment |
| | Scheduled | Buellton Industrial Partners, LLC | $12,378.00 | Lease Cure Payment |
| | Scheduled | CRI Properties, LLC | $48,380.89 | Lease Cure Payment |
| 05/23/2014 | 612 | DCT Rollins Road LLC | $70,059.19 | Lease Cure Payment |
| | Scheduled | Freight Master, LLC | $9,175.26 | Lease Cure Payment |
| | Scheduled | KTR ILL VI LLC | $62,712.57 | Lease Cure Payment |
| | Scheduled | LIT PC, L.P. | $11,878.50 | Lease Cure Payment |
| 05/02/2014 | 387 | NAPA Airport Center LLC | $33,028.93 | Lease Cure Payment |
| | Scheduled | North Market Center LP | $16,352.22 | Lease Cure Payment |
| | Scheduled | Ross N. Condit dba Condit Properties | $26,617.04 | Lease Cure Payment |
| | Scheduled | SFRH Charlotte Flip, LLC | $11,020.48 | Lease Cure Payment |
| 05/17/2014 | 517 | Summit Holladay Partners | $29,372.79 | Lease Cure Payment |
| | Scheduled | The Evans Living Trust, Metroplex Ventures, LLC | $27,868.93 | Lease Cure Payment |
| | Scheduled | Trem Commercial Rentals, LLC | $11,500.00 | Lease Cure Payment |
| | Scheduled | Whitney H. Ingersoll, Christian A. Heimlich and Leon Murphy | $3,220.00 | Lease Cure Payment |

| Date Filed | Claim Number | Claimant | Claim Amount | Nature |
|---|---|---|---|---|
| 4/30/2014 | 354 | Prosperity Funding, Inc. | $41,777.64 | Assumed Agreement |
| 05/21/2014 | 572 | Premium Assignment Corporation | $969,567.16 | Assumed Agreement |